**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

**DOCKET NO. 26-11603-E**

**RYAN PASLEY,**

PLAINTIFF-APPELLANT,

v.

**MERCEDES-BENZ U.S. INTERNATIONAL, INC.,**

DEFENDANT-APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA, WESTERN DIVISION
NO. 7:24-CV-01050-EGL

**BRIEF OF APPELLANT RYAN PASLEY**

COUNSEL FOR APPELLANT:

Leslie A. Palmer
PALMER LAW, LLC
2 North 20th Street, Suite 900
Birmingham, Alabama 35203
(205) 285-3050
leslie@palmerlegalservices.com

Pasley v. Mercedes-Benz U.S. International, Inc., No. 26-11603-E

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Plaintiff-Appellant Ryan Pasley certifies that the following persons and entities have or may have an interest in the outcome of this appeal:

Axon, Hon. Annemarie Carney - United States District Judge, Northern District of Alabama (previously assigned)

Barnello, Joseph, Jr. - Counsel for Defendant-Appellee

Burr & Forman LLP - Law Firm of Counsel for Defendant-Appellee

LaCour, Hon. Edmund G., Jr. - United States District Judge, Northern District of Alabama

Lucas, Michael L. - Counsel for Defendant-Appellee

Mercedes-Benz U.S. International, Inc. - Defendant-Appellee

Palmer, Leslie A. - Counsel for Plaintiff-Appellant

Palmer Law, LLC - Law Firm of Counsel for Plaintiff-Appellant

Pasley, Ryan D. - Plaintiff-Appellant

/s/ Leslie A. Palmer
Leslie A. Palmer
*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Ryan Pasley, requests oral argument. District courts within the Eleventh Circuit are continually applying outdated legal principles in analyzing cases at summary judgment. This appeal presents a number of these issues, giving this Court the ability to address multiple errors in one review, including administrative exhaustion, statutory burdens under the ADA, and the application of *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) and *Ismael v. Roundtree*, 161 F.4th 752 (11th Cir. 2025) on summary judgment motions.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....................1

STATEMENT REGARDING ORAL ARGUMENT .................... I

TABLE OF CONTENTS .................... II

TABLE OF CITATIONS .................... V

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION VII

STATEMENT OF THE ISSUES .................... 1

STATEMENT OF THE CASE .................... 1

A. Nature of the Case .................... 1

B. Course of Proceedings and Disposition Below .................... 2

C. Statement of the Facts .................... 3

1. Pasley, his service-connected PTSD, and the CMM shop. .................... 3

2. The undisclosed "develop at the same level" rating. .................... 4

3. The 2023 promotion, Pasley's complaint, and the reopened process. .................... 5

4. The transfer to B Shift .................... 6

5. The request to return, the condition, and the June 22 email. .................... 8

6. The white candidates' ratings are cured, and both are promoted. .................... 10

7. Pasley’s Leave, December 2023 evaluation, and continued scrutiny. .................... 10

8. The EEOC charge. .................... 13

STANDARD OF REVIEW .................... 15

SUMMARY OF THE ARGUMENT .................... 15

ARGUMENT .................... 17

I. The District Court erred by excluding Pasley’s disability claims as not timely filed with the EEOC. .................... 17

a. Pasley’s EEOC Charge and Amendment satisfied the claim-processing requirements of the ADA .................... 17

b. The scope of an EEOC investigation would (and did) reach Pasley’s disability claim. Pasley's charge described the very events on which his ADA claims rest .................... 21

c. The EEOC actually treated the charge as alleging ADA claims, and MBUSI answered them on the merits .................... 24

d. At a minimum, retaliation that followed the charge needed no separate exhaustion. ....26

II. The district court narrowly construed the definition of disability, discarding the episodic nature of mental-health disorders and the supporting evidence. ....26

a. After the 2008 amendments, "disability" is construed broadly and episodic conditions are covered. ....27

i. The record would permit a jury to find that Pasley is disabled. ....28

ii. The district court's finding ignores the plain text of the statute. ....29

b. The ADA's anti-retaliation provision does not require proof of disability. ....33

III. The District Court's multiple errors require a remand of Pasley's race discrimination claim. ....34

a. The district court excluded key adverse actions under an incorrect legal standard ....35

b. The district court excluded an evaluation under an incorrect comparator analysis. ....38

i. A plaintiff is not required to show comparators as an element of his case. ....39

ii. McRee was similarly situated in all material respects with regard to the Coffin rating. ....39

iii. The district court's reliance on Stone's "develop at the same level" evaluation ignores the rest of the story ....42

c. Viewed as a whole, the evidence would permit a reasonable juror to infer race discrimination. ....43

i. The decisionmaker's own explanation. ....44

ii. Concealment and selective correction. ....45

iii. The grooming of the white candidate. ....45

iv. The departure from seniority practice ....45

v. The transfer and the swap. ....46

vi. Singling out. ....46

vii. Pretext. ....47

viii. The outcome. ....48

ix. The inferential story ........ 48

IV. The District Court Erred in Granting Summary Judgment on Pasley's Race Retaliation Claims. ........ 49

a. The district court never reviewed Pasley’s race retaliation claims as a body of circumstantial evidence. ........ 49

b. The record would permit a jury to infer that Lackner knew of the charge. ........ 50

c. Lackner's own evaluation contradicts his stated reason for downgrading in December of 2023. ........ 51

d. The district court diminished the adverse actions by evaluating them piecemeal. ........ 52

CONCLUSION ........ 53

CERTIFICATE OF COMPLIANCE ........ 54

CERTIFICATE OF SERVICE ........ 54

# TABLE OF CITATIONS

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 33

*Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167 (11th Cir. 1988) ........ 26

*Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018) ........ 15, 17

*Berry v. Crestwood Healthcare LP*, 84 F.4th 1300 (11th Cir. 2023) ........ 50

*Bonner v Cit of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ........ 19

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ........ 37, 39, 52

*Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997) ........ 47

*EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984) ........ 24

*Fed. Express Corp. v. Holowecki*, 552 U.S. 389 (2008) ........ 19

*Fort Bend County v. Davis*, 587 U.S. 541 (2019) ........ 17

*Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883 (11th Cir. 2005) ........ 39

*Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277 (11th Cir. 2004) ........ passim

*Gupta v. E. Tex. State Univ.*, 654 F.2d 411 (5th Cir. Unit A Aug. 1981) ........ 26

*Ismael v. Roundtree*, 161 F.4th 752 (11th Cir. 2025) ........ passim

*Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (*Lewis I*) . 40, 41

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019) (*Lewis II*) ........ 32, 43

*Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048 (11th Cir. 2020) ........ 50, 51

*Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264 (11th Cir. 2014) ........ 27, 31

*Mukhina v. Walmart, Inc.*, 162 F.4th 1128 (11th Cir. 2025) ........ 22, 26

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) ........ i, 37

*Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265 (11th Cir. 2020) ........ 32

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........ 15, 48, 52

*Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970) ........ 19, 20, 21

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) ........ 35

*Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318 (11th Cir. 1998) ........ 33

*Tolan v. Cotton*, 572 U.S. 650 (2014) ........................................................... 42

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939 (11th Cir. 2023) ................ 15, 35, 49

**Statutes**

28 U.S.C. § 1291 ........................................................................................ vi

28 U.S.C. § 1331 ........................................................................................ vi

28 U.S.C. §1343(a)(4) ................................................................................ vi

42 U.S.C. § 12102 ...................................................................................... 27

42 U.S.C. § 12117(a) ............................................................................ vi, 17

42 U.S.C. § 12203 ...................................................................................... 33

42 U.S.C. § 1981 ........................................................................................ vi

42 U.S.C. § 2000e ........................................................................... vi, 37, 50

**Rules**

Eleventh Cir. R. 26.1 .................................................................................... 1

Fed. R. App. P. 26.1 ...................................................................................... 1

Fed. R. App. P. 4 ......................................................................................... vi

Fed. R. Civ. P. 56 ................................................................................. 15, 33

**Regulations**

29 C.F.R. § 1601.12(b) ................................................................................ 19

29 C.F.R. § 1630..2 ............................................................................... 27, 28

29 C.F.R. § 1630.2 ........................................................................... 27, 28, 29

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had federal question subject-matter jurisdiction over this employment-discrimination action under 28 U.S.C. §§ 1331 and 1343(a)(4). Ryan Pasley ("Pasley") sued his employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3); 42 U.S.C. § 1981; and Title I of the Americans with Disabilities Act, 42 U.S.C. § 12117(a). (Doc. 23.)

On April 10, 2026, the district court entered a memorandum opinion granting Defendant Mercedes-Benz U.S. International, Inc.'s ("MBUSI") motion for summary judgment on all claims, stating that it would enter judgment by separate order, and entered a Final Order (Doc. 39 at 1, 37) (Doc. 40). Pasley filed his notice of appeal on May 7, 2026, within the 30 days allowed by Federal Rule of Appellate Procedure 4(a)(1)(A). (Doc. 42). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court erred in applying a heightened burden to EEOC exhaustion where a pro se party discussed ADA allegations with the intake officer, later amended his charge through counsel to amplify and clarify the allegations, and the EEOC investigated the allegations giving the employer ample notice and opportunity to respond.

Whether the district court erred by requiring a plaintiff to present evidence of disability beyond what is required in the statute, disregarding record evidence of the same and finding no disability discrimination.

Whether the district court erred by requiring proof of disability for an ADA retaliation claim.

Whether the district court erred by failing to follow the Supreme Court's holding in *Muldrow* as to adverse employment actions and this Court's holding in *Ismael* (and others) as to comparator and other circumstantial evidence, limiting the plaintiff's evidence of race discrimination.

Whether the district court erred by failing to consider Pasley's circumstantial evidence of race retaliation and requiring a showing of pretext.

## STATEMENT OF THE CASE

### A. Nature of the Case

After nearly two decades of employment with MBUSI, Ryan Pasley, a Black Army veteran with PTSD, applied for promotion to Team Leader in the Coordinate

Measurement Machine ("CMM") shop. (Doc. 39 at 2). When Pasley learned he was excluded from consideration, he complained, forcing MBUSI to re-open the promotion process. In response, Pasley's new supervisor moved him to a different shift, swapping him with the only Black operator on that shift, refused to communicate with him, refused his request to return, and then told him he could have his shift back only if he withdrew from consideration for the promotion. Pasley withdrew his candidacy in writing, explaining that his VA psychiatrist believed the "mind games" by his supervisor would aggravate his PTSD. After watching his supervisor treat white employees more favorably in communications and interactions, Pasley began experiencing heightened symptoms related to his PTSD. MBUSI promoted the two white candidates, without posting the second promotion position. Pasley's supervisors continued to downgrade his rating. Pasley sued MBUSI. (Doc. 23).

**B. Course of Proceedings and Disposition Below**

Pasley sued MBUSI alleging race discrimination and retaliation under Title VII and § 1981, and disability discrimination, failure to accommodate, and retaliation under the ADA. (Doc. 23). MBUSI moved for summary judgment on all counts. (Docs. 25-28). Pasley opposed the motion (Docs. 31-32), and MBUSI replied. (Doc. 35). The court held oral argument on March 10, 2026. (Doc. 48).

On April 10, 2026, the court granted MBUSI's motion in full and entered final judgment. (Doc. 39 at 37; (Doc. 40)). Pasley timely appealed. (Doc. 42).

**C. Statement of the Facts**

**1. Pasley, his service-connected PTSD, and the CMM shop.**

Pasley began working for MBUSI on October 18, 2004, was promoted to Team Leader in 2006, and later stepped down to take an Operator position in the CMM shop, where he has worked since 2013. (Doc. 39 at 2). In 2023 the shop's Operators worked on two rotating shifts, A Shift and B Shift, alternating between day and night every two weeks. (Doc. 39 at 2). Pasley and Mike McRee, who is white, were both Operators on A Shift. (Doc. 39 at 2). Stephen Stone, who is also white, was a Specialist (programmer) who worked straight days. (Doc. 39. at 2-3). In 2023, the time relevant to this case, Pasley was the senior operator. (Doc. 26-1 at 18 (62:11-14)).

Pasley's disability is connected to his military service on the security detail at the 1996 Atlanta Olympics, where he arrived just before the bombing. (Doc. 26-1 at 6-7 (17:17-18:3); Doc. 31-4 ¶¶ 4-5). He has received VA disability benefits since 2008, for most of his employment with MBUSI, and has been rated 100 percent service-connected disabled since 2021. (Doc. 26-1 at 6-7 (17:15-16, 18:3-19)). The VA rates him 100 percent service-connected for post-traumatic stress disorder, also describe as major depressive disorder. (Doc. 26-1 at 6, 17:1-4; Doc.

31-4 at 2 ¶¶ 4-5; Doc. 26-13 at 107, 109). His condition causes periods of emotional dysregulation; when someone yells at him or treats him aggressively, he verbally shuts down and sometimes physically removes himself to avoid an outburst. (Doc. 31-4 ¶ 6).

**2. The undisclosed "develop at the same level" rating.**

MBUSI's performance evaluations include a "potential appraisal" that rates an employee either "ready" for advancement or "develop at the same level." and) according to MBUSI, to qualify for a promotion, an employee must have a "ready" rating. (Doc. 26-15 at 3 ¶ 3).

Group Leader Frank Coffin rated Pasley “ready for team leader” in 2022 because he "felt [Pasley] was ready for team leader." (Doc. 26-6 at 6-7 (16:4-17:9)). Eleven months later, in February of 2023, shortly before he retired, Coffin allegedly rated Pasley "develop at the same level." Doc. 26-6. at 7 (17:15-18:10). Despite MBUSI’s policy requiring review of evaluations with team members, Coffin never told Pasley that he had lowered his rating or reviewed the evaluation. (Doc. 26-6 at 9 (26:19-27:4); Doc. 26-3 at 15 (52:1-5); Doc. 39 at 4; Doc. 26-1 at 14 (47:3-48:23)). When asked what changed between Pasley’s 2022 and 2023 evaluation, Coffin did not point to Pasley's work. Instead, he testified that Pasley had "started hanging out with Jessie" Stallworth, that "him and Jessie were always together mumbling and stuff," and that Pasley “focused on his VA disability

rating," which Coffin said was "all he ever wanted." (Doc. 26-6 at 7 (18:11-19:6)). Stallworth is Black. (Doc. 26-5 at 7 (19:12-15)).

In the same period, Coffin rated McRee "ready," with the comment "exceeds expectations," and he testified that he wanted McRee to be the next Team Leader. (Doc. 26-6 at 5-6 (12:10-14:8); Doc. 26-6 at 9-10 (27:13-29:4)). The outgoing white Team Leader, with Coffin's support, had been grooming McRee for the job by giving him access to shift turnover, special projects, and system information that he did not share with Pasley or with the Black operators on the shift. (Doc. 26-1 at 36 (134:8-135:23); Doc. 31-1 ¶ 11; Doc. 31-2 ¶ 7).

Coffin also rated Stone "develop at the same level," which he explained was unrelated to his work and because Stone liked his straight-day programming job and did not want to rotate as a team lead. (Doc. 26-6 at 8-9 (23:6-25:14)).

**3. The 2023 promotion, Pasley's complaint, and the reopened process.**

In 2023 Pasley, McRee, and Stone applied for an open A Shift Team Leader position. (Doc. 39 at 3). MBUSI's HR department screened the applicants using only the rating on each candidate's most recent evaluation and found that only McRee had a "ready" rating. (Doc. 26-4 at 6 (16:2-14); Doc. 26-15 at 3 ¶ 4). It solicited peer input on McRee alone. (Doc. 39 at 4).

When Pasley asked why he was not listed, HR told him his most recent evaluation rated him "develop at the same level." (Doc. 39 at 4). Pasley, who had

last seen a "ready" rating, went to HR. (Doc. 26-1 at 14 (46:4-49:20)). HR specialist Octave Roberts halted the process and wrote to management that some CMM team members "were given an evaluation they knew nothing about," that the Group Leader "never sat with them," and that "[i]t is only fair that the TMs in this group sit with someone to discuss their performance rating." (Doc. 26-13 at 14; Doc. 26-10 at 5 (12:2-16)). MBUSI decided to restart the process and to have Nicholas Lackner, the new Group Leader, re-evaluate the candidates. (Doc. 39 at 5). Lackner testified that Pasley's complaint was "the one and only reason" the process was reopened. (Doc. 26-9 at 18 (64:10-14)). MBUSI's CMM manager testified that CMM Team Leader vacancies had in the past been "backfilled with who has the most highest seniority if you have interest." (Doc. 26-3 at 9 (25:7-10); *see also* Doc. 31-3 ¶¶ 3-4).

**4. The transfer to B Shift.**

Lackner, who is white, then moved Pasley to B Shift, explaining that he wanted to observe Pasley and McRee on separate shifts. (Doc. 39 at 5; Doc. 26-13 at 15). Pasley was the more senior of the two, and he was not asked; he was told. (Doc. 26-1 at 18 (62:11-16)). Lackner did not consider seniority and did not consider moving McRee instead. (Doc. 26-9 at 8 (22:13-23:3); Doc. 26-9 at 13 (42:15-43:10)). Lackner moved him by swapping him with Howard Acoff, the only

Black operator on B Shift. (Doc. 31-2 at 2 ¶¶ 9-10; Doc. 31-3 at 3 ¶¶ 13-14). Lackner testified that he did not recall the swap. (Doc. 26-9 at 19 (66:4-15)).

The move changed Pasley's crew and his schedule. Because A Shift had just finished two weeks of nights and B Shift was rotating onto nights, the move put Pasley on night shift for four weeks in a row, and he missed his daughter's graduation as a result. (Doc. 26-1 at 18 (62:11-16); Doc. 39 at 6 n.3). Lackner worked days, so during those four weeks he was not present to observe Pasley at all. (Doc. 26-9 at 8-9 (24:3-25:22); Doc. 32 at 14 ¶ 8).

When they were together, Lackner singled Pasley out. When the acting Team Leader offered Pasley the end-of-shift "leave-over," a leadership task, Lackner intervened: "No, don't send him anything." (Doc. 26-1 at 34 (129:2-15)). Co-workers observed that after Pasley complained, management treated him as "radioactive," that Lackner "hyper focused on or targeted" him, and thought he "was being sent to [B] shift to make things hard on him." Lackner even targeted Pasley while he was using his phone on a break, making a "beeline to Pasley and get[ting] all over him" to "[t]urn it off now," without saying anything to anyone else. (Doc. 26-1 at 19 (66:16-23, 67:20-68:12); Doc. 31-3 ¶¶ 15-19). When Pasley asked to speak with him, Lackner said they had nothing to talk about. (Doc. 26-1 at 18 (64:3-13); Doc. 31-3 at 3 ¶¶ 15-19; Doc. 31-2 at 3 ¶ 12).

**5. The request to return, the condition, and the June 22 email.**

On June 15, 2023, Pasley asked Lackner to let him return to A Shift. Lackner said, "denied." (Doc. 26-9 at 9 (28:6-23); Doc. 26-1 at 20 (72:4-6)). When Pasley said he wanted to go to HR and did not want to be written up for leaving his area, Lackner told him that was "the exact reason why you won't get the team leader job." (Doc. 26-1 at 20 (72:19-73:2)). Pasley went to HR, where, visibly upset, he told HR representative William Harden that he suffered from PTSD and asked to be moved back to his shift. (Doc. 26-1 at 24 (89:9-15); Doc. 26-12 at 5 (11:7-14)).

HR then asked Lackner, in writing, why Pasley could not return, and told him that if Pasley was not interested in the position, "[i]t is highly recommended that he be moved back to his original shift." (Doc. 26-13 at 15). Lackner answered that the request would be honored only "[i]f [Pasley] provides to me in writing that he is voluntarily removing himself as a TL candidate." (Doc. 26-13 at 15). That same day Lackner told Pasley, in front of co-workers, that the only way he could return to A Shift was to take his name off the promotion list. (Doc. 26-1 at 21 (74:14-75:6); Doc. 26-2 at 45; Doc. 26-9 at 19-20 (68:22-69:4)).

That evening Pasley emailed Lackner, Manager Andreas Roller, two other managers, and two HR representatives:

> I Ryan Darrell Pasley, on this 22nd day of June would like to remove my name from the Team Leader promotion list

> for the CMM Lab. The reason for this action is because my Group Leader Nicholas Lackner informed that if I write a statement taking my name off the list I could then return back to my regular shift. He had previously denied without cause, but I was told when I was moved from A-Shift it was for evaluation purposes for Team Leader. These type of mind game continues to show the created hostile work environment and retaliation against me for wanting to be treated fairly. Based on that and the advice of my wife and VA Psychiatrist . . . who treats me for PTSD. He feels that this undo stress could greatly aggravate my condition. So for my mental health I will exit this process.

(Doc. 26-2 at 7). HR specialist Roberts testified that, under his HR training, an employee need not use "magic words," and that he recognized this email as a report of a disability. (Doc. 26-10 at 8 (24:4-18)). MBUSI did not follow up with Pasley about his PTSD or about what MBUSI could do to accommodate him, did not address Lackner's conditional approval of his shift return, and did not discuss the "mind games." (Doc. 26-10. at 8-9 (23:15-25:1); (Doc. 26-9 at 14 (47:3-14)). Lackner allowed Pasley to return to A Shift in early July. (Doc. 26-14 at 7). Lackner named McRee Team Leader and created a second Team Leader position for Stone, whom Lackner had re-evaluated and rated ready after Pasley withdrew. (Doc. 39 at 7; Doc. 26-13 at 75-81; Doc. 26-9 at 15 (49:18-52:5)). Lackner never completed a re-evaluation of Pasley during the restarted process. (*See* Doc. 26-9 at 8-9 (24:3-25:22); Doc. 26-13 at 25-30).

**6. The white candidates' ratings are cured, and both are promoted.**

After Pasley withdrew, Lackner re-evaluated Stone. On July 14, 2023, he entered a "Ready for Team Leader" rating for Stone, with comments that Stone "posesses [sic] the knowledge and traits to lead others." (Doc. 26-13 at 80). In mid-July "leadership" decided to create a Team Leader position over the Specialists, MBUSI "reconfirmed" the eligible pool as McRee and Stone, and on August 2 selected McRee and Stone “to fill TL roles.” (Doc. 26-14 at 6). Stone's "ready" evaluation was not completed until August 17, 2023, a week after his offer. (Doc. 26-13 at 81). Lackner promoted McRee using his 2022 evaluation rating. (Doc. 26-13 at 45, 50). Roller claimed that Lackner re-evaluated "everyone." (Doc. 26-3 at 15 (52:1-14)). Pasley's disqualifying rating was never revisited before the selections. (*See* Doc. 26-14 at 6).

**7. Pasley’s Leave, December 2023 evaluation, and continued scrutiny.**

Pasley's son died on July 10, 2023. (Doc. 26-2 at 4). In August 2023, his VA psychiatric nurse practitioner certified to MBUSI that Pasley has a "lifelong [mental health] condition with periods of exacerbations r/t emotional dysregulation," with the "[c]urrent [episode] lasting possibly 12-16wks"; that he has a long-term condition requiring continuing supervision; that he had scheduled monthly prescriber visits and weekly psychotherapy; and that he was unable to perform essential job functions because of "short-term memory deficits and focus

and concentration problems causing difficulties with thought processes such as executive functioning." (Doc. 26-13 at 95-97). The provider's Attending Physician's Statement diagnosed "recurrent Major Depressive Disorder (Severe)," noted that the condition "is lifelong and will have periods of [exacerbations]," and certified Pasley "totally disabled" from August 21, 2023, through November 18, 2023. (Doc. 26-13 at 107). The VA treatment note recorded mood swings "most days," insomnia ("some days only sleeping 3-4 broken hours/night"), poor appetite and energy, "difficulties with concentration and focus," short-term memory deficit, anhedonia, and amotivation ("It's all I can do to get ready and go to work[;] after work there is nothing left"). (Doc. 26-13 at 110). Pasley confirmed he was approved for short-term disability before taking leave. (Doc. 31-6 at 3; Doc. 31-1 ¶ 23; Doc. 32 at 9-10 ¶ 42). After he started his leave, MBUSI approved him for FMLA leave from August 21 to November 18, 2023, but denied short-term disability pay for lack of "objective medical documentation." (Doc. 26-2 at 9; Doc. 26-7 at 6-7 (16:8-19:6), (17:14-18:1)).

Pasley filed his EEOC charge on October 27, 2023, while on leave. (Doc. 26-2 at 44-45). In December 2023, after Pasley returned, Lackner completed Pasley's annual evaluation. He rated Pasley "Satisfactory" in every category, including "Interpersonal Skills" and "Communication," and wrote no criticism in any category. (Doc. 26-13 at 25-29). But he again rated Pasley "Develop at Same

Level," and the only manager comments he wrote noted Pasley's "FMLA 8/21/23-11/18/23" and that Pasley "voluntarily withdrew from CMM TL selection & evaluation 6/22/2023 in writing." (Doc. 26-13 at 30. Lackner explained that he noted the FMLA leave because "it was a significant period of time" in which Pasley "was not there," and the withdrawal because "it was a significant event." (Doc. 26-9 at 16 (54:7-55:7)). In this litigation Lackner attributes the rating to Pasley's communication. (Doc. 26-14 at 4 ¶ 9; Doc. 26-9 at 18-19 (64:20-65:13)). He did not discuss any criticism with Pasley or suggest ways he could improve his rating. (Doc. 27, Conventional Filing Video).

Other witnesses describe Pasley differently. The current Group Leader testified that Pasley does his job, has no performance issues other than not communicating with McRee, and speaks to his current Team Leader. (Doc. 26-5 at 6 (13:14-14:8)). Co-workers attest that Pasley gets along with and speaks to the other team members, and that the friction between Pasley and McRee runs both ways. (Doc. 31-2 at 3 ¶¶ 14-15; Doc. 31-3 at 3 ¶ 22). When the current Group Leader evaluated Pasley in 2025 for a year he had not supervised, he marked Pasley "not ready" because he "followed the same" rating that had been given before. (Doc. 26-5 at 9-10 (28:14-29:7)).

Lackner kept a running file of notes on Pasley, headed "Updates below since 1st interview," with entries from January through March 2024. (Doc. 26-14 at 8-9).

One entry records that, after Pasley did not respond when told to remove union fliers from his desk, Lackner "[s]ent written statement to William Harden and Kadejah Powell" in HR. (Doc. 26-14 at 9).

After Pasley complained, co-workers observed that management treated Pasley as "radioactive," that Pasley "had been given a bad rap because of the lawsuit," and that leadership "picked at Pasley . . . almost like they are trying to set him off." (Doc. 31-3 ¶¶ 15-16, 20-21, 26). Lackner singled Pasley out to remove union literature that had sat on several desks for months,while union stickers, hats, and buttons were displayed elsewhere in the lab,and threatened to take him to HR. (Doc. 31-1 ¶ 18; Doc. 31-2 ¶ 13; Doc. 31-4 ¶ 12; Doc. 26-9 at 17 (57:20-60:8)). He yelled at Pasley for "refusing" a skills assessment that a co-worker watched Pasley complete. (Doc. 31-1 ¶ 26).

**8. The EEOC charge.**

On October 23, 2023, Pasley, without counsel, gave an EEOC intake interview. (Doc. 31-6 at 2-4). The investigator recorded that Pasley "is a veteran with PTSD and depression," that he went on short-term disability "due to his disability," and that his letter to Lackner, HR, and management stated he was being retaliated against and was withdrawing on "the advice of his physician" because the treatment "aggravated his disability." (Doc. 31-6 at 3-4). The EEOC investigator then drafted the charge particulars, which Pasley signed. (Doc. 31-6 at

2). The charge described the undisclosed evaluation, the reopened process, Pasley's transfer to B Shift "even though [he] had more seniority [than] Mr. McCree," the phone incident, and then:

> On June 15, 2023, I asked Mr. Lackner if I could return to A shift and for about five minutes he did not respond and stated denied. . . . I went to HR, and they told me to write a statement and they will do an investigation. On June 22, 2023, in front of a group of people Mr. Lackner told me that the only way he would allow me to retune to A shift is if I removed my name from the team lead promotion list. I wrote a letter to Mr. Lackner, HR, and the management chain informing them that I had been retaliated against and subjected to a hostile work environment.

(Doc. 26-2 at 45). The "letter" the charge describes is the June 22 email, which identified his PTSD and his psychiatrist's warning. (Doc. 26-2 at 7). The intake notes likewise record that Pasley had gone on short-term disability "due to his disability," and that his letter to management cited "the advice of his physician" and his "aggravated . . . disability." (Doc. 31-6 at 3-4). With the assistance of counsel, on February 28, 2024, Pasley filed an amended charge under the same charge number. (Doc. 26-2 at 46-47). The amended charge described his PTSD, his request to HR to return to his familiar shift because Lackner's treatment was "triggering because of my PTSD," the conditioning of that return on his withdrawal, and HR's failure to discuss any accommodation. (Doc. 26-2 at 47).

The EEOC's closure memorandum states: "CP alleges discrimination based on his race (African American), in violation of Title VII. CP also alleges

discrimination based on his disability, in violation of the ADA." (Doc. 26-2 at 48). It records MBUSI's merits response to the disability allegations.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in favor of the non-moving party. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943 (11th Cir. 2023). Summary judgment is inappropriate if there is “a genuine dispute as to any material fact[.]" Fed. R. Civ. P. 56(a). A court "may not make credibility determinations or weigh the evidence," and it "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Whether a plaintiff exhausted administrative remedies and whether the district court applied the correct legal standard are questions of law reviewed de novo. *See Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).

## SUMMARY OF THE ARGUMENT

The district court resolved this case against Pasley on multiple legal errors, each requiring reversal.

First, the court held that Pasley's ADA claims were not exhausted because his pro se charge "focuses solely on race." But the scope of a charge is measured by its facts, not its labels, and Pasley's sworn narrative set out every event on

which the ADA claims rest, the transfer off his regular shift, his request to return, the refusal, the condition that he withdraw from promotion to get his shift back, and the "letter" he sent to Lackner, HR, and management. That letter is the June 22 email in which he invoked his PTSD and his psychiatrist's warning. An EEOC investigator asking why Pasley wanted his shift back, or reading the letter the charge describes, would necessarily have encountered his disability and his request. That is all exhaustion requires. Further, the EEOC's closure memorandum shows that the agency treated the charge as alleging ADA disability discrimination and that MBUSI answered those allegations on the merits. The amended charge, which clarified and amplified the allegations Pasley made at EEOC intake, provided MBUSI notice, investigation, and an opportunity for conciliation.

Second, the court held that no jury could find Pasley disabled because the record did not show "the timing, frequency, and duration" of his episodes. In so holding, the district court applied the pre-2008 standard of disability that Congress rejected and disregarded the record evidence. Under the ADA Amendments Act, disability is broadly construed and when episodic includes an impairment that would substantially limit a major life activity when active. Pasley’s record goes further than required and includes a 100 percent VA disability rating, an FMLA certification describing a lifelong condition with exacerbations that impair memory, concentration, and executive functioning, a treating provider’s diagnosis

of severe recurrent major depressive disorder, and a documented three-month period of incapacity. Additionally, the court incorrectly required Pasley to prove disability for his ADA retaliation claim.

Third, on the race claims, the court made multiple legal errors including applying the heightened adverse-action standard rejected in *Muldrow*, limiting the use of evidence of treatment of other employees as not strict comparators, rejected in *Ismael* and *Lewis II*, and discounting individual pieces of evidence as not disproved instead of viewing the evidence in its totality, as required under *Ismael*.

Finally, the court failed to consider Pasley's race retaliation claims outside of the improper *McDonnell Douglas* framework, rejecting evidence of decisionmaker knowledge and requiring proof of pretext.

## ARGUMENT

### I. The District Court erred by excluding Pasley's disability claims as not timely filed with the EEOC.

#### a. Pasley's EEOC Charge and Amendment satisfied the claim-processing requirements of the ADA.

A plaintiff claiming discrimination or retaliation under the ADA must initiate a charge with the EEOC. 42 U.S.C. § 12117(a); *Batson*, 897 F.3d at 1327. The charge-filing requirement is a claim-processing rule, not a jurisdictional prerequisite. *Fort Bend County v. Davis*, 587 U.S. 541, 550-51 (2019). Its purpose is to give the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and

promoting conciliation efforts." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (quotation omitted). There is no dispute as to the facts underlying Pasley's ADA claims. Pasley interviewed with the EEOC without counsel. He discussed with the intake officer his treatment at work, his need to take disability leave, the lack of promotion, and the denial of short-term disability pay. The investigator, a non-attorney, formalized Pasley's charge. (Doc. 31-6 at 2-3). The charge omitted many details, leaving only a sentence stating "I wrote a letter to Mr. Lackner, HR, and the management chain informing them that I had been retaliated against and subjected to a hostile work environment." (Doc. 26-2 at 45). Pasley, through counsel, amended his EEOC charge. (Doc. 26-2 at 46-47). The amended charge clarified the letter's contents and restated the disability details Pasley gave at intake. (Doc. 26-2 at 46-47). The EEOC accepted the charge, notified MBUSI, investigated, and issued a closure on Pasley's race and disability allegations. (Doc. 26-2 at 48-49). The district court disregarded the amended charge entirely.

EEOC charges must be liberally construed because charging parties are laypersons unfamiliar with the procedures and requirements of the laws they seek to enforce. *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir.

1970)[1]; *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402-06 (2008). Construing ambiguities against the filer would undermine the statutes' remedial scheme and push individuals to seek early counsel, increasing the cost and likelihood of litigation. *Holowecki*, 552 U.S. at 406. Further, federal regulations allow amendments to EEOC charges to relate back to the original filing date where the amendment cures "technical defects or omissions, . . . or to clarify and amplify allegations made therein." 29 C.F.R. § 1601.12(b). The question is whether the district court erred by narrowly reading Pasley's original charge and excluding the amendment that clarified omissions from his interview.

The district court determined Pasley did not "argue that his February 2024 amendments relate back" but instead contended "he fully exhausted his ADA claims when he brought his original 2023 charge." (Doc. 39 at 27, 29 n.10). Pasley did not concede the issue; he argued that MBUSI's cases were distinguishable. (*See* Doc. 32 at 18-19). At the hearing, the court asked "we're not relying on your amended EEOC complaint; right?" to which counsel responded "I don't think so, Your Honor, the amendment was nothing more than just clarifying the points. . . . I don't think we even have to get to that question [because the EEOC's investigation included disability claims]." (Doc. 48 at 40:16-41:8).

---

[1] *Bonner v Cit of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting all prior 5th Circuit precedent).

The district court limited the judicial scope to the original charge. A judicial complaint is limited only by "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory*, 355 F.3d at 1280 (quotation omitted). The scope of the charge "should not be strictly interpreted" because courts are "extremely reluctant to allow procedural technicalities to bar claims brought under" civil rights statutes. *Id.* at 1280. The district court also narrowly construed the original charge. The court concluded "the sworn allegations in the charge are what count." (Doc. 39 at 31). But a *liberal* reading of the facts is necessary to fulfill the statutory purpose. *Sanchez*, 431 F.2d at 465-467. Because a charge of discrimination is meant "to trigger the investigatory and conciliatory procedures of the EEOC" a charging party need only be required to state "*facts* sufficient to trigger a Commission investigation." *Id.* at 462, 466. Pasley satisfied this requirement. Although his interview notes did not make it into his uncounseled charge, the charge specifically mentioned the letter he sent to Lackner, HR, and management, which triggered an investigation into its contents.

This circuit's binding precedent has allowed a lot more to proceed with a lot less. In *Sanchez*, the former Fifth Circuit determined a complaint that stated simply "my boss lady hit me at my rear end and about a month before that I hurt my thumb and was out of work for seven days and the Company didn't pay me. I hurt

my thumb at work[ ]" with boxes checked for only sex discrimination could be amended, outside of the statutory time, to include additional details about the injury, touching, and harassment and an addition of national origin as the legal theory. *Sanchez*, 431 F.2d at 458-59, 463-467. Sanchez's original charge said nothing about national origin. The Fifth Circuit allowed the amendment noting that the facts were the same, but amplified, and it was not her role to determine the legal theory. *Id.* The same is true with Pasley. Even setting aside the regulation's first prong (curing omissions), Pasley's amended charge amplifies the facts he briefly alleged and assigns them a legal theory. The district court concluded that Pasley's original charge "focuses solely on race" and that "[n]othing in his EEOC filing mentioned discrimination based on PTSD." (Doc. 39 at 28-30). That conclusion mistakes the label for the facts.

**b. The scope of an EEOC investigation would (and did) reach Pasley's disability claim. Pasley's charge described the very events on which his ADA claims rest.**

Either way, the question is whether an EEOC investigation of the facts Pasley alleged (the open job, supervisor interactions, and request to return to his shift) would reasonably be expected to reach his disability. His e-mail to Lackner, HR, and management shows it would. Part of Pasley's ADA claim is that MBUSI refused his request to return to his regular shift, conditioned the return on his withdrawal from promotion, ignored his written report that the treatment was

aggravating his PTSD, and promoted other individuals after he complained. (Doc. 23; Doc. 32 at 22-27). Every one of those events is in the sworn narrative of the charge. Pasley alleged that he was moved off his shift; that on June 15 he "asked Mr. Lackner if I could return to A shift" and was told "denied"; that he went to HR, which "told me to write a statement and they will do an investigation"; that on June 22 Lackner told him "the only way he would allow me to retune to A shift is if I removed my name from the team lead promotion list"; he then "wrote a letter to Mr. Lackner, HR, and the management chain informing them that [he] had been retaliated against and subjected to a hostile work environment[,]" and that after Lackner returned him to his shift MBUSI gave the team lead position to McRee and created a second lead position for Stone. (Doc. 26-2 at 45.)

The district court relied in part on this circuit's opinion in *Mukhina v. Walmart, Inc.* stating "the EEOC was not required to connect the dots" between the charging party's request for a holiday and her religious discrimination claim. (Doc. 39 at 30). *See Mukhina*, 162 F.4th 1128, 1134-35 (11th Cir. 2025). But Pasley did not ask the EEOC to connect the dots: the facts he alleged were not background facts but the operative facts of his ADA claims. An investigator looking into them would ask the obvious questions: why Pasley wanted to return to his shift, what he told HR, and what the "letter" said. The answers are in MBUSI's own files. The letter states that Pasley was withdrawing because it was the only way to get his

shift back, that the “mind games” by Lackner show the “hostile work environment and retaliation against [him] for wanting to be treated fairly”; that his "VA Psychiatrist . . . treats me for PTSD," that the psychiatrist believed the "undo stress could greatly aggravate my condition," and that "for my mental health I will exit this process." (Doc. 26-2 at 7). MBUSI's HR file shows that HR "highly recommended" returning Pasley to his shift and that Lackner refused unless Pasley withdrew in writing. (Doc. 26-13 at 15).

The district court discounted the June 22 email because Pasley "never swore to the statements in the email." (Doc. 39 at 31). But Pasley swore to the charge, and the charge identifies the letter and its recipients. The question under *Gregory* is not whether every fact relevant to a claim was itself sworn; it is what investigation "can reasonably be expected to grow out of the charge." *Gregory*, 355 F.3d at 1280. An investigator reading a sworn allegation that the charging party complained in writing to management about a forced withdrawal can reasonably be expected to read the complaint. The court's alternative characterization of the email as a "vague reference" to PTSD, (Doc. 39 at 31), is not fair to the document. The email identifies the diagnosis (PTSD), the treating provider (a VA psychiatrist), the medical opinion (the "stress could greatly aggravate my condition"), and the consequence (withdrawal "for my mental health"). (Doc. 26-2 at 7). MBUSI's own HR representative testified that he would recognize it as a report of a disability.

(Doc. 26-10 at 8 (24:15-18)). A reasonable investigation of the original charge would have run straight into Pasley's PTSD.

**c. The EEOC actually treated the charge as alleging ADA claims, and MBUSI answered them on the merits.**

The district court also held that what the EEOC actually investigated "is irrelevant to the objective inquiry required here." (Doc. 39 at 34). That holding cannot be reconciled with the purpose of the exhaustion requirement or with the record.

The EEOC's closure memorandum states: "CP alleges discrimination based on his race (African American), in violation of Title VII. *CP also alleges discrimination based on his disability, in violation of the ADA.*" (Doc. 26-2 at 48 (emphasis added)). It then summarizes MBUSI's response to the disability allegations, that MBUSI allegedly "had no knowledge that CP suffered from a disability, and he never requested an accommodation," and that short-term disability benefits were denied for insufficient documentation,and recommends dismissal "for no reasonable cause based on the evidence obtained during the investigation." (Doc. 26-2 at 48-49).

The exhaustion requirement exists so that the agency has notice and a chance to investigate and conciliate, and so that the employer has notice and a chance to respond. *Gregory*, 355 F.3d at 1279; *EEOC v. Shell Oil Co.*, 466 U.S. 54, 61-62 (1984). Here each of those purposes was fulfilled as to the ADA claims:

the EEOC identified them, MBUSI received notice of them, MBUSI responded to them on the merits, and the agency resolved them. To hold that the ADA claims were nonetheless unexhausted elevates form over the very function the doctrine serves, contrary to this Court's admonition against allowing "procedural technicalities" to bar claims. *Gregory*, 355 F.3d at 1280.

The district court reasoned that looking at the actual investigation would make exhaustion turn on "whether [a] charge was assigned to a particularly dogged investigator." (Doc. 39 at 34). But the "reasonably be expected" standard asks what a reasonable investigation would encompass, and what the agency actually did is powerful evidence of what was reasonable. Pasley does not argue that an investigator's frolic can expand a charge beyond its facts, but that the agency's own reading of the charge, in an investigation that included the employer's merits response, confirms that disability claims could "reasonably be expected to grow out of" it.

Pasley did not substitute the intake notes for his charge. The notes show what the EEOC knew when its own staff drafted the charge particulars: that his leave was "due to his disability," and that his letter cited his physician's advice about his "aggravated . . . disability." (Doc. 31-6 at 3-4). That evidence explains why the charge narrative references the letter, and it confirms that a reasonable investigation would have encompassed disability. *Mukhina* held that an intake

questionnaire cannot supply a challenged act missing from the charge; it did not hold that a court must ignore evidence that the agency understood the acts described in the charge to involve disability. *Mukhina*, 162 F.4th at 1135.

#### d. At a minimum, retaliation that followed the charge needed no separate exhaustion.

The district court's ruling is independently wrong as to the post-charge conduct underlying Count VI. A plaintiff need not file a new charge to challenge retaliation that grows out of an earlier charge. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988); *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981). Pasley raised this argument below. (Doc. 48 at 41:17-42:6). The December 2023 evaluation, in which Lackner again rated Pasley "develop at the same level" and recorded his FMLA leave and his written withdrawal as the only manager comments, came after the charge and grew out of the very events the charge described. (Doc. 26-13 at 25-30). The district court did not address *Gupta* and instead suggested retaliatory acts that “happened later” could not be the basis for claims because the EEOC could not have looked at them. (Doc. 48 at 18:17-22). This is the reasoning *Gupta* and *Baker* rejected. Nor did the court separately address disability retaliation, referring only to “ADA claims” without regard to post-charge retaliation.

## II. The district court narrowly construed the definition of disability, discarding the episodic nature of mental-health disorders and the supporting evidence.

**a. After the 2008 amendments, "disability" is construed broadly and episodic conditions are covered.**

In the ADA Amendments Act of 2008, Congress rejected the narrow constructions that had developed under the original statute and directed "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). This Court has recognized that the amendments made it substantially easier for plaintiffs to establish a disability. *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268-69 (11th Cir. 2014). The ADA defines "disability" as (A) "a physical or mental impairment that substantially limits one or more major life activities," (B) "a record of such an impairment," or (C) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). The term "substantially limits" "is not meant to be a demanding standard," and an impairment need not "prevent, or significantly or severely restrict," a major life activity. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The determination "should not demand extensive analysis." *Id.* § 1630.2(j)(1)(iii). Importantly, after the amendments, “an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D); 29 C.F.R. § 1630.2(j)(1)(vii). The regulations also recognize that certain impairments, including "***major depressive disorder***, bipolar disorder, ***post-traumatic stress disorder***, obsessive compulsive disorder, and schizophrenia substantially limit brain function” and will, "in

virtually all cases" be found to substantially limit a major life activity. 29 C.F.R. § 1630.2(j)(3)(ii)-(iii). Major life activities include "sleeping," "concentrating, thinking, communicating," and "working," as well as the operation of "major bodily function[s]," including "brain" function. 42 U.S.C. § 12102(2)(A)-(B); *see* 29 C.F.R. § 1630.2(i)(1)(i) (adding "interacting with others").

**i. The record would permit a jury to find that Pasley is disabled.**

Under that broad standard, the evidence of Pasley's disability is substantial. Pasley has service-connected PTSD and major depressive disorder, two of the conditions the regulations identify as substantially limiting brain function in virtually all cases. (Doc. 31-4 at 2 ¶¶ 4-6); 29 C.F.R. § 1630.2(j)(3)(iii). The VA rates him permanently disabled by major depressive disorder at 100 percent. (Doc. 26-7 at 9 (27:8-14)). His FMLA certification, which MBUSI reviewed and approved, describes a "lifelong" mental-health condition "with periods of exacerbation" involving emotional dysregulation, and reports "short-term memory deficits and focus and concentration problems causing difficulties with thought processes such as executive functioning, easily distracted, hard to stay on work tasks." (Doc. 26-7 at 6-7 (16:8-19:6)). His treating provider diagnosed "recurrent major depressive disorder, severe," and prescribed medication. (Doc. 26-7 at 9 (27:5-23). His records describe insomnia, decreased appetite and energy, mood swings, and impaired concentration and memory. (Doc. 26-13 at 95-97, 106-108,

110). Further, Pasley testified that when his condition is triggered by aggressive treatment, he cannot communicate and must withdraw to avoid an outburst. (Doc. 31-4 at 2 ¶ 6).

That evidence speaks directly to the major life activities of concentrating, thinking, sleeping, eating, communicating, interacting with others, and working, and to the major bodily function of the brain. A jury could readily find that Pasley's condition substantially limits him "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

**ii. The district court’s finding ignores the plain text of the statute.**

The district court did not find Pasley’s evidence insufficient under the amended standard. It held instead that Pasley had not shown "the timing, frequency, and duration" of his "periods of exacerbations" or "how often or for how long these symptoms affect his ability to work." (Doc. 39 at 35-36). That analysis exceeds the statute’s text, disregards record evidence of timing and duration, and rests on inapposite precedent.

First, the district court’s requirement that Pasley provide evidence of frequency, timing, or duration cannot be reconciled with 42 U.S.C. §12102(4)(D). Congress provided “[a]n impairment that is episodic [ ] is a disability if it would substantially limit a major life activity when active.” 42 U.S.C. §12102(4)(D). Congress further directed that “[t]he term ‘substantially limits’ shall be interpreted

consistently with the findings and purposes of the ADA Amendments Act of 2008.” 42 U.S.C. §12102(4)(B). Under the plain text of this statute, the question is what the impairment does when active, not how often it becomes active. By requiring proof of the frequency, duration, and timing of Pasley's episodes as a precondition to coverage, the court reimposed a durational and frequency threshold that Congress removed.

Second, the record does contain evidence of timing and duration, going beyond the requirements of the statute. Pasley's treating provider at the VA mental health clinic certified to MBUSI,in the very FMLA and short-term-disability paperwork MBUSI reviewed,that he has a "lifelong [mental health] condition with periods of exacerbations r/t emotional dysregulation"; that the "[c]urrent [episode was] lasting possibly 12-16wks"; that his condition is permanent or long-term and requires continuing supervision; that he had monthly prescriber appointments and weekly psychotherapy on specified dates; and that he could not perform essential job functions because of "short-term memory deficits and focus and concentration problems causing difficulties with thought processes such as executive functioning; easily distracted, hard to stay on work tasks." (Doc. 26-13 at 95-97). The provider diagnosed "recurrent Major Depressive Disorder (Severe)," certified him "totally disabled" from August 21 through November 18, 2023, and noted that he "is permanently service connected disable[d] for MDD at 100%." (Doc. 26-13 at. at

107). The accompanying treatment note documents mood swings "most days," insomnia of "3-4 broken hours/night," poor appetite and energy, "difficulties with concentration and focus," short-term memory deficit, anhedonia, and profound amotivation. (Doc. 26-13 at 110). Pasley testified that his condition causes emotional dysregulation that forces him to fall silent or remove himself when confronted. (Doc. 31-4 ¶ 6).

The evidence of timing (a dated episode, August 21 to November 18, 2023), duration (thirteen weeks of total incapacity, within a provider estimate of twelve to sixteen), frequency (a lifelong, recurrent condition with periodic exacerbations, requiring monthly and weekly treatment), and severity (inability to work at all during the episode) is the kind of medical evidence this Court found sufficient in *Mazzeo*, 746 F.3d at 1268-70. In *Mazzeo*, the physician submitted an affidavit showing the plaintiff had a degenerative disc disease that affected his ability to bend, sleep and walk, limited him to a 10-pound lifting restriction, and noted he would have increasing periods of pain with prolonged sitting and standing. *Id*. at 1268. This Court held that affidavit enough to raise a jury question. *Id.* at 1269.

Under the amended ADA and *Mazzeo*, a reasonable jury could readily find that Pasley's impairment, a diagnosed, service-connected mental-health condition that the VA rates 100 percent disabling, with a record of being totally unable to

work for a dated thirteen-week period, substantially limits his brain function, sleeping, concentrating, thinking, and working when active.

The cases the district court relied on are readily distinguishable. In *Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1273 (11th Cir. 2020), and *Lewis v. City of Union City*, 934 F.3d 1169, 1180-81 (11th Cir. 2019) (*Lewis II*), as the district court read them, the records did not allow the court to assess the effect of the impairments at all. (Doc. 39 at 35-36). But neither case involved an impairment that the regulations identify as substantially limiting in virtually all cases, a 100 percent VA disability rating, or a treating provider's certification of incapacity. In *Munoz*, the plaintiff relied exclusively on her own deposition testimony that she suffered "extreme pain, exhaustion, sleep interruption, and lack of bodily function control." *Munoz*, 981 F.3d at 1273. In *Lewis II*, the plaintiff relied on her own testimony that she had "periodic . . . shortness of breath" and a statement from her doctor that the condition "could" affect her ability to sleep. *Lewis II*, 934 F.3d at 1180. Whatever gaps existed there, none exists here.

Pasley's evidence instead aligns with *Mazzeo*. The question at summary judgment is whether a reasonable jury could find for Pasley on this element, not whether the court is persuaded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986). On this record, it could. Accordingly, the judgment on Pasley's disability discrimination claim should be reversed. [2]

**b. The ADA's anti-retaliation provision does not require proof of disability.**

Even without Pasley's substantial record of disability, his retaliation claim stands. The ADA makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge" or participated in an ADA proceeding. 42 U.S.C. § 12203(a). Unlike § 12112(a), the retaliation provision protects "any individual," and this Court has squarely held that a plaintiff need not be disabled to prevail on an ADA retaliation claim. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). What matters is whether the employee had a good-faith, objectively reasonable belief that he was entitled to an accommodation when he requested one. *Id.* A request for a reasonable accommodation is protected activity. *Id.*

The district court dismissed Count VI on the same disability ground as Count III, without distinguishing the two. (Doc. 39 at 26, 35-37). That was legal

[2] The district court did not reach any other element of Pasley's ADA claims. If this Court reverses on exhaustion and disability, those issues should be addressed by the district court in the first instance. The record shows, at a minimum, genuine disputes about whether Pasley requested an accommodation, whether MBUSI engaged with that request, and whether conditioning the accommodation on surrendering a promotion was itself discriminatory. *See* 42 U.S.C. § 12112(b)(5)(A); Doc. 26-13 at 15; Doc. 26-10 at 8-9 (23:15-25:1).

error, and the record would support a retaliation verdict. Pasley told HR he had PTSD and asked to return to his shift. (Doc. 26-1 at 24 (89:9-15)). HR recommended that he be returned. (Doc. 26-13 at 15). Lackner refused unless Pasley gave up the promotion in writing, and Pasley's written response invoked his PTSD. (Doc. 26-2 at 7). Lackner received that email. (Doc. 26-9 at 14 (47:3-14)). Pasley requested paid disability leave for his condition. MBUSI led Pasley to believe his paid leave was approved, then denied him pay. (Doc. 26-13 at 106-107; Doc. 31-6 at 3; Doc. 31-1 ¶¶ 23-24; Doc. 26-2 at 9; Doc. 39 at 7). Lackner's next evaluation of Pasley rated him satisfactory in every category, including communication, yet denied him readiness for promotion, and its only manager comments recorded Pasley's FMLA leave and his written withdrawal. (Doc. 26-13 at 25-30). During the litigation, McRee alleged Pasley's disability was a "sham" and Coffin alleged his disability rating was his focus. (Doc. 26-8 at 14 (47:1-8); Doc. 26-6 at 7 (19:3-6)).

A jury could find that the decisionmaker's decision to memorialize the leave in his evaluation, the forced withdrawal, the pay denial, and the negative comments reflect retaliation for Pasley's asserting his rights under the ADA. The judgment on that claim should be reversed.

## III. The District Court's multiple errors require a remand of Pasley's race discrimination claim.

In discrimination claims, the ultimate question at summary judgment is whether the record, viewed as a whole and in the light most favorable to the plaintiff, would permit a reasonable jury to infer that race caused an adverse employment action. *Ismael v. Roundtree*, 161 F.4th at 761; *Tynes*, 88 F.4th at 946-47; *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The district court's errors narrowed its view of the evidence and require remand.

#### a. The district court excluded key adverse actions under an incorrect legal standard

First, the district court erred by limiting the adverse actions Pasley could rely on.[3] Although Pasley does not challenge his removal from promotion as a discrete act, the surrounding facts remain relevant. Pasley focuses his claims on the shift transfer, disparate treatment in discipline/targeting, and evaluations. The district court disregarded these adverse actions.

The district court held that the transfer to B Shift and Lackner's other treatment of Pasley were not adverse actions because they did not "affect continued employment or pay,things like terminations, demotions, suspensions without pay, and pay raises or cuts." (Doc. 39 at 13 (quoting *Monaghan v. Worldpay US, Inc.*,

[3]At oral argument below, Pasley's counsel acknowledged that the record did not show that MBUSI forced Pasley to withdraw from the promotion *because of his race*. Doc. 48 at 33:9-14. Pasley does not challenge the ruling on that discrete failure-to-promote theory. Doc. 39 at 11-12. His race-discrimination claims rest on the downgraded evaluation, transfer, and other disparate treatment.

955 F.3d 855, 860 (11th Cir. 2020))); *see* Doc. 39 at 15-16 (holding incidents not actionable because Pasley "has not shown any way it affected his 'continued employment or pay'"). That is not the law. In *Muldrow*, the Supreme Court held that a Title VII plaintiff challenging a discriminatory transfer "must show some harm respecting an identifiable term or condition of employment," but "need not show that the injury satisfies a significance test"; the harm need not be "significant," "material," "serious," or "substantial." *Muldrow*, 601 U.S. at 354-55. Title VII's phrase "terms, conditions, or privileges of employment" is not limited to economic or tangible effects. *Id.* at 354. The *Monaghan* passage the district court quoted describes the higher bar for discrimination claims that *Muldrow* abrogated; *Monaghan* itself was a retaliation case. 955 F.3d at 860-62.

Under the correct standard, the transfer was plainly an adverse action. Lackner involuntarily moved Pasley from the shift he had worked for years onto a shift whose rotation forced him to work four consecutive weeks of nights, a change in schedule that caused him to miss his daughter's high school graduation. (Doc. 26-1 at 15 (52:6-53:18), 18 (62:11-16)). It also took him away from the crew he had worked with for years and placed him on a shift where he was the only Black Operator. (Doc. 26-1 at 21 (76:2-77:8); Doc. 31-2 at 2 ¶¶ 9-10). Once on the new shift, he was excluded from the leadership task of taking the leave-over and missed four weeks of evaluation time with Lackner. (Doc. 26-1 at 34 (129:2-15)). The

shift transfer also came with a condition, transferring back was not allowed unless he gave up his candidacy for promotion. (Doc. 26-13 at 15). The hours one works, the crew one works with, and whether one may remain a candidate for promotion are all terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). Neither of the white candidates was considered for transfer. (Doc. 26-9 at 8 (22:3-12); Doc. 26-9 at 13 (42:15-43:4)). Pasley argued these harms below. (Doc. 32 at 6 ¶ 25, 33-34; Doc. 48 at 34-36).

In *Muldrow* itself, the transfer that sufficed included the change that the plaintiff's "schedule became less regular, often requiring her to work weekends." 601 U.S. at 359. Consecutive weeks of night work is the same kind of harm. *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (a schedule change "may make little difference to many workers, but may matter enormously to a young mother with school-age children").

The district court reasoned that A and B Shifts were "identical" and that the only harm Pasley identified was Lackner's mistreatment, which "would have been present on A Shift as well." (Doc. 39 at 13-14). But after the transfer, Pasley was the only Black operator on B Shift. A jury could find that being moved, alone among three candidates, onto a shift that isolated him racially and kept him away from the supervisor who was supposed to be evaluating him is "some harm." The court also disregarded the harm of missing his daughter's graduation because

Pasley did not formally request time off. (Doc. 39 at 6 n.3). However, whether Pasley could have mitigated the harm by spending scarce vacation he was conserving to care for his dying son, goes to damages, not to whether the transfer altered a term or condition of his employment. (Doc. 26-1 at 18 (62:20-63:2)). The court also emphasized that the transfer lasted "only . . . a few weeks." (Doc. 39 at 14). But *Muldrow* imposes no durational threshold, and the transfer ended only because Pasley surrendered his promotion candidacy to end it.

The district court also disregarded Pasley's evidence of differential treatment in his co-worker/supervisor interactions as "trivial slights," not adverse actions. (Doc. 39 at 15). The court again mistakenly relied on *Monaghan* to the exclusion of *Muldrow*. Pasley testified to the harm the disparate treatment caused him. (Doc. 26-1 at 36 (136:12-22); Doc. 31-4 at 4 ¶ 13). He was isolated, ignored, targeted, yelled at, all triggering his PTSD. That is "some harm," and the court should have treated the conduct as adverse. The district court's exclusion of Pasley's shift transfer and disparate treatment prevented him from presenting key pieces of his discrimination case that a juror could consider under Ismael.

**b. The district court excluded an evaluation under an incorrect comparator analysis.**

Because a rating that "directly disentitles" an employee to promotion is materially adverse, the district court correctly held that the "develop at the same level" rating from Coffin was an adverse action because it disqualified Pasley from

promotion. (Doc. 39 at 16). *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005); *see Burlington*, 548 U.S. at 68. However, the court then excluded the evidence of discrimination, holding that Pasley had no comparator. (Doc. 39 at 18-19). This rationale ignores that Pasley need not provide a comparator and misapplies the facts to the comparator analysis.

**i. A plaintiff is not required to show comparators as an element of his case.**

This circuit has recognized since at least 2011 that a plaintiff is not necessarily doomed because they cannot produce a comparator. *Smith*, 644 F.3d at 1328. Judge Tjoflat, who wrote *Smith*, continues to repeat that directive. Comparator evidence remains relevant "even where there are 'material differences,'" and "it is the jury's role,not ours,to determine how much weight comparator evidence should be given." *Ismael,* 161 F.4th at 764 (Tjoflat, J.) (internal citations omitted). The circuit noted just this year that the failure to produce a comparator only means the plaintiff “does not enjoy the benefit of a presumption of intentional discrimination” and instead “must demonstrate a material issue of triable fact by constructing ‘a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.’” *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1309 (11th Cir. 2026) (Tjoflat, J.) (citing *Ismael*, 161 F.4th at 765, and *Smith*, 644 F.3d at 1328). Judge Tjoflat went on to describe the possible circumstantial evidence of

discrimination as coming in many forms where "each image of discrimination is composed of irregular tiles, unique in size, shape, and color." *Johnson*, 169 F.4th at 1309. As discussed below, even if neither McRee nor Stone were a strict comparator, the court was required to consider how they were treated as part of the overall evidence. *Ismael*, 161 F.4th at 761; *see Akridge v. Alfa Mut. Ins. Co.*, 93 F.4th 1181, 1198 (11th Cir. 2024). Pasley's record paints an image of discrimination without strict comparators. The court acknowledged this principle, but its analysis of the circumstantial evidence treated Stone's initial "not ready" rating as the end of the matter and never mentioned what happened next. (Doc. 39 at 20 n.6, 21). Even under a comparator analysis, Pasley's evidence survives summary judgment.

**ii. McRee was similarly situated in all material respects with regard to the Coffin rating.**

When using a comparator under the *McDonnell Douglas* framework, a comparator must be "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc) (*Lewis I*). That standard does not require that the comparator be "nearly identical" and only asks whether the plaintiff and comparator are alike in the respects that matter to the challenged decision. *Id.* at 1227-29. Ordinarily, a similarly situated comparator will have engaged in the same basic conduct, been subject to the same policy, been

under the same supervisor, and shared a similar employment history. *Id.* The record shows exactly that for Coffin's evaluations of Pasley and McRee.

McRee and Pasley were both CMM operators on A Shift. (Doc. 39 at 2). Both were evaluated by the same Group Leader, Coffin, on the same form, under the same promotion-eligibility policy. (Doc. 26-13 at 19-24, 132-37). Both had been rated "Ready for Team Leader" by Coffin in the prior cycle, in evaluations finalized the same day. (Doc. 26-13 at 84-89, 126-31. Both were former Team Leaders who had stepped down to join CMM. (Doc. 26-1 at 26 (95:12-15)). Both sought the same promotion. And on February 20, 2023, Coffin rated McRee "Ready for Team Leader" seven minutes after rating Pasley "Develop at Same Level." (Doc. 26-13 at 19-24, 132-37). MBUSI identified no disciplinary or performance difference between them; its explanation for the 2023 evaluations is that Coffin "had completed evaluations but failed to review them" with the employees. (Doc. 39 at 4). A comparator need not be a "clone," *Lewis I*, 918 F.3d at 1227. Regarding the Coffin evaluation, McRee is about as close a comparator as the workplace allows.

The district court also turned Pasley's evidence against him. It reasoned that Pasley's evidence that McRee "was provided with more training, tools, and growth opportunities" suggested McRee "had different work and leadership experience and was not similarly situated." (Doc. 39 at 19 n.5). But that evidence is that white

supervisors *gave* McRee leadership opportunities they withheld from Pasley and the other Black operators on the shift. (Doc. 26-1 at 36 (134:8-135:23); Doc. 31-1 ¶ 11; Doc. 31-2 ¶ 7). A disparity manufactured by the differential treatment the plaintiff challenges cannot defeat the comparison, and treating it as though it does draws the inference in the movant's favor. *See Tolan v. Cotton*, 572 U.S. 650, 657-59 (2014) (per curiam). Further, the court disregarded Coffin's own explanation for Pasley's rating, which did not rest on performance at all, but instead gave rise to discriminatory intent. (Doc. 26-6 at 7 (18:11-19:6)). *See* Part III.c.i, *infra*.

**iii. The district court's reliance on Stone's "develop at the same level" evaluation ignores the rest of the story.**

Because Stone is white, the court used Stone's "not ready" evaluation to weigh against race discrimination. (Doc. 39 at 19, 21). That reasoning, however, stops the story halfway. When HR discovered that Coffin's ratings had been entered without the employees' knowledge, MBUSI decided to re-evaluate the candidates, and its manager testified that Lackner was to re-evaluate "everyone." (Doc. 26-13 at 14; Doc. 26-3 at 15 (52:1-14)). Lackner did not enter a new evaluation for McRee until after his promotion. (Doc. 26-13 at 45, 50, 81). Coffin explained that he did not rate Stone ready because Stone "was happy to be there" (Doc. 26-6 at 8-9 (23:13-25:14)); and when the process restarted, Lackner re-evaluated Stone and rated him ready, after which MBUSI created a second Team

Leader position for him outside the posting process. (Doc. 26-13 at 75-81; Doc. 26-9 at 15 (49:18-52:5); Doc. 39 at 7).

Pasley, by contrast, was never re-evaluated before Lackner forced him out of the process. In short, the two white candidates who were rated or re-rated "ready" were promoted, one of them before his qualifying evaluation was even completed, while the disqualifying rating of the only Black candidate remained in place. A jury could find that the Black candidate, whose seniority would have favored him, was downgraded, moved, and pushed out. MBUSI says that a "ready" rating was a prerequisite for the promotion. (Doc. 26-15 at 3 ¶ 3). A jury could find that MBUSI applied that prerequisite to Pasley and not to his white competitors. Pasley raised this point below. (Doc. 32 at 13-14 ¶ 6, 33). The district court did not address it. That is precisely the "systematically better treatment of similarly situated employees" that supports an inference of discrimination. *Lewis II*, 934 F.3d at 1185 (quotation omitted).

**c. Viewed as a whole, the evidence would permit a reasonable juror to infer race discrimination.**

This circuit has “identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct”: “evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer’s justification for its

action is pretextual." *Johnson*, 169 F.4th at 1309-10. Pasley's record contains evidence of each and more. Pasley's "circumstantial evidence, when artfully adhered together and viewed as one," would permit a jury to find for him. *Ismael*, 161 F.4th at 764.

The district court recited those principles but did not apply them. It considered each item of evidence separately and asked whether that item, standing alone, "link[ed]" a particular action to race. (Doc. 39 at 20-22). It discounted the swap that left Pasley the only Black operator on B Shift as insufficient "without more." (Doc. 39 at 21). It reasoned that because Lackner allegedly let white and Black employees alike play their phones while singling out Pasley, the incident "undercuts the notion that Pasley was singled out due to his race." (Doc. 39 at 21-22). And it held that Pasley's failure "to rebut the defendant's proffered non-discriminatory reasons . . . tends to make the 'mosaic' significantly less convincing." (Doc. 39 at 22). Each step drew an inference for the movant, and the last is the reasoning *Ismael* rejected. *See Ismael*, 161 F.4th at 764 ("[A] plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment."). Viewed together and in Pasley's favor, the evidence would permit a reasonable jury to find that race motivated the downgrade, disparate treatment, and transfer:

**i. The decisionmaker's own explanation.**

Coffin rated Pasley "ready" in March 2022 and "not ready" eleven months later, shortly before a Team Leader opening for which he wanted McRee selected. (Doc. 26-6 at 5-7 (12:10-19:6)). When asked what changed, he did not identify any deficiency in Pasley's work and said Pasley had started "hanging out with Jessie," the other Black employee with whom Pasley was "always together mumbling," and that Pasley was focused on his VA disability rating. (Doc. 26-6 at 7 (18:11-19:6)). A jury could find that a supervisor who downgrades a Black employee because of his association with another Black employee, and who then conceals the downgrade, was influenced by race.

**ii. Concealment and selective correction.**

Coffin never told Pasley about the rating. (Doc. 26-6 at 9 (26:19-27:4)). He downgraded the Black candidate and upgraded the white candidate within seven minutes, weeks before he retired and as the Team Leader vacancy opened. (Doc. 26-13 at 19-24, 132-37; Doc. 39 at 4). HR concluded that the undisclosed ratings were unfair and called for re-evaluation. (Doc. 26-13 at 14). That correction was then applied to the white candidates but not to Pasley. *See* Part III.b.iii, *supra*.

**iii. The grooming of the white candidate.**

White leaders gave McRee leadership experience they withheld from Black operators. (Doc. 26-1 at 36 (134:8-135:23); Doc. 31-1 ¶ 11; Doc. 31-2 ¶ 7).

**iv. The departure from seniority practice.**

MBUSI's own manager testified that CMM Team Leader vacancies were "backfilled with who has the most highest seniority," and Pasley was the more senior candidate. (Doc. 26-3 at 9 (25:7-10); Doc. 26-1 at 18 (62:11-14); Doc. 31-3 ¶¶ 3-4). A departure from normal practice when it would have benefited the Black candidate is classic circumstantial evidence. The district court itself recognized as much at oral argument. (Doc. 48 at 11:6-12:11).

**v. The transfer and the swap.**

Lackner chose to move the more senior Black candidate rather than his white competitor, and he did so by swapping Pasley with the only Black Operator on B Shift, leaving Pasley the only Black Operator on that shift. (Doc. 31-2 at 2 ¶¶ 9-10; Doc. 31-3 at 3 ¶¶ 13-14). Lackner's stated purpose was to observe the two candidates separately, (Doc. 26-13 at 15), yet he worked days while Pasley was on nights for four weeks (Doc. 26-9 at 8-9), and he never re-evaluated Pasley before selecting the white candidates (Doc. 26-14 at 6). A jury could find the stated purpose implausible.

**vi. Singling out.**

Co-workers testified that after Pasley complained, management treated him as "radioactive," that Lackner targeted him, yelling at him about things like phone noise and union literature, which he tolerated from others. Co-workers perceived

that Pasley was being sent to B Shift "to make things hard on him." (Doc. 31-3 ¶¶ 16-19; Doc. 31-1 ¶ 18; Doc. 31-4 ¶ 12; Doc. 31-2 at 3 ¶¶ 12-13).

**vii. Pretext.**

Lackner says Pasley's shift transfer was to evaluate Pasley, yet he could not observe Pasley while Pasley was on the opposite shift, kept him from the leave-over, and never completed a re-evaluation of him during the process, while re-evaluating Stone. (Doc. 26-9 at 8-9 (24:3-25:22); Doc. 26-1 at 34 (129:2-15); Doc. 26-13 at 75-81). He never considered moving McRee. (Doc. 26-9 at 13 (42:15-43:10)). Lackner stated he rated Pasley "not ready" in December 2023 because Pasley did not communicate well. (Doc. 26-14 at 4 ¶ 9). But in the same evaluation Lackner rated Pasley "Satisfactory" in both "Communication" and "Interpersonal Skills," without a word of criticism. (Doc. 26-13 at 27-28). In his in-person review he only noted how hard Pasley worked and provided no constructive feedback as to improvement areas. (Doc. 27, Conventional Filing Video). The next Group Leader testified that Pasley does his job and has no performance problems apart from his relationship with McRee, and co-workers attest that Pasley communicates with everyone else. (Doc. 26-5 at 6 (13:14-14:8); Doc. 31-2 at 3 ¶¶ 14-15; Doc. 31-3 at 3 ¶ 22). "[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's explanation permit a jury to disbelieve it. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

And a jury that disbelieves the employer's explanation may infer that the real reason was discriminatory. *Reeves*, 530 U.S. at 147-48. The rating was then carried forward by Lackner's successor, who simply "followed the same." (Doc. 26-5 at 9-10 (28:14-29:7)).

**viii. The outcome.**

Both white candidates became Team Leaders, one through a position created outside the posting process, while the Black candidate was downgraded and forced out; and at the time, every Team Leader and Group Leader in the CMM lab was white. (Doc. 39 at 7; Doc. 26-2 at 47; Doc. 48 at 28:24-29:4). The deviation from the posting process prevented others from applying.

A jury might accept MBUSI's explanations. But a jury could also find, from this evidence, that race was a but-for cause of, or a motivating factor in, the downgrade, disparate treatment, and transfer. That is a jury question. *Reeves*, 530 U.S. at 150-51; *Ismael*, 161 F.4th at 763 ("As a threshold matter, [a plaintiff] does not need to 'prove' anything to defeat a motion for summary judgment.").

**ix. The inferential story**

Taken together, this evidence tells a coherent story: a Black candidate was disqualified by a concealed rating that his supervisor explained by reference to his association with another Black employee; when the concealment came to light, the cure was extended to the white candidates and barriers were put in place to keep

the cure from him; he alone was moved off his shift and isolated as the only Black Operator on another; and the rating that kept him from promotion was later justified by a reason his own evaluation contradicts. The district court's ultimate conclusion was that, "[w]hether the Court looks to the *McDonnell Douglas* framework, the convincing mosaic standard, or only Federal Rule of Civil Procedure 56," the result is the same. (Doc. 39 at 23). Applying the correct standard, the result is not the same. A reasonable jury could infer from that story that race played a role. *See Tynes*, 88 F.4th at 946-47.

## IV. The District Court Erred in Granting Summary Judgment on Pasley's Race Retaliation Claims.

Pasley’s counsel at oral argument noted Pasley’s first protected activity based on race was his October 27, 2023 EEOC charge. (Doc. 39 at 24 & n.8). The district court assumed that Lackner's December 2023 "Develop at Same Level" evaluation was a materially adverse action, ignored other acts, and held that Pasley lacked evidence that Lackner knew of the charge and could not show pretext. (Doc. 39 at 24-26). The holdings rest on the same error: the court analyzed retaliation exclusively through the *McDonnell Douglas* prima facie case and pretext framework, and never asked whether the evidence as a whole would permit a jury to find retaliation.

### a. The district court never reviewed Pasley’s race retaliation claims as a body of circumstantial evidence.

"An employee may rely on a convincing mosaic of circumstantial evidence to prove retaliation." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023). *Ismael* itself was a retaliation case, and it held that retaliation claims "follow the same framework": the question is "whether the defendant intentionally retaliated," based on all the evidence "viewed as one." 161 F.4th at 764. The district court's retaliation analysis, by contrast, consists of a prima facie analysis and a one-paragraph pretext analysis. (Doc. 39 at 23-26). It never considered whether the record, viewed as a whole, would permit a jury to infer that the December 2023 evaluation and continued disparate treatment (targeting) was retaliatory. That omission alone requires reversal.

**b. The record would permit a jury to infer that Lackner knew of the charge.**

A plaintiff must show that the decisionmaker was aware of the protected activity, but awareness may be proven with circumstantial evidence. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). The record contains such evidence. MBUSI received notice of Pasley's charge after it was filed on October 27, 2023. *See* 42 U.S.C. § 2000e-5(b) (EEOC must serve notice of the charge within ten days). The EEOC's closure memorandum, summarizing MBUSI's position statement, describes Lackner's private exchanges with Pasley, what Pasley said "to his group leader," what Pasley was "informed," and what he was "told" about putting his withdrawal in writing. (Doc. 26-2 at 48). A jury could

infer that MBUSI obtained that account from Lackner, the only other participant in those conversations, in responding to the charge. Lackner completed the evaluation between December 5 and 8, 2023, roughly six weeks after the charge. (Doc. 26-13 at 25-30). Co-workers testified that, after Pasley's complaints, management made clear he was "radioactive" and gave him "a bad rap because of the lawsuit." (Doc. 31-3 ¶¶ 16, 21). Lackner required a witness to be present for “legal purposes” when he discussed complaints with Pasley. Doc. 23 at 12 ¶ 111. Taken together and in Pasley's favor, this evidence supports a reasonable inference of knowledge; it is not the "unsupported inference" rejected in *Martin*, where the plaintiff offered nothing beyond speculation. 959 F.3d at 1053-54.

**c. Lackner's own evaluation contradicts his stated reason for downgrading in December of 2023.**

The district court held that Pasley could not show pretext because his "disagreement with [Lackner's] assessment of his performance does not suffice." (Doc. 39 at 26 (quotation omitted)). But Pasley's evidence is Lackner’s own contemporaneous evaluation, not mere disagreement.

Lackner testified that Pasley's "communication" was the *only* reason he rated Pasley "Develop at Same Level." (Doc. 26-9 at 21 (73:12-74:7)). Yet in the same evaluation, Lackner rated Pasley "Satisfactory" in "Communication" which included keeping supervisors and peers informed, conveying information accurately, and being "easy to approach and engage in open and honest

discussion", and rated him "Satisfactory" in "Interpersonal Skills" and "Teamwork." (Doc. 26-13 at 27-28). He entered the "Satisfactory" communication rating and the "Develop at Same Level" rating in the same minute. (Doc. 26-13 at 28, 30). He wrote no comment about communication; the only comments he wrote concerned Pasley's FMLA leave and his June 22 withdrawal. (Doc. 26-13 at 30). And he gave Pasley "generally positive feedback." (Doc. 26-9 at 16 (53:7-10)). Verbally, Lackner noted Pasley worked harder than anyone out there and he provided Pasley no constructive feedback for improvement. (Doc. 27, Conventional Filing Video). An employer's reason that is contradicted by its own contemporaneous documentation is the kind of inconsistency from which a jury may infer pretext. *See Reeves*, 530 U.S. at 147-48. Under *Ismael*, moreover, Pasley was not required to disprove the stated reason at all; the court was required to consider this evidence along with everything else. 161 F.4th at 764.

**d. The district court diminished the adverse actions by evaluating them piecemeal.**

In the retaliation context, an action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (quotation omitted); *Monaghan*, 955 F.3d at 861-62. Context matters, and the inquiry considers the employer's conduct collectively. *Burlington*, 548 U.S. at 69; *see Monaghan*, 955 F.3d at 862-63. The district court instead examined the witness requirement and the union-literature

incident one at a time and found each insufficient standing alone. (Doc. 39 at 24-25). In doing so it disregarded the declarations describing that incident, Lackner singled Pasley out in a hostile tone over literature that had sat on several desks for months, while union paraphernalia was displayed elsewhere in the lab, and threatened to take him to HR. (Doc. 31-1 ¶ 18; Doc. 31-2 ¶ 13; Doc. 31-4 ¶ 12; Doc. 26-9 at 17 (57:20-60:8)). Considered together with the downgrade that kept Pasley off the promotion-eligibility list, the targeting co-workers described, and the false accusation over the skills assessment, (Doc. 31-1 ¶ 26; Doc. 31-3 ¶¶ 16-21, 26), a jury could find that MBUSI's response to Pasley's charge would dissuade a reasonable worker from complaining.

## CONCLUSION

The judgment of the district court failed to give Pasley a full review of his circumstantial evidence and rests on several legal errors. Accordingly, the judgment should be reversed, and the case remanded for trial on Pasley's claims of disability discrimination and retaliation under the ADA and race discrimination and retaliation under Title VII and § 1981.

Respectfully submitted,
/s/ Leslie A. Palmer
Leslie A. Palmer
*Counsel for Plaintiff-Appellant Ryan Pasley*

Dated: October 19, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,696 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Leslie A. Palmer
Leslie A. Palmer
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2026, I electronically filed the foregoing Brief of Appellant with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will send notice of the filing to all counsel of record, including:

Michael L. Lucas
Joseph Barnello, Jr.
BURR & FORMAN LLP
mlucas@burr.com;
jbarnello@burr.com
*Counsel for Defendant-Appellee*

/s/ Leslie A. Palmer
OF COUNSEL