**No. 26-11603**

IN THE
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**RYAN PASLEY,**
*Plaintiff-Appellant,*

v.

**MERCEDES-BENZ U.S. INTERNATIONAL, INC.,**
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of Alabama, Western Division
No. 7:24-cv-01050-EGL

**APPELLANT'S APPENDIX**

Tab A through Tab 48 and Certificate of Service

**Leslie A. Palmer**
PALMER LAW, LLC
2 North 20th Street, Suite 900
Birmingham, Alabama 35203
(205) 285-3050
leslie@palmerlegalservices.com
*Counsel for Plaintiff-Appellant*
*Ryan Pasley*

**INDEX OF APPENDIX**


| Description | Date Filed | Tab |
|---|---|---|
| District Court Docket Sheet, No. 7:24-cv-01050-EGL | | A |
| Complaint | 08/01/2024 | 1 |
| Exhibit 1 – EEOC Charge | | 1-1 |
| Exhibit 2 – Amended EEOC Charge | | 1-2 |
| Exhibit 3 – Notice of Right to Sue | | 1-3 |
| Defendant's Answer to Complaint | 08/27/2024 | 6 |
| Amended Complaint | 11/26/2025 | 23 |
| Defendant's Answer to Amended Complaint | 12/02/2025 | 24 |
| Memorandum Opinion | 04/10/2026 | 39 |
| Order Granting Defendant's Motion for Summary Judgment | 04/10/2026 | 40 |
| Notice of Appeal | 05/07/2026 | 42 |
| Transcript of Motion Hearing held March 10, 2026 | 06/11/2026 | 48 |

Certificate of Service

**TAB A**

District Court Docket Sheet, No. 7:24-cv-01050-EGL

CLOSED,PROTECTIVE ORDER

# U.S. District Court
# Northern District of Alabama (Western)
# CIVIL DOCKET FOR CASE #: 7:24-cv-01050-EGL

Pasley v. Mercedes-Benz U.S. International, Inc.
Assigned to: Judge Edmund G LaCour, Jr
Case in other court: 26-11603-E
Cause: 42:2000e Job Discrimination (Employment)

Date Filed: 08/01/2024
Date Terminated: 04/10/2026
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Ryan Pasley**

represented by **Leslie A Palmer**
PALMER LAW, LLC
2 20th Street North, Suite 900
Birmingham, AL 35203
205-285-3050
Email: leslie@palmerlegalservices.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Mercedes-Benz U.S. International, Inc.**

represented by **Joseph Barnello , Jr.**
BURR & FORMAN LLP
Wachovia Tower
420 20th Street N, Suite 3400
Birmingham, AL 35203
205-251-3000
Fax: 205-244-5792
Email: jbarnello@burr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael L Lucas**
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, AL 35203
205-251-3000
Fax: 205-244-5673
Email: mlucas@burr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2024 | 1 | COMPLAINT against Mercedes-Benz U.S. International, Inc., filed by Ryan Pasley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet)(CLC) |

| | | |
|---|---|---|
| | | (Entered: 08/02/2024) |
| 08/02/2024 | | Filing Fee: Filing fee $ 405, receipt_number AALNDC-4649114. related document 1 COMPLAINT against Mercedes-Benz U.S. International, Inc., filed by Ryan Pasley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet)(CLC). (Palmer, Leslie) ALND Receipt # B-12863 Modified on 8/2/2024 (CLC). (Entered: 08/02/2024) |
| 08/02/2024 | 2 | Request for service by certified mail filed by Ryan Pasley. (Palmer, Leslie) (Entered: 08/02/2024) |
| 08/02/2024 | 3 | Summons Issued as to Mercedes-Benz U.S. International, Inc.. (CLC) (Entered: 08/02/2024) |
| 08/07/2024 | 4 | **INITIAL ORDER GOVERNING ALL FURTHER PROCEEDINGS** - with appendices attached. Signed by Judge Annemarie Carney Axon on 8/7/24. (SAC) (Entered: 08/07/2024) |
| 08/08/2024 | 5 | SUMMONS Returned Executed by Ryan Pasley. Mercedes-Benz U.S. International, Inc. served on 8/6/2024, answer due 8/27/2024. (CLC) (Entered: 08/08/2024) |
| 08/27/2024 | 6 | ANSWER to 1 Complaint by Mercedes-Benz U.S. International, Inc..(Lucas, Michael) (Entered: 08/27/2024) |
| 08/27/2024 | 7 | Corporate Disclosure Statement by Mercedes-Benz U.S. International, Inc.. filed by Mercedes-Benz U.S. International, Inc. (Lucas, Michael) (Entered: 08/27/2024) |
| 08/27/2024 | 8 | NOTICE of Appearance by Joseph Barnello, Jr on behalf of Mercedes-Benz U.S. International, Inc. (Barnello, Joseph) (Entered: 08/27/2024) |
| 08/28/2024 | 9 | **ORDER REGARDING COMPLIANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 26(f)**. Signed by Judge Annemarie Carney Axon on 8/28/24. (SAC) (Entered: 08/28/2024) |
| 09/20/2024 | 10 | REPORT of Rule 26(f) Planning Meeting. (Lucas, Michael) (Entered: 09/20/2024) |
| 09/20/2024 | 11 | Joint MOTION for Hipaa Order by Mercedes-Benz U.S. International, Inc.. (Attachments: # 1 Text of Proposed Order)(Lucas, Michael) (Entered: 09/20/2024) |
| 09/20/2024 | 12 | Joint MOTION for Protective Order by Mercedes-Benz U.S. International, Inc.. (Attachments: # 1 Text of Proposed Order)(Lucas, Michael) (Entered: 09/20/2024) |
| 09/26/2024 | 13 | **QUALIFIED HIPAA PROTECTIVE ORDER**. Signed by Judge Annemarie Carney Axon on 9/26/24. (SAC) (Entered: 09/26/2024) |
| 09/26/2024 | 14 | **PROTECTIVE ORDER**. Signed by Judge Annemarie Carney Axon on 9/26/24. (SAC) (Entered: 09/26/2024) |
| 10/11/2024 | 15 | **SCHEDULING ORDER** governing further proceedings in this action unless modified for good cause shown: Discovery due by 7/31/2025; Dispositive Motions due by 10/8/2025; Joint Status Report due by 6/30/2025. The parties shall be ready for trial in May 2026, to be scheduled by separate order. Signed by Judge Annemarie Carney Axon on 10/11/24. (SAC) (Entered: 10/11/2024) |
| 06/09/2025 | 16 | Joint MOTION for Extension of Time *of Two Months of Certain Scheduling Order Deadlines* by Mercedes-Benz U.S. International, Inc.. (Lucas, Michael) (Entered: 06/09/2025) |
| 06/24/2025 | 17 | **TEXT ORDER** granting the parties' joint motion to extend deadlines. (Doc. 16 ). The discovery deadline is now September 30, 2025. Dispositive motions are now due on or |

| | | |
|---|---|---|
| | | before December 8, 2025. A joint status report is now due on or before August 29, 2025. Signed by Judge Annemarie Carney Axon on 6/24/2025. (KNS) (Entered: 06/24/2025) |
| 08/29/2025 | 18 | STATUS REPORT - *JOINT* - by Mercedes-Benz U.S. International, Inc.. filed by Mercedes-Benz U.S. International, Inc. (Lucas, Michael) (Entered: 08/29/2025) |
| 11/06/2025 | | NOTICE OF REASSIGNMENT: This case is reassigned to Judge Edmund G LaCour, Jr. Judge Annemarie Carney Axon no longer assigned to the case. (KAM) (Entered: 11/06/2025) |
| 11/21/2025 | 19 | TEXT ORDER: **Video Status Conference is set for Tuesday, 11/25/2025 at 10:00 AM** before Judge Edmund G LaCour Jr. Dial-in information will be emailed to counsel prior to the video conference. Signed by Judge Edmund G LaCour Jr on 11/21/2025. (MEB2) (Entered: 11/21/2025) |
| 11/25/2025 | | Minute Entry for proceedings held before Judge Edmund G LaCour Jr: Video Status Conference held on 11/25/2025. (Court Reporter None) (MEB2) (Entered: 11/25/2025) |
| 11/25/2025 | 20 | Unopposed MOTION to Amend/Correct *Complaint* by Ryan Pasley. (Attachments: # 1 Exhibit Ex 1 Amended Complaint)(Palmer, Leslie) (Entered: 11/25/2025) |
| 11/25/2025 | 21 | TEXT ORDER: For good cause shown, the Court **EXTENDS** the Dispositive Motions deadline to 12/15/2025. Responses are due on or before 01/12/2026. Replies, if any, are due on or before 01/26/2026. All other deadlines remain the same. Signed by Judge Edmund G LaCour, Jr on 11/25/2025. (KNS) (Entered: 11/25/2025) |
| 11/26/2025 | 22 | TEXT ORDER: Plaintiff Ryan Pasley's Unopposed Motion to Amend Complaint (Doc. 20 ) is **GRANTED**. The Clerk is **DIRECTED** to file the amended complaint (Doc 20 -1) as a separate docket entry. Defendant Mercedes-Benz U.S. International, Inc. is **DIRECTED** to file an answer to the amended complaint on or before 12/10/2025. Signed by Judge Edmund G LaCour, Jr on 11/26/2025. (KNS) (Entered: 11/26/2025) |
| 11/26/2025 | 23 | AMENDED COMPLAINT against Mercedes-Benz U.S. International, Inc., filed by Ryan Pasley. **Entered by clerk pursuant to Order (Doc. 22)**(KNS) (Entered: 11/26/2025) |
| 11/26/2025 | | Set Deadlines pursuant to Order (Doc. 22): Mercedes-Benz U.S. International, Inc. answer to the Amended Complaint due 12/10/2025. (KNS) (Entered: 11/26/2025) |
| 12/02/2025 | 24 | ANSWER to 23 Amended Complaint by Mercedes-Benz U.S. International, Inc..(Lucas, Michael) (Entered: 12/02/2025) |
| 12/15/2025 | 25 | MOTION for Summary Judgment by Mercedes-Benz U.S. International, Inc.. (Lucas, Michael) (Entered: 12/15/2025) |
| 12/15/2025 | 26 | Evidentiary Material re: 25 MOTION for Summary Judgment . (Attachments: # 1 Exhibit A - Deposition of Plaintiff Ryan Pasley, # 2 Exhibit B - Exhibits to the Deposition of Plaintiff Ryan Pasley, # 3 Exhibit C - Deposition of Andreas Roller, # 4 Exhibit D - Deposition of Brittney Wasilewski, # 5 Exhibit E - Deposition of David Hunter, # 6 Exhibit F - Deposition of Frank Coffin, # 7 Exhibit G - Deposition of Lolly McAbee, # 8 Exhibit H - Deposition of Michael McRee, # 9 Exhibit I - Deposition of Nicholas Lackner, # 10 Exhibit J - Deposition of Octave (OJ) Roberts, # 11 Exhibit K - Deposition of Stephen Stone, # 12 Exhibit L - Deposition of William Harden, # 13 Exhibit M - Plaintiff's Exhbits to the MBUSI Depositions, # 14 Exhibit N - Declaration of Nicholas Lackner, # 15 Exhibit O - Declaration of Frank Walls)(Lucas, Michael) (Entered: 12/15/2025) |
| 12/15/2025 | 27 | NOTICE by Mercedes-Benz U.S. International, Inc. re 25 MOTION for Summary Judgment - *Notice of Conventional Filing of Video Deposition Exhibit* (Lucas, Michael) (Thumb drive received in clerk's office and placed in file on 12/15/2025- Modified on 12/15/2025) (KNS). (Entered: 12/15/2025) |

| | | |
|---|---|---|
| 12/16/2025 | 28 | Brief re 25 MOTION for Summary Judgment . (Lucas, Michael) (Entered: 12/16/2025) |
| 01/07/2026 | 29 | Unopposed MOTION for Extension of Time to File Response as to 25 MOTION for Summary Judgment , 26 Evidentiary Material,,, 28 Brief, 27 Notice, by Ryan Pasley. (Palmer, Leslie) Modified on 1/7/2026 (KNS). (Entered: 01/07/2026) |
| 01/08/2026 | 30 | TEXT ORDER: For good cause shown, Plaintiff's Unopposed Motion for Extension (Doc. 29 ) is **GRANTED**. Plaintiff's response to Defendant's Motion for Summary Judgment (Doc. 25 ) is due on or before January 19, 2026. Defendant's reply, if any, is due on or before February 2, 2026. Signed by Judge Edmund G LaCour Jr on 1/8/2026. (KNS) (Entered: 01/08/2026) |
| 01/19/2026 | 31 | Evidentiary Material *in Response and Opposition to MBUSI Motion for Summary Judgment*. (Attachments: # 1 Exhibit PX 1 Stallworth Declaration, # 2 Exhibit PX 2 McFerrin Declaration, # 3 Exhibit PX 3 Kitchens Declaration, # 4 Exhibit PX 4 Pasley Declaration, # 5 Exhibit PX 5 Handbook Excerpts, # 6 Exhibit PX 6 EEOC Intake Notes, # 7 PX 7 Photo)(Palmer, Leslie) (Entered: 01/19/2026) |
| 01/19/2026 | 32 | RESPONSE in Opposition re 25 MOTION for Summary Judgment *Oral Argument Requested* filed by Ryan Pasley. (Palmer, Leslie) (Entered: 01/19/2026) |
| 01/28/2026 | 33 | Unopposed Motion to Extend Dispositive Reply Brief Deadline and Page Limitation by Mercedes-Benz U.S. International, Inc.. (Barnello, Joseph) Modified on 1/28/2026 (KNS). (Entered: 01/28/2026) |
| 01/29/2026 | 34 | TEXT ORDER: The Court **GRANTS** Defendant's Motion (Doc. 33 ). The defendant may file a reply to Plaintiff's Response in Opposition (Doc. 32 ) on or before February 6, 2026. The Court enlarges the reply brief page limitation to fifteen pages. Signed by Judge Edmund G LaCour Jr on 1/29/2026. (KNS) (Entered: 01/29/2026) |
| 02/06/2026 | 35 | REPLY Brief filed by Defendant Mercedes-Benz U.S. International, Inc. re: 25 MOTION for Summary Judgment filed by Mercedes-Benz U.S. International, Inc.. (Lucas, Michael) (Entered: 02/06/2026) |
| 02/06/2026 | 36 | MOTION to Strike 32 Response in Opposition to Motion, 31 Evidentiary Material, *[certain portions]* by Mercedes-Benz U.S. International, Inc.. (Lucas, Michael) (Entered: 02/06/2026) |
| 02/17/2026 | 37 | RESPONSE in Opposition re 36 MOTION to Strike 32 Response in Opposition to Motion, 31 Evidentiary Material, *[certain portions]* filed by Ryan Pasley. (Palmer, Leslie) (Entered: 02/17/2026) |
| 02/25/2026 | 38 | TEXT ORDER: This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 25 ) and Defendant's Motion to Strike Evidentiary Material from plaintiff's response brief (Doc. 36 ). A **Motion Hearing is set for Tuesday, 3/10/2026 at 1:00 PM** in the Richard Shelby Federal Building and Courthouse, Tuscaloosa, AL before Judge Edmund G LaCour Jr. The parties should be prepared to address all issues included in the pending Motion for Summary Judgment. Signed by Judge Edmund G LaCour Jr on 2/25/2026. (MEB2) (Entered: 02/25/2026) |
| 03/10/2026 | | Minute Entry for proceedings held before Judge Edmund G LaCour Jr: Motion Hearing held on 3/10/2026; Leslie Palmer present for Plaintiff. Joseph Barnello and Michael Lucas present for Defendant. Court's opening remarks. Arguments by Counsel. Separate order to be entered. Hrg adj. (Court Reporter Kelli Griffin) (MEB2) (Entered: 03/10/2026) |
| 04/10/2026 | 39 | MEMORANDUM OPINION. Signed by Judge Edmund G LaCour, Jr on 4/10/2026. (KAM) (Entered: 04/10/2026) |

| | | |
|---|---|---|
| 04/10/2026 | 40 | ORDER. Consistent with the Memorandum Opinion entered with this order, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 25 ). The Court **DENIES AS MOOT** Defendant's Motion to Strike (Doc. 36 ). Signed by Judge Edmund G LaCour, Jr on 4/10/2026. (KAM) (Entered: 04/10/2026) |
| 04/24/2026 | 41 | BILL OF COSTS by Mercedes-Benz U.S. International, Inc.. filed by Mercedes-Benz U.S. International, Inc. (Lucas, Michael) (Entered: 04/24/2026) |
| 04/27/2026 | | NOTICE: The clerk will tax costs on 5/14/2026, pursuant to FRCP 54(d) in response to re 41 Bill of Costs filed by Mercedes-Benz U.S. International, Inc.; objections, if any, to the bill of costs must be filed on or before 5/11/2026. (MEB2) (Entered: 04/27/2026) |
| 05/07/2026 | 42 | NOTICE OF APPEAL as to 39 Memorandum Opinion, 40 Order by Ryan Pasley. Filing fee $ 605, receipt number AALNDC-5147039. Appeal Record due by 5/21/2026. (Palmer, Leslie) Modified on 5/8/2026 (KNS). ALND Rec# B-24275 Modified on 5/8/2026 (KNS). (Entered: 05/07/2026) |
| 05/08/2026 | 43 | NOTICE of Transmittal Letter to the 11th Circuit Court of Appeals (KNS) (Entered: 05/08/2026) |
| 05/08/2026 | 44 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 42 Notice of Appeal (KNS) (Entered: 05/08/2026) |
| 05/11/2026 | | USCA Case Number 26-11603-E for 42 Notice of Appeal, filed by Ryan Pasley. (KNS) (Entered: 05/11/2026) |
| 05/11/2026 | 45 | Opposition to re 41 *Bill of Cost* filed by Ryan Pasley. (Palmer, Leslie) (Entered: 05/11/2026) |
| 05/22/2026 | 46 | TRANSCRIPT REQUEST by Ryan Pasley for proceedings held on 3/10/2026 before Judge LaCour, Transcript due by 6/22/2026. (Palmer, Leslie) (Entered: 05/22/2026) |
| 06/10/2026 | 47 | TRANSCRIPT REQUEST PART II COURT REPORTER ACKNOWLEDGMENT (KNS) (Entered: 06/10/2026) |
| 06/11/2026 | 48 | Transcript of Motion Hearing held on March 10, 2026, before Judge Edmund G. LaCour Jr. Court Reporter/Transcriber Kelli Griffin. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at https://www.alnd.uscourts.gov/sites/alnd/files/forms/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/2/2026. Redacted Transcript Deadline set for 7/12/2026. Release of Transcript Restriction set for 9/9/2026. (KNS) (Entered: 06/11/2026) |
| 06/11/2026 | 49 | TRANSCRIPT REQUEST PART III NOTIFICATION THAT TRANSCRIPT HAS BEEN FILED IN DISTRICT COURT (KNS) (Entered: 06/11/2026) |
| 10/20/2026 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Alabama certifies that the record is complete for purposes of this appeal re: 42 Notice of Appeal,, Appeal No. 26-11603-EE. The entire record on appeal is available electronically, or The record on appeal is available electronically (KNS) (Entered: 10/20/2026) |
| 10/27/2026 | 50 | ORDER of USCA- Pursuant to the 11th Cir. R. 42-2(c), this appeal is DISMISSED for want of prosecution because the appellant Ryan Pasley failed to file an appendix within the |

| | | |
|---|---|---|
| | | time fixed by the rules. (Deemed filed in the 11th Circuit on 10/27/2026) (KNS) (Entered: 10/27/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/27/2026 10:34:01 | | | |
| **PACER Login:** | Palmerlegalservices | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:24-cv-01050-EGL |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**TAB 1**

Complaint
(Filed 08/01/2024)

FILED
2024 Aug-02 AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| RYAN PASLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO: |
| v. | ) | JURY DEMAND |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over claims of Federal Question under 28 U.S.C. § 1331 and over claims to redress Civil Rights violations under 28 U.S.C. § 1343(a)(4). This lawsuit for discriminatory and retaliatory employment practices based on race and disability is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., 42 U.S.C.§ 1981; as amended, and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.*, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*

2. Plaintiff invokes the jurisdiction of this Court to secure protection for and to redress the deprivation of rights secured by Title VII, § 1981, the ADA, and ERISA seeking injunctive and other relief against discrimination and retaliation because of race and disability.

3. Venue is proper within the Western Division of the Northern District of Alabama. At all relevant times, Defendant employed Plaintiff in Vance, Alabama.

## II. PARTIES

4. Plaintiff, Ryan Pasley ("Pasley" or "Plaintiff") is a Black adult resident of Alabama and a citizen of the United States.

5. Defendant, Mercedes-Benz U.S. International, Inc. ("Mercedes" or "Defendant") is a corporation organized under the laws of the state of Alabama that at all relevant times was authorized to do business and was doing business in Vance, Alabama.

6. At all times relevant to this action, Mercedes employed Pasley, making Mercedes an "employer" for the purpose of Title VII, § 1981, the ADA, and ERISA.

7. Mercedes employed at least fifteen (20) persons for each working day during each twenty (20) or more calendar work weeks in the current or preceding calendar year.

## III. CONDITIONS PRECEDENT

8. On October 27, 2023, within 180 days of a discriminatory and retaliatory change to the terms and conditions of Plaintiff's employment (e.g. shift/team assignment), Pasley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 420-2023-03133 (See attached Exhibit 1).

9. After engaging counsel, Pasley filed an amended charge on February 28, 2024. (See attached Exhibit 2).

10. The EEOC issued a Determination and Notice of Rights dated May 3, 2024 that Pasley received via portal download thereafter. (See attached Exhibit 3).

11. Plaintiff timely files this lawsuit within 90 days of receipt of the Determination and Notice of Rights.

12. Pasley has fulfilled all conditions precedent under Title VII and the ADA

13. Pasley has no conditions precedent under § 1981 or ERISA.

## IV. FACTUAL ALLEGATIONS

14. Pasley is a United States Military veteran who suffers from diagnosed PTSD.

15. Pasley is a Black male of African ancestry.

16. Pasley began working for Mercedes on October 18, 2004.

17. For nearly two decades, Mercedes evaluated Pasley's performance as satisfactory through employment evaluations.

18. In 2008, Mercedes promoted Pasley to team lead.

19. In 2014, Pasley turned down a promotion to group leader in production.

20. At the same time, Pasley accepted a position as a Coodinate Measure Machine Operator ("CMM Operator") in the CMM lab at the team member level.

21. CMM Operators require additional skills beyond production line employees.

22. In 2015, Pasley's supervisor, Frank Coffin, evaluated Pasley as "Satisfactory" on the ratings scale but "Needs Development" before being ready for the next level in the CMM lab.

23. Pasley did not receive any more evaluations until March of 2022, when Coffin evaluated his performance for October 2020-October 2021.

24. In the evaluation, Coffin rated Pasley "Satisfactory" on the ratings scale and "Ready for Team Leader."

25. In April of 2023, Pasley self-nominated for a team leader opening in the CMM Lab.

26. Mike McRee and Stephen Stone, both White, also received nominations.

27. On May 4, 2023, Mercedes released the eligible employee names for peer review as part of the promotional process.

28. Mercedes did not include Pasley on the list of eligibles and only submitted Mike McRee for peer review.

29. Pasley asked Taylor Whitman why his name was excluded.

30. Whitman provided him contact information for Brittney Wasilewski, an employee in Human Resources.

31. Pasley e-mailed Wasilewski asking why Mercedes excluded him from the peer review list.

32. After he escalated his question to Human Resources, OJ Roberts responded that Coffin had rated Pasley "Not Ready" in February of 2023.

33. Pasley pointed out that he had never received a February 2023 evaluation/rating and had therefore not had a chance to respond.

34. Roberts stated he would need to do some research and get back to him because if Pasley did not get the evaluation, that was "a little disturbing."

35. On May 9, 2024, the CMM manager, Andy Roller, told the department the promotion process would start over because of abnormalities or irregularities but that evaluations get turned in "all the time" without people knowing about it.

36. Pasley responded to Roller, in front of the group, that if that happens all the time there is a bigger problem because there had already been another promotion that may have been affected.

37. Roller appointed Chris Dickey, White, as interim team lead pending evaluations.

38. Dickey did not want to be acting team lead.

39. In the past, Mercedes had conducted observation evaluations by allowing the candidate to act as team lead for a period then switch out with another candidate. This method of review allowed observation of the candidate in the actual role they were seeking to fill.

40. The CMM operates two shifts, A shift and B shift. Each shift is a team that operates days for two weeks and evenings for two weeks. CMM employees could use flex time to come in late or leave early if needed.

41. After Roller named Dickey acting team lead, Dickey told Pasley he could no longer use flex time per Roller's instruction.

42. Pasley observed White employees continuing to use flex time.

43. The open team lead position was on A Shift, Pasley's shift/team.

44. May 15, 2024, Nick Lackner started in the CMM as group lead, Pasley's supervisor.

45. Lackner is White.

46. On his first day, Lackner moved Pasley to B shift.

47. The move to B shift forced Pasley to work 4 weeks of evenings in a row.

48. He had not asked off for his daughter's graduation because he would have been on A shift and been off in time to attend. He missed the graduation working evenings on B shift.

49. Though he had vacation time available, Pasley was saving his time because he had a terminally ill son at home.

50. In May of 2023, A shift was roughly ½ Black and ½ White team members.

51. When Lackner moved Pasley to B shift, he switched Pasley with the only Black employee on the B shift team.

52. The move to B shift took Pasley out of his routine and away from the team he was familiar with.

53. Group leaders work on day shift so when Pasley worked nights, Lackner was not present to evaluate him.

54. Additionally, Because the team lead position was only available on A shift, the move to B shift did not provide Lackner any opportunity to evaluate Pasley in the team lead role.

55. On at least one occasion, the B Shift team lead was out and Dickey, the acting A shift team lead asked if Pasley wanted the "turnover" – the shift change procedure from team lead to team lead – Lackner stepped in and told Dickey not to give it to Pasley.

56. McRee was absent for nearly one month while Lackner was supposed to be evaluating him on A shift.

57. During that month, Lackner did not observe or speak to Pasley.

58. The CMM team members rotate jobs/seats on a schedule including moving through different stations or "plates" and "tugging" or pulling the car into the lab.

59. Though Lackner usually had his office door open, when Pasley rotated to the station closest to Lackner's office, Lackner would close his door saying he didn't want to hear Pasley's voice.

60. The lab is loud with a lot of ambient noise.

61. On June 14, 2023, Lackner verbally attacked Pasley about having the volume on for a video he was watching on his phone.

62. Lackner screamed at Pasley in front of the rest of the team.

63. Pasley was not the only team member on his cell phone and was not the only team member to be using audible sound.

64. Lackner screaming at Pasley triggered his PTSD symptoms.

65. Pasley left the lab to calm down.

66. When he returned, he asked Lackner if he could speak with him.

67. Lackner told him no, and that he did not have anything to say to him.

68. June 15, 2023, Pasley approached Lacker to speak with him.

69. Lackner ignored Pasley for nearly 10 minutes.

70. When Lackner finally acknowledged Pasley, Lacker again said Pasley could not speak to him.

71. Pasley told him if he was going to act that way and not actually evaluate him, he would like to return to A shift.

72. Lackner responded "denied" and told him that was the exact reason he would not be promoted.

73. Pasley asked if he could go speak with HR.

74. Lackner responded "I don't care what you do."

75. Pasley spoke with Crystal in HR about what was happening.

76. Pasley gave Crystal a written statement that included his PTSD diagnosis and that he was experience a hostile work environment and retaliation.

77. Pasley told HR that moving him from A shift and talking down to him was triggering his PTSD.

78. Pasley told HR he was the only Black candidate for team lead.

79. Crystal told him she had other investigations but would get back to him.

80. June 21, 2023, Crystal stated she had to get a witness statement from Lackner.

81. HR never spoke with Pasley about disability accommodations.

82. June 22, 2023, Lackner told Pasley he would let him go back to A shift if he would write a statement saying he was no longer interested in the team lead position.

83. Lackner conditioned Pasley's accommodation on removing his name from promotional consideration.

84. The same day, Pasley sent an e-mail to multiple people, including Lackner, HR and other supervisors stating he was removing his name from the promotion list because of the hostile work environment and retaliation and at the advice of the physician that treats his PTSD.

85. Pasley received only one response from Crystal saying "OK" but no other supervisor or individual responded.

86. On June 26, 2023, Mercedes told Pasley he could return to A shift.

87. After approximately one week back on A shift, Pasley's son died.

88. Pasley took a couple of weeks bereavement at which time his physician recommended short term disability.

89. Pasley completed the paperwork for 90 days of short-term disability and made multiple attempts to confirm approval, which HR said he had.

90. Pasley started his disability leave on August 18, 2023.

91. After Pasley left for disability leave on August 18, 2023, Mercedes announced it had promoted McRee to team lead.

92. Mercedes also created a second position and promoted Stone to team lead.

93. Stone was not qualified for promotion based on his earlier evaluation.

94. Mercedes updated/changed Stone's evaluation to make him eligible for the newly created position.

95. After a couple of weeks off, Pasley noticed he was not receiving the correct pay.

96. After following up, again, Pasley learned that Mercedes denied his short-term disability claiming he did not respond to a request for more information. Mercedes sent the request to his work e-mail which he did not have access to while on leave instead of his personal e-mail he had included in his short term disability paperwork.

97. Mercedes approved him for FMLA and encouraged him to have his physician release him early if he wanted to be paid.

98. Pasley did not request an earlier return date resulting in 90 days of leave, unpaid.

99. Pasley signed his EEOC charge which he filed pro se on October 27, 2023.

100. Pasley returned to Mercedes on November 20, 2023.

101. On December 8, 2023 Lackner gave Pasley another evaluation.

102. Lackner rated Pasley as satisfactory.

103. Lackner told Pasley "you do good work and outwork people senior to you."

104. Lackner did not give Pasley any guidance for improvement.

105. Lackner marked Pasley not ready for the next level.

106. January 18, 2024, McRee spoke to Pasley about a skills training, going over some paperwork with him.

107. McRee asked Pasley if he wanted a copy of the document.

108. Pasley said he did not want a copy.

109. Because he declined taking a copy of the document, McRee reported to Lackner that Pasley was refusing training.

110. Pasley did not refuse any training.

111. Lackner reprimanded Pasley after bringing in Phil McDuff, another Black employee as a witness "for legal purposes."

112. Lackner told McRee to "let him know" if Pasley gave him "any problems" or refused the training the next day.

113. Pasley told Lackner he did not refuse any training and did not understand what the issue was.

114. On Pasley's next available shift, Lackner manipulated the rotation schedule to make him take the training that no other employee was required to take.

115. The "training" was a short review of the paper that McRee had already reviewed with Pasley the week before.

116. Around February of 2024, Melchior replaced Roller as the manager over CMM.

117. March 5, 2024 Lackner screamed at Pasley about pro-union pamphlets sitting on his desk.

118. When Pasley did not respond, Lackner complained to HR about Pasley.

119. Lackner took vacation for the month of April and resigned effective May 15, 2024.

120. From June of 2023 to May of 2024, other employees ignored and isolated Pasley.

121. After May 15, 2024, and Lackner's departure, other employees began including Pasley again.

122. Lackner's departure will create additional promotional opportunities.

123. Mercedes will not consider Pasley for the opportunities because his December 2023 evaluation from Lackner rated him "not ready."

124. Pasley e-mailed Melchior inquiring what he needed to do for advancement.

125. Melchior told Pasley he had to research to see what was going on with his situation with HR and get some background information.

126. Melchior said he had heard good things about Pasley, including that he worked hard and helped everyone.

127. Melchior said McRee complained that Pasley does not communicate when McRee speaks to him and does not give him feedback.

128. McRee has never counseled Pasley on communication.

129. Pasley's multiple attempts at communication with Lackner involved Lackner ignoring or screaming at him.

## V. STATEMENT OF PLAINTIFF'S CLAIMS

### COUNT ONE
### TITLE VII – RACE DISCRIMINATION

130. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

131. Defendant discriminated against Pasley in the terms and conditions of his employment, because of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.*, by among other things, continually marking him "not ready" for the next level on evaluations and transferring him to another shift where he was the only Black employee.

132. Defendant also discriminated against Pasley by treating him different from white employees regarding flex time, cell phone use, and personal interactions.

133. Pasley's race was a motivating factor in Defendant's differential treatment of Plaintiff.

134. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits, embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

135. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

136. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT TWO**
**§ 1981 RACE DISCRIMINATION**

137. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

138. Defendant discriminated against Pasley in the terms and conditions of his employment, because of his race, in violation of 42 USC § 1981 by among other things, continually marking him "not ready" for the next level on evaluations and transferring him to another shift where he was the only Black employee.

139. Defendant also discriminated against Pasley by treating him different from white employees regarding flex time, cell phone use, and personal interactions.

140. Defendant discriminated against Pasley by failing to promote him to team lead and maintaining him as ineligible for promotion.

141. Defendant failed to promote Pasley and otherwise treated him different in the terms and conditions of his employment because of his race.

142. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits, embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

143. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

144. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by § 1981.

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating § 1981;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT THREE**
**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE**

145. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

146. Pasley is a qualified individual with an impairment that substantially limits his major life activities. Pasley is diagnosed with PTSD, a mental health condition that results in symptoms such as uncontrolled anxiety, depression, problems sleeping, need for stability, etc.

147. Pasley disclosed his disability to Defendant in June of 2023.

148. Pasley requested the accommodation of returning to his shift/team which was more familiar, more friendly, and more racially diverse than the team Mercedes had transferred him to in May.

149. Pasley also reported to HR that Lackner's behavior was triggering his PTSD symptoms.

150. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by failing to engage in the interactive process with Pasley to determine if any other accommodations were available and did not discuss returning him to his shift.

151. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 through Lackner's continued to bully hostile treatment of Pasley.

152. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by conditioning his return to his original shift/team on his removal from the promotion list.

153. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by failing to otherwise accommodate him.

154. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by interfering with his short-term disability leave.

155. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits, embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

156. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

157. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by the ADA.

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating the ADA;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT FOUR**
**TITLE VII – RETALIATION**

158. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

159. Pasley engaged in protected activity under Title VII when he complained of differential treatment in the terms and conditions of his employment, including the hostile treatment from Lackner, because he was the only Black employee seeking the team leader position.

160. Pasley also engaged in protected activity by filing an EEOC charge.

161. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

162. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

163. After he complained, Defendants promoted McRee who was White and created a new position to promote Stone, also White.

164. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

165. After Pasley filed an EEOC charge, Lackner required a Black witness to be present during discussions for "legal purposes."

166. After Pasley filed an EEOC charge, Lackner attempted to report Pasley to HR for pro-union pamphlets on his desk.

167. Defendants retaliated against Pasley because he engaged in conduct protected under Title VII.

## RELIEF

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT FIVE**
**§ 1981 – RETALIATION**

168. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

169. Pasley engaged in protected activity under § 1981 when he complained of differential treatment in the terms and conditions of his employment, including the hostile treatment from Lackner, because he was the only Black employee seeking the team leader position and failure to promote.

170. Pasley also engaged in protected activity by filing an EEOC charge.

171. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

172. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

173. After he complained, Defendants promoted McRee who was White and created a new position to promote Stone, also White.

174. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

175. After Pasley filed an EEOC charge, Lackner required a Black witness to be present during discussions for "legal purposes."

176. After Pasley filed an EEOC charge, Lackner attempted to report Pasley to HR for pro-union pamphlets on his desk.

177. Defendant continues to deny Pasley promotion by keeping him off the eligibility list.

178. Defendants retaliated against Pasley because he engaged in conduct protected under § 1981.

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by § 1981;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating § 1981;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT SIX**
**ADA – RETALIATION**

179. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

180. Pasley engaged in protected activity under the ADA when he requested an accommodation and complained that his manager was increasing the symptoms of his disability.

181. Pasley also engaged in protected activity by filing an EEOC charge.

182. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

183. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

184. Lackner conditioned Pasley's requested accommodation on his removal from promotional consideration.

185. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

186. Defendant continues to deny Pasley promotion by keeping him off of the eligibility list.

187. Defendants retaliated against Pasley because he engaged in conduct protected under the ADA.

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by the ADA;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating the ADA;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT SEVEN**
**ERISA § 510**

188. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

189. Defendant was Plaintiff's employer and a plan sponsor of a plan that included group Short Term Disability benefits.

190. Plaintiff participated in Defendant's plan for Short Term Disability benefits.

191. In June of 2023, Plaintiff suffered a serious medical condition requiring the use of the employer's Short Term Disability benefits.

192. Defendant was aware of Plaintiff's serious medical condition and application for Short Term Disability Benefits.

193. Defendant told Plaintiff he had completed all necessary paperwork and was "covered."

194. Plaintiff took the required disability leave.

195. During his leave, he did not have access to his employee e-mail.

196. Defendant exclusively tried to communicate with Plaintiff via the work e-mail despite having his telephone number, address, and personal e-mail.

197. Defendant interfered with Plaintiff's award of Short-Term Disability benefits.

198. Instead of correcting it, Defendant told Plaintiff his only option was to request an earlier release and return to work.

199. Defendant interfered with Plaintiff's benefits to prevent him from using the benefits to which he was entitled.

200. As a consequence of Defendant's unlawful conduct, Plaintiff suffered damages, including but not limited to lost wages and benefits.

201. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for back pay, front pay, attorney's fees, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

202. Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court.

## RELIEF

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by the ERISA § 510;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating ERISA;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, attorney's fees, expenses, interest, and cost; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**PLAINTIFF REQUESTS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

/s/ Leslie A. Palmer
ASB-0436-L40P

OF COUNSEL:
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205) 285-3050
leslie@palmerlegalservices.com

**DEFENDANT TO BE SERVED AT**
Mercedes-Benz U.S. International, Inc.
C/O W. Steven Nichols or other Agent
1 Mercedes Drive
Vance, AL 35490

**TAB 1-1**

Exhibit 1 – EEOC Charge

FILED
2024 Aug-02 AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| EEOC | **420-2023-03133** |

and EEOC

*State or local Agency, if any*

| I Name *(indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.)* | Home Phone | Year of Birth |
|---|---|---|
| Mr. Ryan D. Pasley | [redacted] | |

Street Address

[redacted]

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Mercedes -Benz United States International | | |

Street Address

1 Mercedes Dr.

VANCE, AL 35490

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address City, State and ZIP Code

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE Earliest | Latest |
|---|---|---|
| Race, Retaliation | 05/15/2023 | 06/30/2023 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am African American. I began working for R on October 18, 2004. In 2013, I was a team lead and was offered a group leader position. However, I stepped down to a team member to take a position as a CMM (Coordinate Measuring Machine) Operator.

On May 4, 2023, the peer review list for Team Lead in CMM came out and my name was not on the list, even though I nominated myself for the position around April 2023. I emailed Taylor Whitman (Interim Group Leader) and asked why my name was not on the list. Mr. Whitman stated that he did not know and later emailed me the name of Whitney Wasilewski (HR Department over Promotion Process) to contact. I emailed Ms. Wasilewski and she replied that I was not ready for the next level. The last evaluation I received was on October 21, 2021, stating that I was ready for the next level. Ms. Wasilewski informed me that I had an evaluation dated March 8, 2022, given by Frank Coffen (Group Leader, Panamanian), that I was not aware of, and it removed me from promotion eligibility.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

**Digitally Signed By: Mr. Ryan D. Pasley**

**10/27/2023**

*Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | **420-2023-03133** |
| State or local Agency, if any | | and EEOC |

On May 9, 2023, my manager, Andy Roller (Caucasian), had a meeting with the shift and stated that the team leader process will have to start over due to lack of feedback on evaluations and it would be another two-month evaluation, before they determine the next team leader.

On May 15, 2023, Nicholas Lackner (Caucasian) became the new group leader. Mr. Lackner informed me that he was moving me to the B shift so that he could evaluate me separate from Mike McCree (Caucasian) for the team lead position. I was moved to B shift even though I had more seniority that Mr. McCree. I was told by Chris Dickey (Team Member filling in as Team Leader until a team leader could be hired) that I could no longer use flex time. However, I observed Caucasians being allowed to use flex time.

On June 14, 2023, Mr. Lackner approached me while I was using my phone to listen to a car and told ne to put my headphones in, because he did not want to hear my phone. However, everyone else was using their phone without headphones and he did not say anything to them.

On June 15, 2023, I asked Mr. Lackner if I could return to A shift and for about five minutes he did not respond and stated denied. I asked him why and he stated because I was going to do what he said. I went to HR, and they told me to write a statement and they will do an investigation.

On June 22, 2023, in front of a group of people Mr. Lackner told me that the only way he would allow me to retune to A shift is if I removed my name from the team lead promotion list. I wrote a letter to Mr. Lackner, HR, and the management chain informing them that I had been retaliated against and subjected to a hostile work environment.

The team lead position was given to Mr. McCree and another team lead position was created and given to Stephen Stone (Caucasian). I was allowed to go back to my previous shift in July 2023.

I believe that I have been retaliated and discriminated against because of my race (African American) in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Mr. Ryan D. Pasley**<br>**10/27/2023**<br><br>*Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**TAB 1-2**

Exhibit 2 – Amended EEOC Charge

FILED
2024 Aug-02 AM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

AMENDED

EEOC Form 5 (06/22)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

EEOC 420-2023-03133

Recvd 2-28-2024

and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev., etc.)* | Home Phone | Year of Birth |
|---|---|---|
| Mr. Ryan D. Pasley | | |

Street Address, City State and ZIP Code

[redacted]

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Mercedes-Benz United States International | 500+ | |

Street Address, City State and ZIP Code

1 Mercedes Drive, Vance AL 35490

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address, City, State and ZIP Code

DISCRIMINATION BASED ON

Race, Disability, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| 5/15/23 | Continuing |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a Black male of African ancestry. I have been diagnosed with PTSD, a disability. I authorize the EEOC to disclose my disability. Because of my PTSD I require stability in schedules and routines. I began working for Mercedes October 18, 2004. My performance since 2004 has been satisfactory and my evaluations show that. I received a promotion in 2008 to team lead. In 2014 I passed over a group leader job in production to accept a position as CMM (Coordinate Measuring Machine) Operator – at the team member level. In 2015 my supervisor Frank Coffin (Panamanian non-Black) gave me an evaluation that marked me "Needs Development" in the section related to readiness for the next level. This rating prevents you from being promoted above your current level. In the 2015 evaluation Coffin stated it would take me "several years to be fully developed and ready for the next level in CMM room." After 2015, Coffin did not evaluate me again until 2022 for the 2020-2021 year. On March 8, 2022, Coffin rated me as "Ready for Team Leader." In April of 2023, I nominated myself for a CMM Team Lead position that was open. On May 4, 2023, Mercedes released the names for Peer Review, the only name on the list was Mike McCree (WM). I asked my interim group leader why my name was not included, and he provided me with a contact in HR. I emailed HR and Mercedes replied that Coffin rated me not ready for the next level. HR said Coffin had rated me not ready in February of 2023. However, Coffin never gave me this evaluation or a chance to respond.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

02 / 28 / 2024

*Date*

RYAN D. PASLEY

*Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*)

Palmer Law LLC – 104 23rd St. S. Ste. 100, Birmingham, AL 35233 – (205) 285-3050 – leslie@palmerlegalservices.com

Doc ID: 36e7e4ee1d79ed0b02d0802646a2124616692f42

AMENDED

EEOC Form 5 (06/22)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | EEOC | 420-2023-03133 |

_______________________________________________ and EEOC

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Mercedes started the promotion process over around May 9, 2023 claiming lack of feedback on evaluations. Starting over provided two months for evaluations to determine who should receive the promotion to Team Lead. One week later, Nicholas Lackner (WM) became the new Group Leader for CMM. Lackner immediately moved me to B Shift to separate me from McCree who was also up for team lead. A shift and B Shift operate on a 2 week-day/night rotation. I had been on A Shift for many years, held seniority over McCree, and had planned my schedule according to my rotation well in advance. Moving me to B Shift changed my entire work crew and forced me to work 4 weeks in a row on night shift. In addition to moving me to B Shift, Mercedes did not allow me to use flex time – a term/condition of employment I observed White employees using.

Lackner moving me to B Shift was against the usual course of business for evaluating potential team leads. Normally, Mercedes would let the individuals on the list operate as interim in the position to evaluate them. Instead, Lackner had a third individual, (WM) who was not interested in lead acting as interim and separated me McCree. After one month on B Shift, Lackner had not even spoken to me, let alone evaluated me for any promotion. On June 14, 2023, Lackner scolded me for using my phone without earpieces but did not address the other employees. At that time, I tried to speak with him and was going to tell him about some medical issues within my family. He snapped "we have nothing to talk about." The next day, June 15, 2023, I again tried to speak to Lackner about moving back to A Shift. After ignoring me for a while, he just said "denied." I asked him if I could go to HR. I reported this incident to HR. I specifically told HR that the way he was treating me, moving me from my familiar shift, and talking down to me was triggering because of my PTSD and that I was the only Black candidate for lead. I told them he was trying to instigate things with me and I wrote a statement to HR. HR did not ask me about any accommodations or discuss why I needed to move back to A Shift. One week later, on June 22, 2023, Lackner told me I could only go back to A-shift if I removed my name from the promotion list. He made this statement in front of many people on the shift. I e-mailed HR stating that the reason I was removing my name was because Lackner told me it was the only way I could move back to my shift. I specifically reported that the mindgames created a hostile work environment and were retaliatory for seeking fair treatment and were triggering my PTSD. No one from HR ever attempted to discuss any accommodations with me or question me about being forced to withdraw my name to return to my shift. Lackner returned me to A Shift in June 26, 2023. On July 10th my son died. I took a couple of weeks bereavement then returned to work until August 18, 2023 when I went on medical leave and applied for Short Term Disability. Either during my bereavement or right after my medical leave started, Lackner/Mercedes hired McCree and Stephen Stone (WM) as team lead. Stone had been marked not ready but Mercedes changed his evaluation to qualify him. There was only one lead spot open for application, A Shift, but Mercedes created a second spot and promoted stone, who is not on A or B Shift, holds straight day shift. All team leads and group leader in CMM are White.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>02 / 28 / 2024 RYAN D. PASLEY<br>*Date* *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

AMENDED

EEOC Form 5 (06/22)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | EEOC | 420-2023-03133 |

______________________________ and EEOC

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

While on leave, Mercedes attempted to communicate with me via my MBSU e-mail about short term disability knowing I did not have access to work email while on leave. I went weeks without pay before I finally discovered Mercedes denied me Short Term Disability. I have returned to work but believe I am being retaliated against for filing my original EEOC Charge and subjected to a retaliatory hostile work environment. In January of 2024 McCree –mentioned that I needed some training and asked if I wanted a copy of the papers he had gone over. I stated I did not need the papers and he went on to report to Lackner that I was refusing training causing Lackner to reprimand me in front of a witness he said was for "legal purposes." Lackner told the witness to "let him know" if I gave him "any problems" the next day. On January 23, 2024, McCree manipulated the work rotation schedule causing another employee to pull parts out of turn as a way to make me take training no other employee was taking. I have received an evaluation since my return to work. Despite all reports being good and not being told any way I needed to improve, Lackner again held me as not ready for the next step.

I was discriminated against because of Race when Mercedes manipulated the system to promote two White men and because of disability by Mercedes's failure to accommodate my need to return to A-Shift. Further, Mercedes retaliated against me for requesting an accommodation and complaining about discrimination by removing my flex time, making me remove my name from the promotion list, and otherwise targeting me, changing the terms and conditions of my employment. I have also been retaliated against and subjected to a retaliatory hostile work environment for filing an EEOC charge by being kept "not ready" for promotion without any guidance or correction. This conduct violates Title VII and the ADA.

.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct.<br><br>02 / 28 / 2024     RYAN D. PAsley<br>*Date*     *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |



Doc ID: 36e7e4ee1d79ed0b02d0802646a2124616692f42

Dropbox Sign

Audit trail

| | |
|---|---|
| **Title** | Amended EEOC Charge |
| **File name** | 3a6d4e70-d667-11ee-9edb-39f921653553.pdf |
| **Document ID** | 36e7e4ee1d79ed0b02d0802646a2124616692f42 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

**This document was requested from palmerlaw.lawcus.com**

## Document History

| | | |
|---|---|---|
| SENT | **02 / 28 / 2024**<br>18:29:50 UTC | Sent for signature to Ryan Darrell Pasley<br>[redacted]<br>leslie@palmerlegalservices.com<br>IP: 71.45.181.169 |
| VIEWED | **02 / 28 / 2024**<br>18:50:41 UTC | Viewed by Ryan Darrell Pasley [redacted]<br>IP: 172.56.224.210 |
| SIGNED | **02 / 28 / 2024**<br>18:52:03 UTC | Signed by Ryan Darrell Pasle [redacted]<br>IP: 172.56.224.210 |
| COMPLETED | **02 / 28 / 2024**<br>18:52:03 UTC | The document has been completed. |

**TAB 1-3**

Exhibit 3 – Notice of Right to Sue

FILED
2024 Aug-02 AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
# BIRMINGHAM DISTRICT OFFICE

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Birmingham Direct Dial: (205) 651-7020
FAX (205) 212-2105
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)
Issued On: May 3, 2024

**To:** Mr. Ryan D. Pasley
[redacted]

Charge No: 420-2023-03133

EEOC Representative and email: Andre Williams
Investigator
andre.williams@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 420-2023-03133.

On behalf of the Commission,

SHERI GUENSTER Digitally signed by SHERI GUENSTER
Date: 2024.05.03 16:12:46 -05'00'

/for Bradley A. Anderson
District Director

**Cc:**
Mercedes-Benz U.S. International, Inc
c/o Michael L Lucas
Burr & Forman LLP
420 20th St N Ste 3400
Birmingham, AL 35203

Mercedes-Benz U.S. International, Inc
c/o Keith Stephens
1 Mercedes Drive
Vance, AL 35490

Leslie Palmer
Palmer Law LLC
104 23rd St. S#100
Birmingham, AL 35233

Please retain this notice for your records.

**TAB 6**

Defendant's Answer to Complaint
(Filed 08/27/2024)

FILED
2024 Aug-27 PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

**RYAN PASLEY,**

**Plaintiff,**

**v.**

**MERCEDES-BENZ U.S. INTERNATIONAL, INC.,**

**Defendant.**

**CIVIL ACTION NO: 7:24-cv-01050-ACA**

**DEFENDANT MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S ANSWER TO PLAINTIFF'S COMPLAINT**

Comes now Defendant, Mercedes-Benz U.S. International, Inc. ("MBUSI"), and answers the Complaint filed against it in this matter as follows:

**FIRST DEFENSE**

**Note:** The numbered paragraphs of the First Defense correspond to the numbered paragraphs of the Complaint.

1. MBUSI admits that this Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331, that Plaintiff asserts claims under Title VII, Section 1981, the ADA, and ERISA, and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 1 of the Complaint.

2. MBUSI admits that Plaintiff asserts claims under Title VII, § 1981, the ADA and ERISA and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 2 of the Complaint.

3. MBUSI admits that venue is correct within the Western Division of the Northern District of Alabama and that Plaintiff is employed in Vance, Alabama. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 3 of the Complaint.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. MBUSI admits that Plaintiff filed a charge of race and retaliation discrimination No: 420-2023-03133 on October 27, 2023 with the Equal Employment Opportunity Commission, and a copy of that charge is attached as Exhibit 1 to Plaintiff's Complaint. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 8 of the Complaint.

9. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint and therefore denies the same.

10. MBUSI admits that the EEOC issued a determination and notice of rights dated May 3, 2024 as to EEOC Charge No: 420-2023-03133, a copy of the determination is attached as Exhibit 3 to Plaintiff's Complaint and that Plaintiff received notice of that determination on May 3, 2024. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 10 of the Complaint.

11. Denied.

12. Denied.

13. Denied.

14. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 14 of the Complaint and therefore denies the same.

15. MBUSI admits that Plaintiff is a black male and except as specifically admitted herein, MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the remaining allegations of Paragraph 15 of the Complaint and therefore denies the same.

16. MBUSI admits that Plaintiff's initial date of employment at MBUSI was October 18, 2004.

17. Denied.

18. MBUSI admits that at some period during Plaintiff's employment Plaintiff held a Team Leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 18 of the Complaint.

19. Denied.

20. MBUSI admits that Plaintiff moved to the CMM Lab in 2014 as a CMM operator. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 20 of the Complaint.

21. MBUSI admits that CMM operators require different skills from production team members and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 21 of the Complaint.

22. Denied.

23. Denied.

24. Denied.

25. Admitted.

26. MBUSI admits that Mike McRee and Stephen Stone both bid on team leader opening positions in the CMM Lab. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 26 of the Complaint.

27. MBUSI admits that it sought peer review as to the eligible candidates for the team leader opening in the CMM Lab. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 27 of the Complaint.

28. Denied.

29. Admitted.

30. Admitted..

31. Admitted.

32. Denied.

33. MBUSI admits that Plaintiff stated he had never received his performance evaluation. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 33 of the Complaint.

34. MBUSI admits that Roberts stated he would look into the matter and get back with Plaintiff. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 34 of the Complaint.

35. Denied.

36. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint and therefore denies the same.

37. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint and therefore denies the same.

38. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint and therefore denies the same.

39. Denied.

40. MBUSI admits that CMM Lab operates on two shifts, A and B, that each shift operates days for two weeks and evenings for two weeks and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 40 of the Complaint.

41. Denied.

42. Denied.

43. MBUSI admits the open position was on A Shift. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 43 of the Complaint.

44. MBUSI admits that Nicholas Lackner became Plaintiff's Group Leader. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 44 of the Complaint.

45. Admitted.

46. MBUSI admits that Lackner moved Plaintiff to the B Shift for observation and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 46 of the Complaint.

47. Denied.

48. Denied.

49. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 49 of the Complaint and therefore denies the same.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. MBUSI admits Plaintiff never requested an accommodation. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 81 of the Complaint.

82. MBUSI admits that Plaintiff's Group Leader told Plaintiff if he wanted to return to the A Shift he would need to provide written documentation stating he was no longer interested in the team leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 82 of the Complaint.

83. Denied.

84. MBUSI admits that on June 22, 2023, Plaintiff sent an email removing himself from consideration for the Team Leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 84 of the Complaint.

85. Denied.

86. Admitted.

87. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the remaining allegations of Paragraph 87 of the Complaint and therefore denies the same.

88. MBUSI admits Plaintiff took bereavement leave and except as specifically admitted herein, is without knowledge or information sufficient as to form a belief as to the truth of the remaining allegations of Paragraph 88 of the Complaint and therefore denies the same.

89. Denied.

90. Denied.

91. MBUSI admits that McRee was promoted to team leader and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 91 of the Complaint.

92. MBUSI admits that it created a team leader position for programmers and promoted Stone to that position.

93. Denied.

94. Denied.

95. Denied.

96. Denied.

97. Denied.

98. Denied.

99. MBUSI admits that Plaintiff signed his EEOC Charge on October 27, 2023 and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 99 of the Complaint.

100. MBUSI admits that Plaintiff returned to work after his family medical leave on November 20, 2023.

101. Denied.

102. Denied.

103. Denied.

104. Denied.

105. Admitted.

106. Denied.

107. Denied.

108. Denied.

109. Denied.

110. Denied.

111. Denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. MBUSI admits that Lackner resigned his employment with MBUSI. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 119 of the Complaint.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

127. Denied.

128. Denied.

129. Denied.

130. For answer to Paragraph 130 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

131. Denied.

132. Denied.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

137. For answer to Paragraph 137 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

145. For answer to Paragraph 145 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

151. Denied.

152. Denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. For answer to Paragraph 158 of the Complaint, MBUSI incorporates by reference its answers to Paragraphs 1 through 129 above.

159. Denied.

160. Denied.

161. Denied.

162. Denied.

163. Denied.

164. Denied.

165. Denied.

166. Denied.

167. Denied.

168. For answer to Paragraph 168 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

169. Denied.

170. Denied.

171. Denied.

172. Denied.

173. Denied.

174. Denied.

175. Denied.

176. Denied.

177. Denied.

178. Denied.

179. For answer to Paragraph 179 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

180. Denied.

181. Denied.

182. Denied.

183. Denied.

184. Denied.

185. Denied.

186. Denied.

187. Denied.

188. For answer to Paragraph 188 of the Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

189. Denied.

190. Denied.

191. Denied.

192. Denied.

193. Denied.

194. Denied.

195. Denied.

196. Denied.

197. Denied.

198. Denied.

199. Denied.

200. Denied.

201. Denied.

202. Denied.

**SECOND DEFENSE**

Except as specifically admitted herein, MBUSI denies each and every allegation of Plaintiff's Complaint.

**THIRD DEFENSE**

MBUSI denies that Plaintiff is entitled to any of the relief that Plaintiff claims in his Prayer for Relief.

**FOURTH DEFENSE**

MBUSI denies that Plaintiff has exhausted his administrative prerequisites to suit.

**FIFTH DEFENSE**

Some or all of Plaintiff's claims may be barred by the applicable limitations period and/or laches.

**SIXTH DEFENSE**

Some or all of the Plaintiff's claims are barred because they are outside the scope of Plaintiff's Charge of Discrimination filed with the EEOC.

**SEVENTH DEFENSE**

Some or all of the Plaintiff's claims are barred because of his failure to make them a subject of a timely Charge of Discrimination filed with the EEOC.

**EIGHTH DEFENSE**

Plaintiff has failed to mitigate his damages.

**NINTH DEFENSE**

MBUSI acted for legitimate, non-discriminatory, non-retaliatory, non-pretextual reasons.

**TENTH DEFENSE**

Plaintiff was not the subject of any disparate treatment.

**ELEVENTH DEFENSE**

Even if the finder of fact determines that MBUSI violated Title VII, all decisions made with respect to Plaintiff would have been made in any event, for legitimate non-discriminatory, non-retaliatory, non-pretextual reasons.

**TWELFTH DEFENSE**

MBUSI at all times acted in a good faith effort to comply with the law.

**THIRTEENTH DEFENSE**

Defendant is not liable for the activities alleged because Defendant had in place appropriate policies against discrimination and retaliation and adequate procedures to receive and remedy complaints, and Plaintiff unreasonably failed to take advantage of these policies.

**FOURTEENTH DEFENSE**

Plaintiff did not suffer an adverse employment action.

**FIFTEENTH DEFENSE**

Some of Plaintiff's claims may be barred by release, waiver, estoppel and judicial estoppel.

**SIXTEENTH DEFENSE**

Defendants did not breach any duty to Plaintiff and met all of their obligations under any relevant plans, policies, or contracts made the subject of this case.

**SEVENTEENTH DEFENSE**

Plaintiff alleged protected conduct was not the "but-for" cause of any adverse action about which Plaintiff complains.

**EIGHTEENTH DEFENSE**

Plaintiff was not the subject of any retaliatory treatment.

**NINETEENTH DEFENSE**

Plaintiff is not, and had not been, an otherwise qualified individual with a disability.

**TWENTIETH DEFENSE**

Plaintiff is not regarded as, and has not been regarded as, an individual with a physical or mental impairment substantially limiting a major life activity.

**TWENTY-FIRST DEFENSE**

Defendant did not discriminate against Plaintiff on the basis of any actual, recorded, or perceived disability.

**TWENTY-SECOND DEFENSE**

Plaintiff does not, and did not, have a record of a mental or physical impairment that substantially limits one or more major life activities.

**TWENTY-THIRD DEFENSE**

Plaintiff does not have standing to assert a claim under ERISA.

**TWENTY-FOURTH DEFENSE**

Plaintiff's claims and/or damages may be barred and/or limited by the doctrine of after-acquired evidence.

**TWENTY-FIFTH DEFENSE**

Plaintiff's claims may be barred by release, waiver, estoppel or judicial estoppel.

**TWENTY-SIXTH DEFENSE**

To the extent that any claims are made under statutes with caps on relief, those caps are asserted.

**TWENTY-SEVENTH DEFENSE**

Plaintiff fails to state a claim against MBUSI that would warrant the award of punitive damages.

**TWENTY-EIGHTH DEFENSE**

Plaintiff is not entitled to punitive damages as none of the actions taken by MBUSI relative to the Plaintiff were taken maliciously, intentionally, in bad faith, or with callous or reckless disregard for the federally protected rights of Plaintiff.

**TWENTY-NINTH DEFENSE**

MBUSI's STD plan is a payroll practice and is not subject to ERISA.

**THIRTIETH DEFENSE**

MBUSI reserves the right to assert additional defenses as discovery progresses in this case.

s/ Michael L. Lucas
Michael L. Lucas (LUC004)
Joe Barnello (BAR219)

Attorneys for Defendant
Mercedes-Benz U.S. International, Inc.

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100
mlucas@burr.com
jbarnello@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2024, I electronically filed the foregoing Defendant, Mercedes-Benz U.S. International, Inc.'s Answer to Plaintiff's Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Leslie A. Palmer
PALMER LAW, LLC
104 23rd Street South
Suite 100
Birmingham, Alabama 35233
leslie@palmerlegalservices.com

s/ Michael L. Lucas
OF COUNSEL

**TAB 23**

Amended Complaint
(Filed 11/26/2025)

FILED
2025 Nov-26 PM 12:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| RYAN PASLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO: |
| v. | ) | JURY DEMAND |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**FIRST AMENDED COMPLAINT**

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over claims of Federal Question under 28 U.S.C. § 1331 and over claims to redress Civil Rights violations under 28 U.S.C. § 1343(a)(4). This lawsuit for discriminatory and retaliatory employment practices based on race and disability is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., 42 U.S.C.§ 1981; as amended, and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*.

2. Plaintiff invokes the jurisdiction of this Court to secure protection for and to redress the deprivation of rights secured by Title VII, § 1981, and the ADA,

seeking injunctive and other relief against discrimination and retaliation because of race and disability.

3. Venue is proper within the Western Division of the Northern District of Alabama. At all relevant times, Defendant employed Plaintiff in Vance, Alabama.

## II. PARTIES

4. Plaintiff, Ryan Pasley ("Pasley" or "Plaintiff") is a Black adult resident of Alabama and a citizen of the United States.

5. Defendant, Mercedes-Benz U.S. International, Inc. ("Mercedes" or "Defendant") is a corporation organized under the laws of the state of Alabama that at all relevant times was authorized to do business and was doing business in Vance, Alabama.

6. At all times relevant to this action, Mercedes employed Pasley, making Mercedes an "employer" for the purpose of Title VII, § 1981, and the ADA.

7. Mercedes employed at least fifteen (20) persons for each working day during each twenty (20) or more calendar work weeks in the current or preceding calendar year.

## III. CONDITIONS PRECEDENT

8. On October 27, 2023, within 180 days of a discriminatory and retaliatory change to the terms and conditions of Plaintiff's employment (e.g. shift/team

assignment), Pasley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 420-2023-03133 (See attached Exhibit 1).

9. After engaging counsel, Pasley filed an amended charge on February 28, 2024. (See attached Exhibit 2).

10. The EEOC issued a Determination and Notice of Rights dated May 3, 2024 that Pasley received via portal download thereafter. (See attached Exhibit 3).

11. Plaintiff timely files this lawsuit within 90 days of receipt of the Determination and Notice of Rights.

12. Pasley has fulfilled all conditions precedent under Title VII and the ADA

13. Pasley has no conditions precedent under § 1981 or ERISA.

## IV. FACTUAL ALLEGATIONS

14. Pasley is a United States Military veteran who suffers from diagnosed PTSD.

15. Pasley is a Black male of African ancestry.

16. Pasley began working for Mercedes on October 18, 2004.

17. For nearly two decades, Mercedes evaluated Pasley's performance as satisfactory through employment evaluations.

18. In 2008, Mercedes promoted Pasley to team lead.

19. In 2014, Pasley turned down a promotion to group leader in production.

20. At the same time, Pasley accepted a position as a Coordinate Measure Machine Operator ("CMM Operator") in the CMM lab at the team member level.

21. CMM Operators require additional skills beyond production line employees.

22. In 2015, Pasley's supervisor, Frank Coffin, evaluated Pasley as "Satisfactory" on the ratings scale but "Needs Development" before being ready for the next level in the CMM lab.

23. Pasley did not receive any more evaluations until March of 2022, when Coffin evaluated his performance for October 2020-October 2021.

24. In the evaluation, Coffin rated Pasley "Satisfactory" on the ratings scale and "Ready for Team Leader."

25. In April of 2023, Pasley self-nominated for a team leader opening in the CMM Lab.

26. Mike McRee and Stephen Stone, both White, also received nominations.

27. On May 4, 2023, Mercedes released the eligible employee names for peer review as part of the promotional process.

28. Mercedes did not include Pasley on the list of eligibles and only submitted Mike McRee for peer review.

29. Pasley asked Taylor Whitman why his name was excluded.

30. Whitman provided him contact information for Brittney Wasilewski, an employee in Human Resources.

31. Pasley e-mailed Wasilewski asking why Mercedes excluded him from the peer review list.

32. After he escalated his question to Human Resources, OJ Roberts responded that Coffin had rated Pasley "Not Ready" in February of 2023.

33. Pasley pointed out that he had never received a February 2023 evaluation/rating and had therefore not had a chance to respond.

34. Roberts stated he would need to do some research and get back to him because if Pasley did not get the evaluation, that was "a little disturbing."

35. On May 9, 2024, the CMM manager, Andy Roller, told the department the promotion process would start over because of abnormalities or irregularities but that evaluations get turned in "all the time" without people knowing about it.

36. Pasley responded to Roller, in front of the group, that if that happens all the time there is a bigger problem because there had already been another promotion that may have been affected.

37. Roller appointed Chris Dickey, White, as interim team lead pending evaluations.

38. Dickey did not want to be acting team lead.

39. In the past, Mercedes had conducted observation evaluations by allowing the candidate to act as team lead for a period then switch out with another candidate. This method of review allowed observation of the candidate in the actual role they were seeking to fill.

40. The CMM operates two shifts, A shift and B shift. Each shift is a team that operates days for two weeks and evenings for two weeks. CMM employees could use flex time to come in late or leave early if needed.

41. After Roller named Dickey acting team lead, Dickey told Pasley he could no longer use flex time per Roller's instruction.

42. Pasley observed White employees continuing to use flex time.

43. The open team lead position was on A Shift, Pasley's shift/team.

44. May 15, 2024, Nick Lackner started in the CMM as group lead, Pasley's supervisor.

45. Lackner is White.

46. On his first day, Lackner moved Pasley to B shift.

47. The move to B shift forced Pasley to work 4 weeks of evenings in a row.

48. He had not asked off for his daughter's graduation because he would have been on A shift and been off in time to attend. He missed the graduation working evenings on B shift.

49. Though he had vacation time available, Pasley was saving his time because he had a terminally ill son at home.

50. In May of 2023, A shift was roughly ½ Black and ½ White team members.

51. When Lackner moved Pasley to B shift, he switched Pasley with the only Black employee on the B shift team.

52. The move to B shift took Pasley out of his routine and away from the team he was familiar with.

53. Group leaders work on day shift so when Pasley worked nights, Lackner was not present to evaluate him.

54. Additionally, Because the team lead position was only available on A shift, the move to B shift did not provide Lackner any opportunity to evaluate Pasley in the team lead role.

55. On at least one occasion, the B Shift team lead was out and Dickey, the acting A shift team lead asked if Pasley wanted the "turnover" – the shift change procedure from team lead to team lead – Lackner stepped in and told Dickey not to give it to Pasley.

56. McRee was absent for nearly one month while Lackner was supposed to be evaluating him on A shift.

57. During that month, Lackner did not observe or speak to Pasley.

58. The CMM team members rotate jobs/seats on a schedule including moving through different stations or "plates" and "tugging" or pulling the car into the lab.

59. Though Lackner usually had his office door open, when Pasley rotated to the station closest to Lackner's office, Lackner would close his door saying he didn't want to hear Pasley's voice.

60. The lab is loud with a lot of ambient noise.

61. On June 14, 2023, Lackner verbally attacked Pasley about having the volume on for a video he was watching on his phone.

62. Lackner screamed at Pasley in front of the rest of the team.

63. Pasley was not the only team member on his cell phone and was not the only team member to be using audible sound.

64. Lackner screaming at Pasley triggered his PTSD symptoms.

65. Pasley left the lab to calm down.

66. When he returned, he asked Lackner if he could speak with him.

67. Lackner told him no, and that he did not have anything to say to him.

68. June 15, 2023, Pasley approached Lacker to speak with him.

69. Lackner ignored Pasley for nearly 10 minutes.

70. When Lackner finally acknowledged Pasley, Lacker again said Pasley could not speak to him.

71. Pasley told him if he was going to act that way and not actually evaluate him, he would like to return to A shift.

72. Lackner responded "denied" and told him that was the exact reason he would not be promoted.

73. Pasley asked if he could go speak with HR.

74. Lackner responded "I don't care what you do."

75. Pasley spoke with Crystal in HR about what was happening.

76. Pasley gave Crystal a written statement that included his PTSD diagnosis and that he was experience a hostile work environment and retaliation.

77. Pasley told HR that moving him from A shift and talking down to him was triggering his PTSD.

78. Pasley told HR he was the only Black candidate for team lead.

79. Crystal told him she had other investigations but would get back to him.

80. June 21, 2023, Crystal stated she had to get a witness statement from Lackner.

81. HR never spoke with Pasley about disability accommodations.

82. June 22, 2023, Lackner told Pasley he would let him go back to A shift if he would write a statement saying he was no longer interested in the team lead position.

83. Lackner conditioned Pasley's accommodation on removing his name from promotional consideration.

84. The same day, Pasley sent an e-mail to multiple people, including Lackner, HR and other supervisors stating he was removing his name from the promotion list because of the hostile work environment and retaliation and at the advice of the physician that treats his PTSD.

85. Pasley received only one response from Crystal saying "OK" but no other supervisor or individual responded.

86. On June 26, 2023, Mercedes told Pasley he could return to A shift.

87. After approximately one week back on A shift, Pasley's son died.

88. Pasley took a couple of weeks bereavement at which time his physician recommended short term disability.

89. Pasley completed the paperwork for 90 days of short-term disability and made multiple attempts to confirm approval, which HR said he had.

90. Pasley started his disability leave on August 18, 2023.

91. After Pasley left for disability leave on August 18, 2023, Mercedes announced it had promoted McRee to team lead.

92. Mercedes also created a second position and promoted Stone to team lead.

93. Stone was not qualified for promotion based on his earlier evaluation.

94. Mercedes updated/changed Stone's evaluation to make him eligible for the newly created position.

95. After a couple of weeks off, Pasley noticed he was not receiving the correct pay.

96. After following up, again, Pasley learned that Mercedes denied his short-term disability claiming he did not respond to a request for more information. Mercedes sent the request to his work e-mail which he did not have access to while on leave instead of his personal e-mail he had included in his short term disability paperwork.

97. Mercedes approved him for FMLA and encouraged him to have his physician release him early if he wanted to be paid.

98. Pasley did not request an earlier return date resulting in 90 days of leave, unpaid.

99. Pasley signed his EEOC charge which he filed pro se on October 27, 2023.

100. Pasley returned to Mercedes on November 20, 2023.

101. On December 8, 2023 Lackner gave Pasley another evaluation.

102. Lackner rated Pasley as satisfactory.

103. Lackner told Pasley "you do good work and outwork people senior to you."

104. Lackner did not give Pasley any guidance for improvement.

105. Lackner marked Pasley not ready for the next level.

106. January 18, 2024, McRee spoke to Pasley about a skills training, going over some paperwork with him.

107. McRee asked Pasley if he wanted a copy of the document.

108. Pasley said he did not want a copy.

109. Because he declined taking a copy of the document, McRee reported to Lackner that Pasley was refusing training.

110. Pasley did not refuse any training.

111. Lackner reprimanded Pasley after bringing in Phil McDuff, another Black employee as a witness "for legal purposes."

112. Lackner told McRee to "let him know" if Pasley gave him "any problems" or refused the training the next day.

113. Pasley told Lackner he did not refuse any training and did not understand what the issue was.

114. On Pasley's next available shift, Lackner manipulated the rotation schedule to make him take the training that no other employee was required to take.

115. The "training" was a short review of the paper that McRee had already reviewed with Pasley the week before.

116. Around February of 2024, Melchior replaced Roller as the manager over CMM.

117. March 5, 2024 Lackner screamed at Pasley about pro-union pamphlets sitting on his desk.

118. When Pasley did not respond, Lackner complained to HR about Pasley.

119. Lackner took vacation for the month of April and resigned effective May 15, 2024.

120. From June of 2023 to May of 2024, other employees ignored and isolated Pasley.

121. After May 15, 2024, and Lackner's departure, other employees began including Pasley again.

122. Lackner's departure will create additional promotional opportunities.

123. Mercedes will not consider Pasley for the opportunities because his December 2023 evaluation from Lackner rated him "not ready."

124. Pasley e-mailed Melchior inquiring what he needed to do for advancement.

125. Melchior told Pasley he had to research to see what was going on with his situation with HR and get some background information.

126. Melchior said he had heard good things about Pasley, including that he worked hard and helped everyone.

127. Melchior said McRee complained that Pasley does not communicate when McRee speaks to him and does not give him feedback.

128. McRee has never counseled Pasley on communication.

129. Pasley's multiple attempts at communication with Lackner involved Lackner ignoring or screaming at him.

## V. STATEMENT OF PLAINTIFF'S CLAIMS

### COUNT ONE
### TITLE VII – RACE DISCRIMINATION

130. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

131. Defendant discriminated against Pasley in the terms and conditions of his employment, because of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.*, by among other things, continually marking him "not ready" for the next level on evaluations and transferring him to another shift where he was the only Black employee.

132. Defendant also discriminated against Pasley by treating him different from white employees regarding flex time, cell phone use, and personal interactions.

133. Pasley's race was a motivating factor in Defendant's differential treatment of Plaintiff.

134. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits,

embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

135. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

136. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including

damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT TWO**
**§ 1981 RACE DISCRIMINATION**

137. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

138. Defendant discriminated against Pasley in the terms and conditions of his employment, because of his race, in violation of 42 USC § 1981 by among other things, continually marking him "not ready" for the next level on evaluations and transferring him to another shift where he was the only Black employee.

139. Defendant also discriminated against Pasley by treating him different from white employees regarding flex time, cell phone use, and personal interactions.

140. Defendant discriminated against Pasley by failing to promote him to team lead and maintaining him as ineligible for promotion.

141. Defendant failed to promote Pasley and otherwise treated him different in the terms and conditions of his employment because of his race.

142. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits, embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

143. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

144. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by § 1981.

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating § 1981;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT THREE**
**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE**

145. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

146. Pasley is a qualified individual with an impairment that substantially limits his major life activities. Pasley is diagnosed with PTSD, a mental health condition that results in symptoms such as uncontrolled anxiety, depression, problems sleeping, need for stability, etc.

147. Pasley disclosed his disability to Defendant in June of 2023.

148. Pasley requested the accommodation of returning to his shift/team which was more familiar, more friendly, and more racially diverse than the team Mercedes had transferred him to in May.

149. Pasley also reported to HR that Lackner's behavior was triggering his PTSD symptoms.

150. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by failing to engage in the interactive process with Pasley to determine if any other accommodations were available and did not discuss returning him to his shift.

151. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 through Lackner's continued to bully hostile treatment of Pasley.

152. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by conditioning his return to his original shift/team on his removal from the promotion list.

153. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by failing to otherwise accommodate him.

154. Defendant discriminated against Pasley because of his disability, in violation of 42 USC § 12101 by interfering with his short-term disability leave.

155. Because of Defendant's unlawful and discriminatory conduct, Pasley suffered damages including, but not limited to, lost wages and benefits, embarrassment, humiliation, shame, damages to professional reputation, and emotional pain and anguish.

156. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive

damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

157. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful practices set forth herein unless enjoined by this Court

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by the ADA.

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating the ADA;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT FOUR**
**TITLE VII – RETALIATION**

158. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

159. Pasley engaged in protected activity under Title VII when he complained of differential treatment in the terms and conditions of his employment, including the hostile treatment from Lackner, because he was the only Black employee seeking the team leader position.

160. Pasley also engaged in protected activity by filing an EEOC charge.

161. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

162. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

163. After he complained, Defendants promoted McRee who was White and created a new position to promote Stone, also White.

164. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

165. After Pasley filed an EEOC charge, Lackner required a Black witness to be present during discussions for "legal purposes."

166. After Pasley filed an EEOC charge, Lackner attempted to report Pasley to HR for pro-union pamphlets on his desk.

167. Defendants retaliated against Pasley because he engaged in conduct protected under Title VII.

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT FIVE**
**§ 1981 – RETALIATION**

168. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

169. Pasley engaged in protected activity under § 1981 when he complained of differential treatment in the terms and conditions of his employment, including the hostile treatment from Lackner, because he was the only Black employee seeking the team leader position and failure to promote.

170. Pasley also engaged in protected activity by filing an EEOC charge.

171. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

172. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

173. After he complained, Defendants promoted McRee who was White and created a new position to promote Stone, also White.

174. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

175. After Pasley filed an EEOC charge, Lackner required a Black witness to be present during discussions for "legal purposes."

176. After Pasley filed an EEOC charge, Lackner attempted to report Pasley to HR for pro-union pamphlets on his desk.

177. Defendant continues to deny Pasley promotion by keeping him off the eligibility list.

178. Defendants retaliated against Pasley because he engaged in conduct protected under § 1981.

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by § 1981;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating § 1981;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

**COUNT SIX**
**ADA – RETALIATION**

179. Plaintiff adopts and realleges the allegations of paragraphs 1-129 as if fully set forth herein.

180. Pasley engaged in protected activity under the ADA when he requested an accommodation and complained that his manager was increasing the symptoms of his disability.

181. Pasley also engaged in protected activity by filing an EEOC charge.

182. After Pasley complained, Lackner became more hostile toward him resulting in isolation.

183. After Pasley complained, Lackner required Pasley to remove his name from promotion consideration.

184. Lackner conditioned Pasley's requested accommodation on his removal from promotional consideration.

185. After Pasley filed an EEOC charge, Lackner evaluated Pasley marking him not ready for the next level but did not provide guidance for advancement.

186. Defendant continues to deny Pasley promotion by keeping him off of the eligibility list.

187. Defendants retaliated against Pasley because he engaged in conduct protected under the ADA.

**RELIEF**

WHEREFORE, PREMISES CONSIDERED, Pasley requests this Court assume jurisdiction of this cause of action and award the following relief:

a. Enter a declaratory judgment that Defendant's policies, practices, and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by the ADA;

b. Grant Plaintiff a permanent injunction enjoining Defendant's, their agents, successors, employees, attorneys, and those acting in concert with Defendant or at Defendant's request from violating the ADA;

c. Grant Plaintiff an Order requiring Defendant to make him whole by granting appropriate declaratory relief, backpay, compensatory damages (including damages for mental anguish), punitive damages, interest attorney's fees, expenses, and costs; and

d. Grant Plaintiff such other, further, different, or additional relief and benefits as justice may require.

e.

**PLAINTIFF REQUESTS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

/s/ Leslie A. Palmer
ASB-0436-L40P

OF COUNSEL:
Palmer Law, LLC
104 23rd Street South, Suite 100
Birmingham, AL 35233
(205) 285-3050

leslie@palmerlegalservices.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2025, I filed the foregoing with the Court's CM/ECF electronic filing system which will provide service to all counsel of record:

Michael L. Lucas (LUC004)
Joe Barnello (BAR219)
Mercedes-Benz U.S. International, Inc.
BURR & FORMAN LLP
420 North 20th Street
3400 Shipt Tower
Birmingham, Alabama 35203
Telephone: 205-252-3000
Facsimile: 205-458-5100
mlucas@burr.com
jbarnello@burr.com

OF COUNSEL
*/s/ Leslie A. Palmer*

**TAB 24**

Defendant's Answer to Amended Complaint
(Filed 12/02/2025)

FILED
2025 Dec-02 PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **RYAN PASLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO: 7:24-cv-01050-EGL** |
| | ) | |
| **MERCEDES-BENZ U.S. INTERNATIONAL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S ANSWER TO PLAINTIFF'S FIRST AMENDED FIRST AMENDED COMPLAINT**

Comes now Defendant, Mercedes-Benz U.S. International, Inc. ("MBUSI"), and answers the Plaintiff's First Amended First Amended Complaint filed against it in this matter as follows:

## FIRST DEFENSE

**Note:** The numbered paragraphs of the First Defense correspond to the numbered paragraphs of the First Amended Complaint.

1. MBUSI admits that this Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331, that Plaintiff asserts claims under Title VII, Section 1981, and the ADA, and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 1 of the First Amended Complaint.

2. MBUSI admits that Plaintiff asserts claims under Title VII, § 1981, and the ADA, and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 2 of the First Amended Complaint.

3. MBUSI admits that venue is correct within the Western Division of the Northern District of Alabama and that Plaintiff is employed in Vance, Alabama. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 3 of the First Amended Complaint.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. MBUSI admits that Plaintiff filed a charge of race and retaliation discrimination No: 420-2023-03133 on October 27, 2023 with the Equal Employment Opportunity Commission, and a copy of that charge is attached as Exhibit 1 to Plaintiff's First Amended Complaint. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 8 of the First Amended Complaint.

9. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 9 of the First Amended Complaint and therefore denies the same.

10. MBUSI admits that the EEOC issued a determination and notice of rights dated May 3, 2024 as to EEOC Charge No: 420-2023-03133, a copy of the determination is attached as Exhibit 3 to Plaintiff's First Amended Complaint and that Plaintiff received notice of that determination on May 3, 2024. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 10 of the First Amended Complaint.

11. Denied.

12. Denied.

13. Denied.

14. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 14 of the First Amended Complaint and therefore denies the same.

15. MBUSI admits that Plaintiff is a black male and except as specifically admitted herein, MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the remaining allegations of Paragraph 15 of the First Amended Complaint and therefore denies the same.

16. MBUSI admits that Plaintiff's initial date of employment at MBUSI was October 18, 2004.

17. Denied.

18. MBUSI admits that at some period during Plaintiff's employment Plaintiff held a Team Leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 18 of the First Amended Complaint.

19. Denied.

20. MBUSI admits that Plaintiff moved to the CMM Lab in 2014 as a CMM operator. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 20 of the First Amended Complaint.

21. MBUSI admits that CMM operators require different skills from production team members and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 21 of the First Amended Complaint.

22. Denied.

23. Denied.

24. Denied.

25. Admitted.

26. MBUSI admits that Mike McRee and Stephen Stone both bid on team leader opening positions in the CMM Lab. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 26 of the First Amended Complaint.

27. MBUSI admits that it sought peer review as to the eligible candidates for the team leader opening in the CMM Lab. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 27 of the First Amended Complaint.

28. Denied.

29. Admitted.

30. Admitted..

31. Admitted.

32. Denied.

33. MBUSI admits that Plaintiff stated he had never received his performance evaluation. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 33 of the First Amended Complaint.

34. MBUSI admits that Roberts stated he would look into the matter and get back with Plaintiff. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 34 of the First Amended Complaint.

35. Denied.

36. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 36 of the First Amended Complaint and therefore denies the same.

37. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 37 of the First Amended Complaint and therefore denies the same.

38. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations in Paragraph 38 of the First Amended Complaint and therefore denies the same.

39. Denied.

40. MBUSI admits that CMM Lab operates on two shifts, A and B, that each shift operates days for two weeks and evenings for two weeks and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 40 of the First Amended Complaint.

41. Denied.

42. Denied.

43. MBUSI admits the open position was on A Shift. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 43 of the First Amended Complaint.

44. MBUSI admits that Nicholas Lackner became Plaintiff's Group Leader. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 44 of the First Amended Complaint.

45. Admitted.

46. MBUSI admits that Lackner moved Plaintiff to the B Shift for observation and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 46 of the First Amended Complaint.

47. Denied.

48. Denied.

49. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the allegations of Paragraph 49 of the First Amended Complaint and therefore denies the same.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

81. MBUSI admits Plaintiff never requested an accommodation. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 81 of the First Amended Complaint.

82. MBUSI admits that Plaintiff's Group Leader told Plaintiff if he wanted to return to the A Shift he would need to provide written documentation stating he was no longer interested in the team leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 82 of the First Amended Complaint.

83. Denied.

84. MBUSI admits that on June 22, 2023, Plaintiff sent an email removing himself from consideration for the Team Leader position. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 84 of the First Amended Complaint.

85. Denied.

86. Admitted.

87. MBUSI is without knowledge or information sufficient as to form a belief as to the truth of the remaining allegations of Paragraph 87 of the First Amended Complaint and therefore denies the same.

88. MBUSI admits Plaintiff took bereavement leave and except as specifically admitted herein, is without knowledge or information sufficient as to

form a belief as to the truth of the remaining allegations of Paragraph 88 of the First Amended Complaint and therefore denies the same.

89. Denied.

90. Denied.

91. MBUSI admits that McRee was promoted to team leader and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 91 of the First Amended Complaint.

92. MBUSI admits that it created a team leader position for programmers and promoted Stone to that position.

93. Denied.

94. Denied.

95. Denied.

96. Denied.

97. Denied.

98. Denied.

99. MBUSI admits that Plaintiff signed his EEOC Charge on October 27, 2023 and except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 99 of the First Amended Complaint.

100. MBUSI admits that Plaintiff returned to work after his family medical leave on November 20, 2023.

101. Denied.

102. Denied.

103. Denied.

104. Denied.

105. Admitted.

106. Denied.

107. Denied.

108. Denied.

109. Denied.

110. Denied.

111. Denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

119. MBUSI admits that Lackner resigned his employment with MBUSI. Except as specifically admitted herein, MBUSI denies the remaining allegations of Paragraph 119 of the First Amended Complaint.

120. Denied.

121. Denied.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

127. Denied.

128. Denied.

129. Denied.

130. For answer to Paragraph 130 of the First Amended Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

131. Denied.

132. Denied.

133. Denied.

134. Denied.

135. Denied.

136. Denied.

137. For answer to Paragraph 137 of the First Amended Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

145. For answer to Paragraph 145 of the First Amended Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

151. Denied.

152. Denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. For answer to Paragraph 158 of the First Amended Complaint, MBUSI incorporates by reference its answers to Paragraphs 1 through 129 above.

159. Denied.

160. Denied.

161. Denied.

162. Denied.

163. Denied.

164. Denied.

165. Denied.

166. Denied.

167. Denied.

168. For answer to Paragraph 168 of the First Amended Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

169. Denied.

170. Denied.

171. Denied.

172. Denied.

173. Denied.

174. Denied.

175. Denied.

176. Denied.

177. Denied.

178. Denied.

179. For answer to Paragraph 179 of the First Amended Complaint, MBUSI incorporates herein by reference its answers to Paragraphs 1 through 129 above.

180. Denied.

181. Denied.

182. Denied.

183. Denied.

184. Denied.

185. Denied.

186. Denied.

187. Denied.

**SECOND DEFENSE**

Except as specifically admitted herein, MBUSI denies each and every allegation of Plaintiff's First Amended Complaint.

**THIRD DEFENSE**

MBUSI denies that Plaintiff is entitled to any of the relief that Plaintiff claims in his Prayer for Relief.

**FOURTH DEFENSE**

MBUSI denies that Plaintiff has exhausted his administrative prerequisites to suit.

**FIFTH DEFENSE**

Some or all of Plaintiff's claims may be barred by the applicable limitations period and/or laches.

**SIXTH DEFENSE**

Some or all of the Plaintiff's claims are barred because they are outside the scope of Plaintiff's Charge of Discrimination filed with the EEOC.

**SEVENTH DEFENSE**

Some or all of the Plaintiff's claims are barred because of his failure to make them a subject of a timely Charge of Discrimination filed with the EEOC.

**EIGHTH DEFENSE**

Plaintiff has failed to mitigate his damages.

**NINTH DEFENSE**

MBUSI acted for legitimate, non-discriminatory, non-retaliatory, non-pretextual reasons.

**TENTH DEFENSE**

Plaintiff was not the subject of any disparate treatment.

**ELEVENTH DEFENSE**

Even if the finder of fact determines that MBUSI violated Title VII, all decisions made with respect to Plaintiff would have been made in any event, for legitimate non-discriminatory, non-retaliatory, non-pretextual reasons.

**TWELFTH DEFENSE**

MBUSI at all times acted in a good faith effort to comply with the law.

**THIRTEENTH DEFENSE**

Defendant is not liable for the activities alleged because Defendant had in place appropriate policies against discrimination and retaliation and adequate procedures to receive and remedy First Amended Complaints, and Plaintiff unreasonably failed to take advantage of these policies.

**FOURTEENTH DEFENSE**

Plaintiff did not suffer an adverse employment action.

**FIFTEENTH DEFENSE**

Some of Plaintiff's claims may be barred by release, waiver, estoppel and judicial estoppel.

**SIXTEENTH DEFENSE**

Plaintiff alleged protected conduct was not the "but-for" cause of any adverse action about which Plaintiff complains.

**SEVENTEENTH DEFENSE**

Plaintiff was not the subject of any retaliatory treatment.

**EIGHTEENTH DEFENSE**

Plaintiff is not, and had not been, an otherwise qualified individual with a disability.

**NINETEENTH DEFENSE**

Plaintiff is not regarded as, and has not been regarded as, an individual with a physical or mental impairment substantially limiting a major life activity.

**TWENTIETH DEFENSE**

Defendant did not discriminate against Plaintiff on the basis of any actual, recorded, or perceived disability.

**TWENTY-FIRST DEFENSE**

Plaintiff does not, and did not, have a record of a mental or physical impairment that substantially limits one or more major life activities.

**TWENTY-SECOND DEFENSE**

Plaintiff's claims and/or damages may be barred and/or limited by the doctrine of after-acquired evidence.

**TWENTY-THIRD DEFENSE**

Plaintiff's claims may be barred by release, waiver, estoppel or judicial estoppel.

**TWENTY-FOURTH DEFENSE**

To the extent that any claims are made under statutes with caps on relief, those caps are asserted.

**TWENTY-FIFTH DEFENSE**

Plaintiff fails to state a claim against MBUSI that would warrant the award of punitive damages.

**TWENTY-SIXTH DEFENSE**

Plaintiff is not entitled to punitive damages as none of the actions taken by MBUSI relative to the Plaintiff were taken maliciously, intentionally, in bad faith, or with callous or reckless disregard for the federally protected rights of Plaintiff.

**TWENTY-SEVENTH DEFENSE**

MBUSI reserves the right to assert additional defenses as discovery progresses in this case.

s/ Michael L. Lucas
Michael L. Lucas (LUC004)
Joe Barnello (BAR219)

Attorneys for Defendant
Mercedes-Benz U.S. International, Inc.

**OF COUNSEL:**

BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100
mlucas@burr.com
jbarnello@burr.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2025, I electronically filed the foregoing Defendant, Mercedes-Benz U.S. International, Inc.'s Answer to Plaintiff's First Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Leslie A. Palmer
PALMER LAW, LLC
104 23rd Street South
Suite 100
Birmingham, Alabama 35233
leslie@palmerlegalservices.com

s/ Michael L. Lucas
OF COUNSEL

**TAB 39**

Memorandum Opinion
(Filed 04/10/2026)

FILED
2026 Apr-10 PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **RYAN PASLEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **7:24-cv-1050-EGL** |
| | ) | |
| **MERCEDES-BENZ U.S. INTERNATIONAL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Ryan Pasley sued his employer, Defendant Mercedes-Benz U.S. International, Inc. (MBUSI), asserting claims of race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as claims of disability discrimination and retaliation under the Americans with Disabilities Act. *See* Doc. 23. Defendant MBUSI moves for summary judgment on all of Pasley's claims. Doc. 25. Having heard oral argument on the motion and considered the parties' briefs and evidentiary submissions, the Court finds that MBUSI's motion (Doc. 25) is due to be **GRANTED** for the reasons below.

Also pending before the Court is MBUSI's Motion to Strike (Doc. 36). That motion (Doc. 36) is **MOOT** because the resolution is not material for the Court's determination as to the pending summary judgment motion.

## BACKGROUND

Most of the relevant facts are undisputed and are set out below. Any disputes are noted by the Court and do not create material issues of fact.

Pasley is a black male who began working at MBUSI on October 18, 2004. Doc. 28 at ¶1. He worked as a body shop Team Member, was promoted to Team Leader in 2006, then stepped down from Team Leader to take a Team Member position in the Coordinate Measurement Machine shop (CMM) in 2013. *Id.*

The employee, leadership, and shift structure of the CMM shop is relevant to Pasley's claims. In 2023, there were two different groups of employees: Specialists and Operators. Operators, employees who use large machines to measure vehicles, worked in two shifts—A Shift and B Shift. *Id.* at ¶¶6-7. The two shifts rotated every two weeks between evening and day shift. *Id.* Specialists, employees who performed specialized programming, worked only day shift. *Id.* At the beginning of the relevant period, Pasley and Mike McRee[1] were Team Member Operators working A Shift, *id.* at ¶7, and Stephen Stone was a Team Member Specialist, *id.* at ¶6. Frank Coffin worked as Group Leader until April 2023, and Andreas Roller was the Manager until

[1] The parties are inconsistent with spelling. Sometimes they spell this individual's name "McRee," Doc. 28 at ¶10; Doc. 32 at 5, ¶13, but there are instances they spell it "McCree," Doc. 28 at ¶¶15, 25. The records indicate that his name is "Michael McRee." Doc. 26-8.

February 2024. *Id.* at ¶¶3-4. Stone and McRee are white, and Coffin's race is disputed between the parties, but ultimately is irrelevant.[2]

The issues raised by Pasley in this action began in relation to an internal promotion process.

**A. Promotional Process and Shift Transfer**

In 2022, a Team Leader position opened in the CMM shop. Doc. 28 at ¶8. Pasley, Mike McRee, Phil McDuff, and Reggie Oswalt applied, with Oswalt ultimately being selected. *Id.* at ¶¶8, 10. In April 2023, Coffin retired as Group Leader, and Nicholas Lackner was selected as Group Leader for the CMM shop. *Id.* at ¶¶14, 24. In 2023, another Team Leader position for A Shift opened in the CMM shop; Stone, McRee, and Pasley applied. *Id.* at ¶¶11, 15.

MBUSI explained the process to fill a Team Leader position. The relevant shop will request a position, management will approve the request, and HR will then post a QR code through which a Team Member can nominate other members for the position or self-nominate. *Id.* at ¶9. If a candidate meets the minimum qualifications, HR will send out a request for peer input on each candidate. *Id.* Team Members provide peer input, HR sends the results to management, and management and HR make the final determination. *Id.* Pasley concedes that MBUSI uses this process but

[2] Coffin testified that everyone in Alabama "thinks" he is black, Doc. 28 at ¶4; Doc. 32 at 4, ¶4, but that he identifies as "Hispanic" and "mixed," Doc. 26-6 at 11, and Pasley's evidence suggests Coffin is Panamanian, Doc. 32 at 4, ¶4.

argues that it has not always been followed. Doc. 32 at 4-5, ¶9. He contends that MBUSI has, in the past, promoted by seniority instead. *Id.*

Regardless of how MBUSI promoted in the past, it is undisputed that the QR code/peer input process was utilized for the relevant 2023 Team Leader promotion. MBUSI posted the position, and as noted, Stone, McRee, and Pasley applied. Doc. 28 at ¶15. MBUSI determined that only McRee met the minimum criteria, so it solicited peer input for McRee, but not Stone or Pasley. *Id.* at ¶17. When Pasley learned that MBUSI was not requesting peer input for him, he was confused and followed up, inquiring as to why he was not listed as eligible. *Id.* at ¶18.

MBUSI informed Pasley that his most recent evaluation had rated him as "develop at the same level" rather than "ready for advancement," *id.* at ¶19, and a "ready for advancement" evaluation was a necessary qualification for promotion, *id.* at ¶16. Pasley then contacted HR because he believed that he had been marked "ready" in his last evaluation. *Id.* at ¶¶19-20. Stone also raised the same concern at this time. *Id.* at ¶21.

When Pasley went to HR, an HR specialist halted the promotion process to allow time to investigate the issue. *Id.* at ¶20; Doc. 26-13 at 14. The investigation revealed that Coffin, the Group Leader, had completed evaluations but failed to review them with each Team Member. Doc. 28 at ¶22; Doc. 26-13 at 14. Pasley had in fact been marked as "develop at the same level" in his most recent evaluation, but

had been marked as "ready" in the evaluation preceding that one. Doc. 28 at ¶¶19, 22.

Since multiple Team Members had not received notice of their most recent evaluations, MBUSI decided to restart the promotion process and have Lackner, the current Group Leader, evaluate all applicants. *Id.* at ¶¶22, 25. As part of this process, Lackner moved Pasley to B Shift so that he could evaluate McRee and Pasley, the two Operator applicants (Stone was a Specialist), on separate shifts. *Id.* at ¶25. MBUSI believed that Pasley was "agreeable to the move." *Id.* While Pasley disputes this fact by claiming that he "questioned why … Lackner was moving him," Doc. 32 at 6, ¶25, the evidence Pasley cites does not show that he ever communicated his "question[ing]" to MBUSI, *see id.* (citing Doc. 26-1 at 18, 62:1-16). Pasley's race discrimination claims are based partially on the transfer and on interactions that occurred after the transfer.

While working B Shift, Pasley was on a break at his workstation watching a video on his phone, and Lackner told him to turn the sound off or use headphones. Doc. 28 at ¶¶26, 27; Doc. 32 at 6, ¶27. Pasley was apparently the only Team Member singled out, and he alleges other workers typically listen to audio out loud. Doc. 32

at 6, ¶27. In addition to the cell phone incident, Pasley alleges generally that Lackner mistreated him and did not verbally engage with him.[3]

On June 15, 2023, Pasley told Lackner he wanted to return to A Shift, and Lackner denied the request. Doc. 28 at ¶29. That same day, Pasley went to speak with HR. Doc. 32 at 7, ¶29; Doc. 26-13 at 82. After initially denying the transfer request, Lackner informed Pasley that he could return to A Shift if he withdrew from the promotional process, Doc. 28 at ¶29, because the promotion evaluation was the reason for the shift change, Doc. 26-13 at 15. On June 22, 2023, Pasley sent the following email to Lackner, Roller (manager), and others:

> I Ryan Darrell Pasley, on this 22nd day of June would like to remove my name from the Team Leader promotion list for the CMM Lab. The reason for this action is because my Group Leader Nicholas Lackner informed that if I write a statement taking my name off the list I could then return back to my regular shift. He had previously denied without cause, but I was told when I was moved from A-Shift it was for evaluation purposes for Team Leader. These type of mind game continues to show the created hostile work environment and retaliation against me for wanting to be treated fairly. Based on that and the advice of my wife and VA Psychiatrist [] who treats me for PTSD. He feels

[3] Due to the transfer, Pasley was working nights on dates he originally planned to work days, and he missed his daughter's graduation. Doc. 28 at ¶28. The only relevant allegation from this fact is that Lackner would not talk to him when he approached him, but it undisputed that he did not attempt to formally request time off for the graduation, *id.*; Doc. 32 at 7, ¶28.

> that this undo [sic] stress could greatly aggravate my condition. So for my mental health I will exit this process.

Doc. 26-2 at 7. Pasley returned to A Shift. Doc. 28 at ¶34. With only two remaining applicants for promotion, Lackner appointed McRee to Team Leader for A Shift and decided to appoint Stone as a Team Leader over the Specialists. *Id.* at ¶¶36-37.

**B. Short-Term Leave**

Pasley decided to take time off beginning in August 2023, and he applied for short-term disability and family medical leave. *Id.* at ¶¶40-41. MBUSI granted Pasley's request for family medical leave but denied his short-term disability leave because his application did not contain sufficient medical documentation. *Id.* at ¶¶43-44. Pasley disputes this conclusion, arguing that his medical documentation met the requirements for short-term disability. Doc. 32 at 10-11, ¶¶45-46. He also claims that he made numerous efforts to confirm the approval and was informed by an HR employee that he was good to go. *Id.* at 9-10, ¶42. The dispute as to whether his short-term disability was correctly denied is not relevant for purposes of this motion.

**C. Continued Issues at Work**

Apparently Pasley's work problems did not end after he returned to A Shift. In December 2023, after Pasley's leave, he again received an evaluation of "develop at the same level" based on Lackner's view that Pasley lacked the necessary communication skills for promotion. Doc. 28 at ¶¶48-49. And then in March 2024,

Lackner asked Pasley to remove union paperwork that was sitting on his desk, *id.* at ¶53, allegedly in an aggressive manner, Doc. 32 at 12, ¶53. Pasley also alleges that he was denied the use of flex-time, but that he observed white employees being allowed to use it. Doc. 23 at ¶¶41-43.[4]

**D. EEOC Charges**

Pasley filed an EEOC Charge of Discrimination on October 27, 2023, alleging that he was retaliated and discriminated against because of his race. Doc. 26-2 at 44-45. In support of his claim, he details the promotional process, the move to B Shift, the cell phone incident, and his subsequent return to A Shift and withdrawal from consideration for promotion. *Id.* The charge does not mention a disability, Pasley's PTSD, or any allegations relating to a request for an accommodation. *Id.*

On February 28, 2024, Pasley filed an Amended Charge, this time with the assistance of counsel. *Id.* at 46-47. The amended charge added factual details and for the first time alleged disability discrimination. *Id.* The amended charge alleges facts regarding Pasley's PTSD, requests for accommodation, and MBUSI's failure to accommodate. *Id.*

[4] In his response to MBUSI's motion for summary judgment, Pasley seems to have abandoned this claim. He does not support it with citations to the record, and indeed asserts that "Roller paused the use of flex-time in CMM." Doc. 32 at 14, ¶7. This concession seems to contradict his claim that he was not allowed to use flex time because of his race.

**E. The Lawsuit**

After the EEOC closed its investigation, Pasley brought this action against MBUSI, asserting multiple causes of action. *See* Doc. 1. Pasley's amended complaint asserts six counts: race discrimination under Title VII and 42 U.S.C. § 1981, disability discrimination and failure to accommodate under the ADA, and retaliation under Title VII, § 1981, and the ADA. *See generally* Doc. 23. MBUSI moves for summary judgement on all claims. *See* Doc. 25.

**STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In reviewing the evidence submitted, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In considering a motion for summary judgment, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## ANALYSIS

### I. Counts I and II: Race Discrimination

Pasley asserts Title VII and § 1981 racial discrimination claims against MBUSI, alleging that MBUSI discriminated against him by marking him not ready for promotion, transferring him to another shift, treating him different than white employees regarding "flex time" and cell phone use, and failing to promote him to Team Lead. Doc. 23 at ¶¶130-44. Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Similarly, 42 U.S.C. § 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). Pasley's claims under Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), so the Court will evaluate Counts I and II together, except for Pasley's failure to promote theory.

#### A. Failure to Promote Theory

In only his § 1981 claim, Pasley alleges MBUSI "discriminated against [him] by failing to promote him to team lead and maintaining him as ineligible for promotion." Doc. 23 at ¶140. To prove a § 1981 claim, Pasley must establish that

"race was a but-for cause of [his] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). He cannot do so. It is undisputed that Pasley voluntarily withdrew his name from consideration. And at the hearing on this motion, Pasley conceded that there is no evidence that MBUSI forced Pasley to withdraw from the promotion based on his race. Any race discrimination claim based on a failure to promote theory therefore fails as a matter of law.

**B. Incidents Other Than the Failure to Promote**

Omitting the promotion decision, Pasley's race discrimination claims are based on "marking him 'not ready' for the next level on evaluations," "transferring him to another shift," and allegedly "treating him different from white employees regarding flex time, cell phone use, and personal interactions." Doc. 23 at ¶¶131-32, 138-39. He supports his claim with circumstantial evidence, attempting to show that MBUSI discriminated against him based on his race. *See Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) ("A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination.").

Where a plaintiff seeks to prove his race discrimination claims based on circumstantial evidence alone, the *McDonnell Douglas* framework provides courts with a helpful tool. *Ismael v. Roundtree*, 161 F.4th 752, 765 (11th Cir. 2025). But where a plaintiff cannot establish a prima facie case, he may still avoid summary judgment if he presents a "convincing mosaic" of circumstantial evidence,

demonstrating a material issue of triable fact on the issue of intentional discrimination. *Id.*

As an initial matter, some the actions MBUSI allegedly undertook do not amount to an adverse employment action—which is not only an element of a prima facie case, but an essential element of the discrimination claim itself, without which there is no Title VII or § 1981 liability. *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012); *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023). Title VII protects against adverse employment actions based on race, which in this context, "consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020). Pasley "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). His complaints about the transfer to B Shift, the cell phone incident, and other "personal interactions" do not meet that standard.

*1. The Transfer*

Pasley gives the Court no reason why the transfer to B Shift left him "worse off," *id.*, as all of Pasley's allegations relate to Lackner's mistreatment of Pasley—but Lackner was Pasley's group leader on A Shift as well. When the shifts are identical and the only harm identified would have been present on A Shift as well,

the Court does not find that Pasley demonstrated that the transfer (which was only in effect for a few weeks) affected the terms and conditions of his employment. *Id.* at 347 ("[A] transferee must show some harm respecting an identifiable term or condition of employment."). "The critical issue, Title VII's text indicates, is whether" Pasley—because he is black—was "exposed to disadvantageous terms or conditions of employment to which members of" another race were "not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Pasley identifies no "disadvantageous terms or conditions" of B Shift that weren't present on A Shift.

Moreover, even if the transfer were an adverse employment action, Pasley has "fail[ed] to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination," because there is "not enough evidence to infer discrimination" is why Lackner moved Pasley to B Shift. *Tynes*, 88 F.4th at 947. Pasley makes two assertions about the transfer in his brief opposing summary judgment:

> • MBUSI ignored the seniority rules when moving Pasley to another shift and swapped him with the only Black team member on that shift.
>
> • Lackner, (White) did not evaluate Pasley after alleging that's why he moved him to B Shift. He was not in Pasley's presence to observe him for at least one month. He promoted McRee (White) without evaluating him and created a new position for Stone (White).

Doc. 32 at 30. But neither assertion is supported by a citation to the record, nor apparently by any citations to the record earlier in Pasley's brief. As to the first bullet

point, there is no evidence of "seniority rules" regarding which Team Member gets transferred to another shift when a Group Leader wants to evaluate two Team Members for a Team Leader position. As to the second, Pasley is apparently referring to his earlier contention that "Lackner would not have interacted with Pasley or be[en] able to observe him when on evening shift for 4 weeks," *id.* at 14, based on the fact that Lackner's time at work overlapped with the day shift, and that A Shift had just finished up two weeks of night shift when Pasley was transferred to B Shift, meaning that for four weeks, Lackner could not evaluate him. But the same would have been true for McRee had he been transferred to B Shift. And it is unclear what evidence Pasley relies on to assert that Lackner promoted McRee without evaluating him; the Court will not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992). Finally, Pasley has not shown that creating a Team Lead for Specialists and appointing Stone, who was a Specialist, for the position indicates that Lackner moved Pasley to B Shift because he was black.

*2. The Cell Phone Incident and Other "Personal Interactions"*

On the record before the Court, there is no evidence showing that the cell phone incident or other personal interactions were any more than a "[t]rivial slights"—the perhaps unpleasant interactions were not a "tangible employment

action" because Pasley has not shown any way it affected his "continued employment or pay." *Monaghan*, 955 F.3d at 859-60.

*3. Flex-time Use*

Pasley alleges in his amended complaint that "Defendant … discriminated against Pasley by treating him different from white employees regarding flex time," Doc. 23 at ¶139, but he has not adequately supported that allegation in his summary judgment briefing. Indeed, he does not dispute that while "MBUSI was more liberal in the CMM Shop and allowed the use of flex time," "[w]hen David Hunter became GL over the CMM Shop in December 2024, he discontinued the use of flex time as to all CMM TMs." Doc. 28 at ¶¶54-55; Doc. 32 at 12. He mentions "flex time" only once in his opposition to MBUSI's summary-judgment motion, and then only to note that "Roller paused the use of flex-time in CMM." Doc. 32 at 14. Thus, Pasley's claim as to the use of flex time fails as a matter of law, and in considering Pasley's claims, the only actionable "adverse employment action" is the evaluation by Coffin.

*4. The "Not Ready" Evaluation*

Pasley's "not ready" evaluation is an adverse employment action because it affected his ability to be promoted. *Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005) ("[A]n evaluation that directly disentitles an employee to a raise of any significance is an adverse employment action under Title VII."). But Pasley

must "put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Ismael*, 161 F.4th at 763.

One way a plaintiff can survive summary judgment on an intentional race discrimination claim is by establishing his case under the three-step *McDonnell Douglas* burden shifting framework. *Lewis v. City of Union City (Lewis I)*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). In step one, the plaintiff must establish a prima facie case of discrimination by showing he (A) belongs to a protected class; (B) was subjected to an adverse employment action, (C) was qualified to perform the job in question, and (D) his "employer treated 'similarly situated' employees outside [his] class more favorably." *Tynes*, 88 F.4th at 944. If the plaintiff makes this prima facie showing, he is entitled "to a rebuttable presumption of intentional discrimination," and then at the second step, the defendant must rebut the presumption "by offering evidence of a valid, non-discriminatory justification for the adverse employment action." *Id.* If the defendant succeeds, then at the third step, "the presumption of discrimination falls away and the plaintiff tries to show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Id.* The Court need not reach steps two and three of the *McDonnell Douglas* framework because Pasley has not established a prima facie case. *See Ismael*, 161 F.4th at 765.

Since Pasley's failure to establish any of the four elements of step one dooms his prima facie case, *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1307-08 (11th Cir. 2026), the Court proceeds to the fourth element to determine if Pasley "presents evidence of a comparator—someone who is similarly situated in all material respects." *Tynes*, 88 F.4th at 944 (internal quotation marks omitted) (quoting *Jenkins*, 26 F.4th at 1249). A plaintiff can establish that a comparator is "sufficiently similar" by presenting evidence that the comparator and plaintiff: engaged in the same conduct, were subject to the same employment guidelines, were under the jurisdiction of the same supervisor, shared the same employment or disciplinary history, or other evidence tending to show similarity in "all material respects." *Lewis I*, 918 F.3d at 1227-28.

Pasley has not proffered a comparator for his evaluation allegation, *see* Doc. 23 at ¶¶131, 138, because he fails to allege an employee, similar in all material respects, who was marked "ready" when Pasley was marked "not ready." While the record contains evidence of both Stone's and McRee's evaluations, neither can serve as a comparator. McRee, a white employee, was marked "ready" when Pasley was marked "not ready" in the 2023 evaluations, Doc. 28 at ¶17, but the record does not contain details of McRee's employment history, disciplinary history, or any other evidence that would allow the Court to determine if he is similarly situated enough to be a valid comparator for Pasley. While we know that McRee was an Operator on

A Shift, like Pasley, *id.* at ¶7, there is not enough evidence for the Court to find that he was "similarly situated in all material respects," which is a "high bar to meet." *Tynes*, 88 F.4th at 947; *see Coleman v. Morris-Shea Bridge Co.*, No. 21-13764, 2026 WL 551909, at *5 (11th Cir. Feb. 27, 2026) ("We have frequently found comparators invalid despite sharing a formal title."). Pasley clearly has not met this "high bar" when he presents no actual evidence comparing himself to McRee.[5] Stone, another white employee, cannot serve as Pasley's comparator because it is undisputed that he was also marked "not ready," and therefore not treated more favorably than Pasley. *See* Doc. 28 at ¶¶17, 21.

In his response, Pasley argues that "viewing the evidence in the light most favorable to Pasley, he has pointed to differential treatment of multiple employees …." Doc. 32 at 34 n.6. But he clearly has not done so, and where the burden was on Pasley to provide valid comparator evidence, *see Lewis I*, 918 F.3d at 1217, a conclusory assertion in his response does not suffice. The Court is not required to mine the record for Pasley to find a valid comparator for his claims. Thus, he has not established a prima facie case.

Pasley's failure to establish a comparator and resulting failure to establish a prima facie case does not end the Court's analysis. *Lewis v. City of Union City*

---

[5] Pasley avers that McRee was provided with more training, tools, and growth opportunities. Doc. 32 at 9, ¶39; *see* Doc. 31-2 at ¶7; Doc. 31-1 at ¶11. So Pasley's own contentions at least suggest that McRee had different work and leadership experience and was not similarly situated to Pasley.

*(Lewis II)*, 934 F.3d 1169, 1185 (11th Cir. 2019). Pasley can still survive summary judgment if he produces a "wide range of circumstantial evidence," creating a "convincing mosaic," that will allow a jury to infer intentional discrimination by MBUSI. *Ismael*, 161 F.4th at 760. Evidence establishing this mosaic may include, "among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (internal quotation marks omitted) (quoting *Lewis II*, 934 F.3d at 1185).[6]

Pasley provides three pages of bullet-pointed "circumstantial evidence" to support his undifferentiated "race claims," Doc. 32 at 28, and argues, absent citations to the record, supporting authority, or significant analysis, that he has created a convincing mosaic. *Id.* at 28-32. But even after trying to connect Pasley's assertions with the record cites he offers earlier in his brief, much of Pasley's "proffered evidence" is simply unsupported or unhelpful. Pasley bears the burden to produce evidence that would permit a reasonable juror to infer that *race* motivated the specific actions against him. He has not done so. For example, he alleges that "[t]he computer program used to run audits in CMM refers to machines as slave and

[6] In order to see if he creates a convincing mosaic, the Court will consider all the evidence, including the incidents that did not rise to the level of constituting adverse employment actions. Similarly, the Court will consider the evidence regarding other employees, even though they were not "strict comparators." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1198 (11th Cir. 2024).

master," and that MBUSI did not change the program after black employees complained about the titles. *Id.* at 31. But Pasley doesn't explain how that fact makes it likely that any of the alleged actions of which Pasley complains were based on his race. Considering the totality of the evidence and the whole picture that Pasley paints, there is no evidence pointing to any "link[]" between the actions against him and his race. *See Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013) ("Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race.").

As to Pasley's evaluation, the record shows that a white employee (Stone) was also marked not ready for promotion. And on the shift transfer, Pasley's only evidence purporting to show a connection to race is that he was switched with the only black employee on B Shift, but without more, this does not show that he was moved to B Shift based on discriminatory intent, much less that his "not ready" evaluation was based on his race. The cell phone incident similarly provides no support for Pasley's claim. By pointing out that *everyone else*—black, white, or otherwise—was allowed to use their cell phones with volume on, Pasley undercuts the notion that Pasley was singled out due to his race. If both white and black employees used their cell phones with volume on and only Pasley was singled out—

the singling out, while perhaps misguided, does not appear to be on account of his race.

While the convincing mosaic inquiry is technically outside the bounds of *McDonnell Douglas* framework, the questions asked in that framework are still relevant. *Tynes*, 88 F.4th at 946. And where, like here, a plaintiff fails to rebut the defendant's proffered non-discriminatory reasons for its actions, that failure tends to make the "mosaic" significantly less convincing.[7] Disagreement with MBUSI's rating decision is simply a "quarrel[] with the wisdom of that reason" and not a credible rebuttable. *See Chapmon v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.").

While Pasley is correct that he technically does not have to "rebut each reason head on," show pretext, or point to comparators, Doc. 32 at 31-32, the failure to do so is still relevant to the viability of his claims. Pasley says he "only needs to produce some circumstantial evidence," *id.* at 32, but that is not the standard. The circumstantial evidence must "directly create an inference of discrimination" for Pasley to survive summary judgment. *Ismael*, 161 F.4th at 763. He still has the

[7] A showing of pretext is not the "end-all be-all," but the plaintiff still has "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Ismael*, 161 F.4th at 762.

ultimate burden to produce enough evidence to allow a reasonable jury to find intentional discrimination. *Tynes*, 88 F.4th at 946. And this he has not done.

Pasley's claims fail under the convincing mosaic standard for many of the same reasons he fails to make out a prima facie case. The two "standards" look to the same ultimate inquiry—whether there is enough evidence for a jury to find intentional discrimination. *Id.* at 947. And most of the time, "[a] failure in the prima facie case often also reflects a failure of the overall evidence" because "the *questions* the plaintiff must answer to make a prima facie case are relevant to the ultimate question of discrimination." *Id.* at 945-46. Pasley relies heavily on the convincing mosaic standard, but critically, this standard does not somehow transform his claims or the record. "The same evidence placed in a looser frame does not transform it into something new." *Melton v. I-10 Truck Ctr. Inc.*, 166 F.4th 905, 915 (11th Cir. 2026). Whether the Court looks to the *McDonell Douglas* framework, the convincing mosaic standard, or only Federal Rule of Civil Procedure 56, the result is the same—there is simply not enough evidence in the record for a jury to find for Pasley on the "ultimate question" of intentional discrimination. *Tynes*, 88 F.4th at 946.

## II. Counts IV and V: Title VII and § 1981 Retaliation

Pasley asserts claims for retaliation under Title VII and § 1981, alleging he was retaliated against after he engaged in protected activity by complaining of discrimination. Doc. 23 at ¶¶158-67, 168-78. To establish a prima facie case of

retaliation, Pasley must show (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Pasley concedes that his only protected activity was filing his EEOC charge in October 2023.[8] This concession limits the potential retaliatory actions to the following: Lackner evaluating Pasley as "not ready," requiring a black witness to be present during a meeting, and attempting to report Pasley to HR for pro-union pamphlets. Doc. 23 at ¶¶164-66, 174-76.

MBUSI argues that the evaluation, witness, and union pamphlet incidents cannot constitute adverse employment actions. Doc. 28 at 28. The Court will assume the December 2023 evaluation is a sufficient adverse employment action, *see Gillis*, 400 F.3d at 888, but the other allegations are not actionable. In the retaliation context, mistreatment is actionable if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," even if it does not "rise[] to the level of a tangible employment action." *Monaghan*, 955 F.3d at 861 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But Pasley does not explain how having a witness sit in on a meeting would meet this standard. And there is no evidence in the record that Lackner "attempted to report

---

[8] Pasley conceded this at the hearing held on this motion on March 10, 2026.

Pasley to HR,"[9] so the only question remaining is whether Lackner asking Pasley to remove union paperwork from his desk constitutes an adverse employment action. On the current record, the Court finds that the request does not meet this standard. Pasley was not disciplined in any way, and the record does not show how this mistreatment would constitute an adverse employment.

As to causation, MBUSI correctly notes that there is no record evidence showing Lackner's knowledge of the EEOC complaint. Doc. 28 at 27. To succeed on his retaliation claim, Pasley "needs to show" that Lackner "actually knew about [his] protected expression," the EEOC charge. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). At the hearing on this motion, Pasley argued that everyone knew about the charge. This broad assertion is not supported by evidence, and Lackner's awareness cannot be established by "unsupported inference." *Id.* Pasley's "speculation about [his] boss's knowledge cannot make up for the missing evidence," *id.* at 1050, and he has failed to show a genuine issue of material fact on this claim.

Even if the Court assumed Pasley satisfied the prima facie case, MBUSI has also briefed Lackner's legitimate business reason for evaluating Pasley as "not

[9] In discussing this incident, Pasley says that after he did not respond to Lackner about the paperwork, Lackner "went to his desk and began fervently typing – likely a report to HR." Doc. 32 at 12, ¶53. This speculation is not evidence that Lackner attempted to report Pasley to HR for the union paperwork.

ready"—his lack of communication skills and the necessary leadership qualities. Doc. 28 at 19-20. And Pasley failed to show that these reasons were pretextual. *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). To be sure, Pasley avers that he has sufficient communication skills and should have been marked ready for promotion. "But [Pasley's] disagreement with [Lackner's] assessment of his performance does not suffice to show pretext." *Cooper v. Airbus Americas, Inc.*, No. 25-10378, 2026 WL 852233, at *9 (11th Cir. Mar. 27, 2026) (citing *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022)); *see also Coleman*, 2026 WL 551909, at *6 ("The inquiry into pretext centers on the employer's beliefs ... not on reality as it exists outside the decision maker's head.").

## III. Counts III and VI: Disability Discrimination and Retaliation

Under the ADA, Pasley alleges disability discrimination, failure to accommodate, and retaliation. In Count III, Pasley alleges that MBUSI discriminated against him because of his PTSD and failed to accommodate him, in violation of the ADA. Doc. 23 at ¶¶145-57. In Count VI, Pasley alleges that MBUSI retaliated against him because he engaged in ADA protected conduct. *Id.* at ¶¶179-87. MBUSI moves for summary judgment on both claims, arguing (1) Pasley's claims are barred because he failed to exhaust his administrative remedies, and (2) that Pasley's ADA claims fail as a matter of law. Doc. 28 at 30.

**A. Failure to Administratively Exhaust His Claims**

Pasley filed an EEOC Charge of Discrimination on October 27, 2023, claiming that MBUSI had retaliated and discriminated against him because of his race. Doc. 26-2 at 44-45. In February 2024, Pasley filed a counseled Amended Charge, including details of his PTSD and alleged disability discrimination and failure to accommodate. *Id.* at 46-47. In moving for summary judgment, MBUSI argues that Pasley's ADA claims are barred because the Amended Charge does not "relate back" to his October 2023 charge. Doc. 28 at 30-33. Pasley, in turn, does not argue that his February 2024 amendments relate back; he contends that he fully exhausted his ADA claims when he brought his original 2023 charge. *See* Doc. 32 at 18-19.

Before filing a judicial complaint alleging discrimination or retaliation under the ADA, a plaintiff must exhaust his administrative remedies by filing a Charge of Discrimination with the EEOC. *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018); *Zillyette v. Cap. One Fin. Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the Civil Rights Act of 1964."). By statute, the "[c]harges shall be in writing under oath or affirmation," 42 U.S.C. § 2000e-5(b), and its filing "initiates 'an integrated, multi-step enforcement procedure' that enables the EEOC to detect and remedy various discriminatory

employment practices." *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (quoting *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 61-62 (1984)). After receiving the charge, the EEOC must provide "notice to the employer within a specified time period that a charge has been filed," and must investigate the charges. *Id.* This filing thus provides the EEOC "the 'first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Batson*, 897 F.3d at 1327 (quoting *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)); *Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir. 1989).

"In light of [this] purpose," a plaintiff's judicial complaint is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," and courts should allow only judicial claims which "amplify, clarify, or more clearly focus the allegations in the EEOC complaint." *Gregory*, 355 F.3d at 1279-80 (internal quotations omitted). It is "inappropriate" for a plaintiff to allege "new acts of discrimination." *Id.* The Court therefore must determine whether Pasley's ADA failure to accommodate, disability discrimination, and retaliation claims are "like or related to, or grew out of, the allegations contained in [his] EEOC charge." *Id.* at 1280.

Pasley's October 27, 2023, EEOC charge focuses solely on race. For the box "DISCRIMINATION BASED ON" he lists "Race, Retaliation." Doc. 26-2 at 44.

When it comes to the facts underlying the charge, he begins: "I am African American," and then recounts some of the allegations over the promotion and transfer process discussed above, including that "[t]he team lead position was given to Mr. McCree and another team lead position was created and given to Stephen Stone (Caucasian)." *Id.* at 44-45. It concludes: "I believe that I have been retaliated and discriminated against because of my race (African American) in violation of Title VII …." *Id.* at 45. The narrative statement does not even generally reference disability discrimination or Pasley's PTSD. *Id.* [10]

Faced with this charge, the EEOC could not have reasonably been expected to investigate whether MBUSI discriminated against Pasley based on his PTSD or failed to provide accommodations for his PTSD. The case is much like *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1224 (11th Cir. 2000), in which the plaintiff "brought a retaliation claim" in court that differed from the one he described in his charge. In the charge:

> Chanda checked the "retaliation" box as well as the "disability" box on his EEOC papers and in the "particulars" section thereof wrote "I also complained about discrimination." Chanda's affidavit, however, states that he was "retaliated against because [he] complained both verbally and in writing about discrimination due to [his] disability." While his EEOC affidavit appears to allege retaliation for complaining of discrimination based on his disability, Chanda brought the claim under

[10] Pasley filed a counseled amended EEOC charge on February 28, 2024, and included allegations of disability discrimination. Doc. 26-2 at 46-47. But because Pasley does not contend that this amendment relates back to his original charge, the Court considers only his original charge and whether this complaint grew out of the factual allegations in that charge.

> Title VII in his complaint, couching it as a[n] ethnic discrimination claim.

*Id.* at 1224-25. The Eleventh Circuit didn't buy it. While "Chanda's EEOC filing reflect[ed] an intention to pursue a retaliation claim, … "there [wa]s no reference to a national origin claim," and "[n]othing in his EEOC filing mention[ed] discrimination based on national origin, any complaint about such discrimination, or a claim under Title VII." *Id.* at 1225. The court thus concluded "that a reasonable investigation based on the EEOC charge did not and would not encompass retaliation based on complaints about national origin discrimination." *Id.*

The same is true for Pasley. Nothing in his EEOC filing mentioned discrimination based on PTSD, any complaint about such discrimination, or a claim under the ADA. That charge, focused solely on race, would not lead a reasonable investigator to delve into the sort of ADA claims that Pasley brings here.

Consider too the Eleventh Circuit's recent decision in *Mukhina v. Walmart, Inc.*, 162 F.4th 1128 (11th Cir. 2025). There the plaintiff argued she had sufficiently exhausted a claim of religious discrimination in her charge of national origin discrimination and retaliation because she stated that she was "denied time off on New Year's Eve, one of the most important holidays for [Mukhina] as a Russian person with many national traditions" and compared it to the holiday of Christmas Day in America. *Id.* at 1132 (internal quotation marks omitted). The EEOC was not required to connect the dots when Mukhina did not specifically explain that New

Year's Eve was a religious holiday. *Id.* The factual allegation regarding her denied time off did not serve to exhaust her religious discrimination claim, even though the two were related. *Id.* at 1132-33. Under *Mukhina*, Pasley did not exhaust his disability claims.

Pasley responds that his "finalized charge includes an e-mail" that addresses his PTSD. Doc. 32 at 21. But that's not accurate. His charge *mentions* an email that *mentions* PTSD, but that is not enough to exhaust his ADA claims for at least two reasons. First, the sworn allegations in the charge are what count. And while Pasley declared under penalty of perjury that he "wrote a letter to Mr. Lackner, HR, and the management chain informing them that I had been retaliated against and subjected to a hostile work environment," Doc. 26-2 at 45, he never swore to the statements in the email (especially those not referenced in the charge). They are not "allegations in the EEOC complaint." *Gregory*, 355 F.3d at 1279.

Second, the email makes only a vague reference to Pasley's PTSD, *see* Doc. 26-2 at 7, while the charge details the promotional process, mistreatment by Lackner, and the shift transfer—all actions supposedly taken against Pasley because of his race, *see id.* at 44-45. Based only on one potential vague reference, the Court cannot find that Pasley exhausted his ADA claims. Pasley's reference to PTSD in the email, even if considered, does not provide factual allegations relating to his disability. Given that the EEOC charge says nothing about a disability, a request for

accommodation, or MBUSI's failure to provide an accommodation, there are clear "material differences," *Wu*, 863 F.2d at 1547, between Pasley's EEOC charge and his claims in Counts III and VI, *see* Doc. 23.

Pasley further argues that "there is no doubt that a reasonable investigator would be aware of the ADA claims because the scope of the investigation actually included Pasley's disability claims." Doc. 32 at 21. In support, Pasley cites only to the EEOC intake investigator's notes, claiming the EEOC did in fact investigate his disability claims. *Id.* at 21-22. But the intake interview does not support a finding of exhaustion. "[T]he employee's formal charge, not the intake questionnaire, is what counts." *Mukhina*, 162 F.4th at 1135.[11] Like an intake questionnaire, an intake interview is typically completed before the formal charge and does not serve the same purpose as the formal charge; the intake interview does not "inititat[e] [] the agency's investigation of the complaint"; the formal charge does. *See Pijnenburg*, 255 F.3d at 1306.[12]

---

[11] The intake interview and questionnaire are not the same as the formal charge. "The law is clear that a charge must be verified—*i.e.,* written under oath or affirmation—in order to support a valid judicial suit." *Francois v. Miami Dade Cnty., Port of Miami*, 432 F. App'x 819, 821 (11th Cir. 2011). Pasley's interview is not a verified complaint and is not evidence of the investigation.

[12] "The intake interview process is designed to ensure that an individual's submission meets the requirements of a charge of discrimination." *Lewis v. Mercedes-Benz USA, LLC*, No. 1:22-CV-4804, 2025 WL 2058826, at *3 (N.D. Ga. Feb. 6, 2025), *report and recommendation adopted*, No. 1:22-CV-04804, 2025 WL 2058824 (N.D. Ga. June 23, 2025). The intake interview is not part of the EEOC's investigation, which is triggered by the formal charge. Pasley offers no argument or evidence as to the intake interview playing a uniquely significant role in the EEOC's investigation of his claim.

Pasley's intake interview therefore functions neither as a formal charge nor as evidence of the investigation. The interview was on October 23, 2023, and Pasley finalized his charge on October 27, 2023. *See* Doc. 31-6; Doc. 26-2 at 44-45. There is also "no evidence that the EEOC considered the [interview] to be a charge of discrimination," *Bost v. Fed. Express Corp.*, 372 F.3d 1233 (11th Cir. 2004), and the law is clear that the actual charge directs the EEOC's investigation, so the interview taken to help Pasley file his charge is not evidence of what the EEOC actually investigated. *See Pijnenburg*, 255 F.3d at 1306.

Even if the Court considered the intake interview in its exhaustion analysis, "it would not help [Pasley]." *Mukhina*, 162 F.4th at 1135. The intake notes include the following: "CP states that he is a veteran with PTSD and depression, and he was trying to hold it in the role. … [H]e went on short term disability due to his disability …." Doc. 31-6 at 3. "CP states that he wrote a letter to Mr. Lackner, HR, and everyone up the management chain stating he was being retaliated against, harassment, and due to the advice of his physician for undue hardship and aggravated his disability." *Id.* at 4.

These notes are still insufficient to show that Pasley exhausted his disability claims. Considering the notes, the Court has, at most, statements that Pasley has PTSD and struggled with mental health during the relevant time period, which are not allegations that a failure to accommodate, disability discrimination, or retaliation

claim could "reasonably be expected to grow out of." *Gregory*, 355 F.3d at 1280. A mention of his alleged disability in an intake interview does not make it reasonable that an EEOC investigation, focused on allegations of race discrimination, would then include an investigation into MBUSI's motive as related to Pasley's PTSD.

Moreover, even if the EEOC did investigate Pasley's disability claims, that is irrelevant to the objective inquiry required here. The question is "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *Patterson*, 38 F.4th at 1345, not what investigation happened to follow from the charge. Otherwise, whether a plaintiff is deemed to have exhausted his claim could turn on whether his charge was assigned to a particularly dogged investigator or one giving only the minimum adequate effort. That risks "render[ing] arbitrary what the agency has attempted to make uniform." *Pijnenburg*, 255 F.3d at 1306-07; *but see Smith v. Sentry Ins.*, 674 F. Supp. 1459, 1467 (N.D. Ga. 1987) (concluding that "a judicial complaint of employment discrimination may include any allegations of discrimination encompassed by an EEOC investigation, even if the EEOC investigation was arguably broader than the EEOC charge triggering the investigation").

In sum, Pasley's ADA claims are not "inextricably intertwined" with his claims of racial discrimination and retaliation. *See Gregory*, 355 F.3d at 1280. The ADA claims pleaded in Count III and VI are entirely distinct from the allegations of

race discrimination brought in Pasley's EEOC charge. The Court thus finds that Pasley did not sufficiently exhaust his administrative remedies and cannot bring his ADA claims.

**B. Failure to Show a Covered "Disability"**

Counts III and VI fail as a matter of law for another reason. To bring his ADA claims, Pasley must establish that he has a "disability" as defined by the Act. *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023). The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), and defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment," 42 U.S.C. § 12102(1); *see also Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). While Pasley's PTSD likely qualifies as an impairment, he still must show that it "substantially limits" his ability "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

Pasley argues that he has presented "substantial evidence … that his PTSD substantially limits multiple major life activities." Doc. 32 at 23. Pasley's evidence consists of medical records, Doc. 26-13 at 95, 97, 110, 113, and his own testimony, *see generally* Docs. 26-1, 31-4. But a court "cannot assess whether [a plaintiff] meets the definition of disabled under the ADA" if "the record does not contain evidence

of the timing, frequency, and duration" of the alleged impairment. *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1273 (11th Cir. 2020); *see Lewis II*, 934 F.3d at 1181. Pasley's medical records show that he has Major Depressive Disorder which has periods of exacerbations, causing emotional dysregulation, short term memory loss, and sometimes insomnia, poor appetite, worsening depression, mood swings, and feeling overwhelmed with life. *See* Doc. 26-13 at 95, 97, 110, 113. Pasley testifies that his PTSD, when triggered, affects his ability to communicate well with others. Doc. 32 at 16, ¶23. But Pasley does not point to any evidence describing the frequency of these "periods of exacerbations" or explaining how often or for how long these symptoms affect his ability to work or participate in other major life activities.

Given the lack of specific evidence regarding the frequency and severity of Pasley's episodes and the resulting effect on his abilities, there is no genuine issue of material fact regarding whether he is "disabled." *Compare Munoz*, 981 F.3d at 1273 (holding that there was not enough evidence to determine whether impairment substantially limited plaintiff), *and Lewis II*, 934 F.3d at 1180-81 (same), *with Mazzeo*, 746 F.3d at 1268-70 (holding evidence to be sufficient when doctor testified and explained the injury and how it specifically affected plaintiff's ability to "walk, bend, sleep, and lift more than ten pounds"). With no evidence as to the timing, frequency, and duration of Pasley's depressive episodes and the resulting effect on

his ability to work or perform other major life activities, a jury would be unable to find that Pasley's PTSD substantially limits a major life event as compared to the general population. *See Munoz*, 981 F.3d at 1268-70.

## CONCLUSION

There is no genuine issue of material fact as to any of Pasley's claims. Accordingly, MBUSI's Motion for Summary Judgment (Doc. 25) is **GRANTED**. The Court **DENIES AS MOOT** MBUSI's Motion to Strike (Doc. 36). The Court will enter judgment by a separate order.

**DONE** and **ORDERED** this 10th day of April, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

.

**TAB 40**

Order Granting Defendant's Motion for Summary Judgment
(Filed 04/10/2026)

FILED
2026 Apr-10 PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **RYAN PASLEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **7:24-cv-1050-EGL** |
| | ) | |
| **MERCEDES-BENZ U.S. INTERNATIONAL, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Consistent with the Memorandum Opinion entered with this order, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 25). The Court **DENIES AS MOOT** Defendant's Motion to Strike (Doc. 36).

**DONE** and **ORDERED** this 10th day of April, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

.

**TAB 42**

Notice of Appeal
(Filed 05/07/2026)

FILED
2026 May-07 PM 07:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION**

| | | |
|---|---|---|
| **Ryan Pasley,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 7:24-cv-1050-EGL |
| | ) | |
| **Mercedes-Benz U.S. International, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**Notice of Appeal**

COMES NOW Ryan Pasley, Plaintiff in the above-named case, by and through his undersigned counsel of record and hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the Court's decision of April 10, 2026 (Doc. 39), granting summary judgment for Defendant on all claims; and the Final Order (Doc. 40); and from all other interlocutory orders or rulings affecting his rights entered by the Court prior to the entry of the final judgment.

Respectfully submitted on May 7, 2026,

/s/Leslie Palmer
Attorney for Plaintiff
ASB-0436-L40P

PALMER LAW, LLC
2 North 20th Street, Suite 900
Birmingham, AL 35203
Telephone: (205) 285-3050
Email: leslie@palmerlegalservices.com

**Certificate of Service**

I hereby certify that on this date, May 7, 2026, I served the foregoing document on Counsel of Record by electronically filing the same with the Court's CM/ECF system or via electronic mail as appropriate.

Michael L. Lucas
Joseph Barnello
Burr & Forman LLP
mlucas@burr.com
jbarnello@burr.com
Attorneys for Mercedes-Benz U.S. International, Inc.

*/s/Leslie Palmer*
OF COUNSEL

**TAB 48**

Transcript of Motion Hearing held March 10, 2026
(Filed 06/11/2026)

FILED
2026-Jun-11 AM 08:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

CASE NO: 7:24-cv-1050-EGL

RYAN PASLEY,

Plaintiff,

v.

MERCEDES-BENZ U.S. INTERNATIONAL, INC.,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

MOTION HEARING

TUESDAY, MARCH 10, 2026

TUSCALOOSA FEDERAL BUILDING AND COURTHOUSE
2005 UNIVERSITY BOULEVARD
TUSCALOOSA, ALABAMA 35401

BEFORE THE HONORABLE EDMUND LACOUR, JR.
UNITED STATES DISTRICT JUDGE

COURT REPORTER:
Kelli Griffin, RPR, CRR
Federal Official Court Reporter
1759 Fifth Avenue North
Birmingham, Alabama 35203
Kelli_Griffin@alnd.uscourts.gov

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

# APPEARANCES

**FOR THE PLAINTIFF:**

**LESLIE A. PALMER**
**Palmer Law, LLC**
**2 North 20th Street**
**Suite 900**
**Birmingham, Alabama 35203**

**FOR THE DEFENDANT:**

**JOSEPH BARNELLO, JR.**
**MICHAEL L. LUCAS**
**Burr & Forman, LLP**
**420 20th Street North**
**Suite 3400**
**Birmingham, Alabama 35203**

(Proceedings commenced at 1:00 p.m. in open court.)

THE COURT: All right. Thank y'all for being here for this hearing on Mercedes-Benz' motion for summary judgement and I expect the motion to strike or -- as well, that's pending. I appreciate the helpful briefing from the parties, and so I'll let the defendant go first. You can maybe plan to take, say, about 20 minutes and let the other side go for about 20, and then if there's some back-and-forth after that, we will certainly allow for that.

But with that, who will be presenting argument for Mercedes-Benz?

MR. BARNELLO: Your Honor, Joe Barnello for the defendant.

THE COURT: All right. And for the plaintiff?

MS. PALMER: Leslie Palmer for the plaintiff.

THE COURT: Great. Thank you.

MS. PALMER: Your Honor, do you just want us to argue our briefs, or are there any particular questions you want to ask?

THE COURT: I am definitely going to have some questions as we go and sort of see if there are points of agreement. It's -- I mean, for sense of record, I am going to have some questions for both sides to, like, maybe where they can point me in the record if that's helpful or -- and sort of some of the legal implications of some of the arguments here

too.

MR. BARNELLO: Your Honor, since we're going, like, 20 minutes, 20 minutes, do you want the parties to argue from the stand or from the table?

THE COURT: Yeah. From the stand if you could.

MR. BARNELLO: Ready, Your Honor?

THE COURT: Yes.

MR. BARNELLO: All right, Your Honor. May it please the Court.

As I just mentioned, my name is Joe Barnello arguing for the defendants today. So we're here on a couple of motions, first the motion for summary judgement and also the motion to strike. I would like to just start off by making a point on the motion to strike that -- to concede the point that Ms. Palmer was correct. We overlooked in the file that she had issued subsequent initial disclosures after the date. So while we concede that the general objection to the witnesses not being on initial disclosures, we concede that argument or waive that argument, we still hold that the motion to strike is due to be granted on the more specific grounds to the paragraphs. So, for instance, that certain paragraphs that were mentioned were irrelevant, not predicated on personal knowledge, contain conclusive or speculative or lacking foundation information as well as unidentified hearsay within hearsay or contradicting sworn testimony.

But we would like to focus today on the motions for summary judgment because the -- our position is that even if the motion to strike is denied, there still isn't subsequent information within those declarations that would overcome our motion for summary judgement or that would create a genuine issue of a material fact.

THE COURT: Great. And just to be clear then on the motion to strike -- this will be useful in case I do need to get into it -- and some parameters on the summary judgement motion. All of your arguments that were premised on the idea that the declarations go beyond purported knowledge -- I'm looking at, like, page 4 of Document 36, which is Stallworth's declaration tends to go much beyond his purported knowledge -- I guess the knowledge with regard to Lackner and Roller as paragraphs 3 through 13 et cetera have no pertinence to instance with Lackner or Roller. So you're withdrawing that argument, but to the extent there are more specific arguments, those are still in play?

MR. BARNELLO: Correct, Your Honor.

THE COURT: Okay. That's helpful. Thank you for clearing that up for us. And yeah, you can turn to the summary judgement motion.

MR. BARNELLO: Thank you, Your Honor. So turning to the summary judgement motion, overall, Plaintiff's arguments stem from the new Eleventh Circuit ruling in Ismael which we

believe -- or my interpretation of that is it hasn't -- Ismael hasn't changed anything in employment law that hasn't been the case since Rule 56 was enacted or since the courts have interpreted Rule 56. Instead, Ismael still holds that the bedrock principles of employment law, first, that Title XII and the ADA do not permit a plaintiff to second guess legitimate business decisions of Mercedes as well as Plaintiff is still required at summary judgement to show or to point the Court to concrete, substantial evidence that would prove each element of their claims.

THE COURT: Right. But one question on that. Just help me think through this business judgment argument that you-all have.

If -- I mean, they don't have to show that race was the only reason -- the only but-for cause. So there could be two but-for causes, a legitimate one and a racial one, and that would be -- that would still be enough to take that to the jury and for them to even -- to get a win. So how does that interact -- one, am I right about that? I seem to recall having read that quite recently in an Eleventh Circuit opinion. But then, two, how does that interact with, sort of, your arguments about business judgment?

MR. BARNELLO: Yes, Your Honor. So correct, this is a Title VII ADA case for the discrimination purposes. For retaliation, the but-for standard would still apply. It would

7

have to be the only reason like an ADA claim on age would be. But for the discrimination, Title VII and ADA portions of those discrimination portions, that is correct, it doesn't have to be the only but-for. There could be a motivating factor standard if that is argued, which I don't -- which we don't have a motivating factor but maybe a mixed motive as well. So, but that still doesn't negate the point that there has to be enough -- substantial evidence of racial disability or retaliatory intent in the record, and that's what is lacking here. There is no evidence of racial intent in any of the adverse employment actions being argued here today.

In fact, many of the -- what is alleged to be adverse employment actions don't even arise to that standard after Muldrow. There still has to be some harm to a term and condition of employment. Here --

THE COURT: And that's a question that will probably be more for your friend. But, I guess, looking back over the amended complaint, and Count 1 says there has been discrimination because of race by, among other things, marking him not ready for the next level on evaluations, transferring him to another shift, and then flextime, cell phone use, and personal interactions.

I mean, I have questions over whether, like, a comment about the cell phone use would qualify as, sort of, employment discrimination, but even if it did, what would be the -- like,

what would be the remedy or what would be the -- maybe there's, like, some minor damages for a negative personal interaction, but, I mean, we are not dealing with a hostile work environment claim here; right?

MR. BARNELLO: Exactly, Your Honor.

So my argument would be focused on what the two adverse employment actions that would arise to that standard would be if there were a discriminatory, retaliatory attempt, which would be the failure to promote claim and maybe the denial of short-term disability, which, I believe, are the two main arguments that the plaintiff puts forward. However, there was no failure to promote here in the sense of the plaintiff, Mr. Pasley, himself withdrew from consideration for the position.

His first complaint to -- or first report to Mercedes' human resources was that he wasn't included within the list of eligibles, as he words it, or he wasn't marked ready for team leader for the -- the CMM operator team leader position that was eventually given to Mr. McRee, but once Mr. Pasley reported that, the whole process for that operator team leader position was restarted. And Mr. Lackner, the group leader at the time, moved Mr. Pasley to the B shift so that he could be evaluated equally to Mr. McRee. And there was no complaints from Mr. Pasley at that time about being moved to the B shift for that period.

There's also several arguments that didn't allow Mr. Lackner to evaluate Mr. Pasley because he was being moved to the night shift. However, A shift and B shift in the CMM room rotate every two weeks, and the record shows that there was at least two rotations of Mr. Pasley working on the day shift which allowed Mr. Lackner to evaluate. Instead, this was about -- this was told to be about a two-month evaluation period, and I believe it was a little over a half period, so maybe a month to a month and a half that Mr. Lackner was evaluating both Mr. McRee and Mr. Pasley and Mr. Stone, who was on a different type of schedule.

And at that time, Mr. Pasley went to Mr. Lackner and asked to be moved back to the A shift. Mr. Lackner's response was: Well, you are still being evaluated for the team leader position and unless you give to me in writing some -- he has evidence of it as well -- I am not moving you back because you are still being evaluated. At no point did Mr. Pasley say to Mr. Lackner that he needed to be accommodated for a disability. He didn't even mention a disability. In fact, it is clear in the record that Mr. Lackner didn't know that there was a diagnosis of PTSD until the email a couple of days later, which was the written confirmation.

So the decision had already been made by -- honestly, by Mr. Pasley himself to move back and to withdraw his name. So that -- and the case law is clear there that you can't have a

failure to promote claim or a successful failure to promote claim if you withdraw yourself or don't apply for the position.

While Plaintiff had tried to -- in their response brief, tried to distinguish the cases that we brought, the distinguishments just aren't material or might be a little inaccurate. So for an exact example, Malladi versus Principi, which is out of the Middle District in 2006, it was -- the Plaintiff, Malladi, there's no evidence in there that she was -- that the company tried to dissuade her from applying for the position. It was just what the posting said, and the Court was very clear to irrespective of her reasons. So as long as the reason wasn't discriminatory, it doesn't matter why the plaintiff withdraws. Once they withdraw consideration, there is no failure to promote claim.

So that is one avenue for the Court to dismiss the failure to promote claim. There's also the alternatives of well, even if Mr. Pasley would not have withdrawn himself, he wasn't the best choice for the position. And it's a heightened standard for the plaintiff at -- even at summary judgement to point in the record not just that he was qualified for the position but that the disparities between his qualifications and those of the successful applicant are of such weight and significance that no reasonable person in the exercise of impartial judgment could have chosen the plaintiff or the candidate that was chosen over the plaintiff. And that is from the -- I am

probably going to botch the name of the Eleventh Circuit case but D'Onofrio. So those are just another reason.

You have multiple group leaders in the record stating that -- now, that would be Mr. Coffin, the previous group leader, that was out by the time of the decision and then the --

THE COURT: What about -- so he has got this, sort of, theory that previously seniority had really been one way that these team leaders were being selected and then there was a deviation from that. Couldn't that -- as he was the most senior person for the position, so couldn't that be seen as, sort of, suspicious and some circumstantial evidence that when there were sort of very senior White team members who were potentially up for the team lead gig then they could get that through seniority but then when it was his turn, they switch to this other approach?

MR. BARNELLO: Your Honor, that's just not true in the record either in the sense of seniority is not the end-all, be-all or even a high standard when it comes to team leader. It's all -- it's a merit-based system. So we pointed out in our reply brief that even the section of the handbooks that Plaintiff put in the record state that seniority isn't the end-all, be-all, it is all merit based, and the case law says that as well, that a company is not required to rely on seniority in promotion decisions. That --

THE COURT: But there might be a difference there

between what they are required to do and what they have done. So there's, sort of, the legal point that they can, sort of, lay it out however they want to if it is on nonracial and legitimate grounds, but you can still have the factual allegation. And, I mean, I think there was -- I'll have to look back and see if there's competent evidence to back it up -- but that could be at least some evidence, right, if like there were, again, senior White team members that go by seniority and they become group leaders or team leaders and then the senior employee is Black and they decide to, sort of, switch.

MR. BARNELLO: Yeah.

THE COURT: Is there evidence -- am I misremembering the evidence? Is there not evidence to that affect or if there's evidence to that affect, is it your argument that that's still not competent evidence for the failure to promote claim?

MR. BARNELLO: That last point, Your Honor, so there is no concrete evidence in the record that Mercedes uses seniority, in fact, like, over time to choose the team leaders. It's merit based, first off. That's what -- the handbook even says that seniority is not used, and it isn't the past practice. The thing about the CMM room is that there hadn't been open team leader positions for -- before the -- so the position that Mr. McRee got, there was one the year before in

**2022, and I think there was, like, I believe the evidence in the record says it may have been 15-plus years before there was a team leader position open before that.**

**So there's just no concrete evidence. Everything is speculative in the record or not based on personal knowledge that seniority is used over time. I believe that's some of the evidence that we asked to be stricken in the motion to strike. But also, the depositions of the management team in Mercedes will show that seniority is not used or isn't -- it's merit based.**

**But, again, it is not just that point that Mr. McRee was deemed to be the better position -- to be the better candidate for his. It's conceded that Mr. Stone was the -- even by Plaintiff -- that he was the more qualified individual for the specialist team leader role. It further goes back to that first avenue, Your Honor, of Mr. Pasley didn't give Mercedes the opportunity to choose him for team leader because he withdrew himself from the position.**

**And second -- and I guess not second now, third, would be the point that if we're looking at this through the lens of race discrimination -- whether or not there was race discrimination, there is no evidence of racial -- like, a racial motive or discriminatory intent in this case and Plaintiff's own testimony practically concedes that point, Your Honor. He says multiple times -- or not multiple times but he**

**says throughout his deposition that -- and the depositions of individuals like the current group leader, David Hunter, who is of the same protected class of Plaintiff, that the CMM lab is racially diverse. There's at least -- there's a mix of African-American employees, White employees, and employees of other races, that there has been no complaints against Mr. Lackner. He has never received a complaint against him in the decades -- in the decade of employment that he had at Mercedes. Plaintiff admitted there was no racially derogatory comments made toward him or others, that Mr. Lackner noted in his testimony that he would never have thought of race when switching the shifts. David Hunter says that he's unaware of any racial tensions. And, again -- and Mr. Pasley admits in his depositions that he had a cordial or friendly relationships with Mr. Coffin, the former group leader, and Mr. Lackner prior to him realizing that his -- that he was marked not ready for advancement. It's just that he was upset about that. There is nothing in the record that there was racial discrimination in those decisions.**

**THE COURT: So one thing, and I -- before I end up ruling on this motion, I am going to read a bunch of Eleventh Circuit cases to see how the standard applies at summary judgement. But it's a convincing mosaic, the standard, so I think, like, an unconvincing mosaic would not be enough. But I am still trying to map out in my mind, like, how little**

evidence is enough and how much is enough. And maybe you can point me to one or two cases where you think they had more evidence than Mr. Pasley has but the Eleventh Circuit still said it was not enough. And -- because it's -- you have got this negligence analogy in Judge Tjoflat's decision, and I can, sort of, envision how you would lose a case at summary -- how Plaintiff would lose a case at summary judgement on negligence theory because you can just look at the evidence and say this clearly isn't enough because here is the irrelevant evidence about duty or whatnot.

But when we're talking about, sort of, intent and just how you, sort of, read somebody's, sort of, inner motivations, that just is harder for me to conceive, like, how much evidence is enough to get there -- right -- and how it works. If you come back with all of this other evidence and I agree, like you have got evidence that the teams are diverse. You have got some diverse members in leadership. You have got what seems like a pretty good record or at least an absence of a bad record for many years then how does that, sort of, fit into this whole mosaic as it were?

MR. BARNELLO: Your Honor, I understand. Yes. The -- simply -- nothing -- that has been a question of employment law for years and years and years. I mean, the main case for convincing mosaic back -- was the Smith v. Lockheed-Martin case, and that's the case that's cited every time subsequently

by district courts and the Eleventh Circuit. And, I mean, if you look at how much evidence was required to make a convincing mosaic in Smith v. Lockheed-Martin, that's kind of the path -- there was a well-documented history of racial tensions in that facility that led to a shooting -- a race-based shooting. And then, it's a reverse discrimination case, and you had proof of the employer, when they were making disciplinary decisions, marking whether or not the employee was White or Black when they made those decisions. And there's three or four other instances of what created that convincing mosaic.

THE COURT: And that would be a good case as to what is enough. But, like, I think from -- what would be most helpful for me to get from you would be, like, what was not enough? And then, why was -- why is Pasley on, sort of, that side of the ledger.

MR. BARNELLO: Yeah, there's -- Your Honor, I can't point to a specific case that's not enough because there's just a plethora of those cases that are not enough. And what the argument here is is just that there is no evidence of race discrimination or racial intent here. It's -- again, it is the plaintiff's burden at summary judgement to point to that evidence in the discriminatory -- or in the record -- Rule 56 record of discriminatory intent, and it's lacking here. I mean, even after Ismael when there has been about a couple of dozen cases, you can still see that the district courts haven't

**changed their mindset on how they look at these cases. They look at the prima facie case and once they determine that the plaintiff has or hasn't met the prima facie case and/or there has been a legitimate reason without pretext, they go to the convincing mosaic. So while I can't point to a specific case, it's just because there's so many where it isn't enough, and that's what this case is more like where it isn't enough.**

**And, Your Honor, so that is the argument wrapped around here for the race discrimination portion of it is that, one, Mr. Pasley withdrew himself. So there can't be intent to racially discriminate when he's the one who withdrew from consideration. Two, that Mr. McRee and then subsequently Mr. Stone were more qualified and no reasonable -- or not one reasonable person could say otherwise. And then, three, there simply is a dearth of or lack of racial intent as admitted to by the plaintiff in his deposition and shown by the depositions of not only the recommending group leader but the subsequent group leaders of the same protected class of Plaintiff.**

**So then, we can turn to, Your Honor, maybe the best question for me, do you want to return to retaliation on race, or do we move to ADA discrimination?**

**THE COURT: Just very briefly touch on ADA, because I will have -- I want to make sure I have a little time to ask questions of Ms. Palmer. But we will need to sort of stop the hearing a little bit after 2:00. So I want to make sure**

there's enough time.

MR. BARNELLO: Okay. If you don't mind if I can just put my phone out to see the time.

So, yes, we will turn to the ADA now, and the ADA is an even simpler disposition here because it is both procedural and substantive. The procedural here is that Plaintiff's failed to exhaust their ADA case both for the failure to promote and the STD benefits because it wasn't included in a charge that was filed within 180 days.

THE COURT: All right. Well, look at the two pages there. I think it's 44 and 45 of one of the document numbers. And I will have some questions for Ms. Palmer about that. I mean, I know the case law looks a lot at the facts that are alleged rather than the legal issues. But it's a little -- I mean, there's nothing at all touching on disability in those two pages of the complaint. That raises some serious problems. And then, I think, even if you did take it, there are -- I think there's some additional retaliation arguments when it comes to disability that would be based on things that came after the EEOC complaint, and it would be hard to say that the EEOC could look into that because it was never brought to their attention because it happened later; right?

MR. BARNELLO: Correct. Not only that it happened later but even the allegations from prior, before the EEOC complaint, those weren't timely exhausted. The case law is

**clear that you can't look into an unverified intake questionnaire from the EEOC, and the plaintiff is asking this Court to expand further what's already not allowed into intake interviews, Your Honor.**

**So -- and that's just, like I just mentioned, is not permitted in the case law and shouldn't be permitted as it would -- as one court said, it would just complete -- like be violative of the administrative exhaustion and the EEOC's role.**

**THE COURT: One question. Pasley reported -- from Pasley's opposition brief, that he reported to HR, Lackner, and others that he was only removing his name because Lackner was making him change shifts and that his psychiatrist that treats his PTSD believes that the mind games would exacerbate his condition. Why isn't that enough to request an accommodation?**

**MR. BARNELLO: Your Honor, two points there. First, he didn't mention that until the written report, I believe that is June -- that email is June 23rd, whereas he was asking Mr. Lackner to move on the 21st and 22nd. He hadn't mentioned PTSD at all. The decision was already made, as long as he put it in writing.**

**Second, he's just -- he's not -- in that email, Mr. Pasley doesn't relate his PTSD symptoms to needing to move for the -- or to -- for the promotion process, just that he's needing to be moved. And that's exactly what Mercedes did. They -- he asked to go from B shift to A shift, and that's what happened.**

**The went from B shift to A shift. Mr. Pasley doesn't ask for an accomodation related to the promotion process.**

**And the law is clear that -- on a couple of sub-points here, first, that the employers need to -- or employers' requirement to engage in the interactive process isn't triggered until a request for accommodation is made, and two, if the employee is not satisfied with the accommodation or if that accommodation wasn't a reasonable accommodation, the employee has the obligation to come forward to the employer. And that never happened in this case either.**

**Simply put, there is no report of a -- an accomodation request. And that goes also to the race as well in the sense of there was no protected activity including race. It's very clear. And if we go back to -- for both race and disability, they're Exhibits 1 and 2 to the plaintiff's deposition. They're Docs. 26-2 on pages 2 and pages 6. Those are the complaints that were made to HR. They're signed off by Mr. Pasley, both. And one is a statement, and one is his team member comments and what he is formally complaining about. He had the opportunity to even check boxes that say race and disability and chose not to. And he had the opportunity to say that race and/or disability were --- in his comments or his statement, and he doesn't. Simply put, there was no complaint about race or disability by Mr. Pasley, and since there's no protected activity, there can be no subsequent retaliation**

claim because that's an essential element.

So but furthermore, also, even if that were a request for an accommodation or if Mr. Pasley has a disability as recognized under the ADA, again, Plaintiff has that burden as well to point to evidence in the summary judgement record that there is a substantial limitation on major life activity, not just that you have a condition.

THE COURT: Yes. And I am going to have some questions for Ms. Palmer about that. If -- let's see. I may give you one more minute --

MR. BARNELLO: Okay.

THE COURT: -- to wrap up, and then, I would like to make sure I give her plenty of time.

MR. BARNELLO: Yes, Your Honor. So just very quickly then is that even if there were all of these -- the other criteria, Mr. Pasley -- all of the legitimate reasons reach back from the race portion to the accommodation or the -- sorry -- the failure to promote that the individuals were more qualified for the position.

And then, when you get to the second thing, the short-term disability denial, there's once again, no evidence of disability discriminatory intent. Ms. McAbee simply followed the policy that Mercedes has that -- and her good faith belief there was not enough objective medical documentation. And that's it. I mean, Mr. Pasley complains that he didn't receive

the email, but he also didn't have the Kronos app. He could have called the office if he had a complaint. But all of those are moot points because it's simply that Ms. McAbee, as the representative there, just chose or made the good faith decision that there was not enough objective medical documentation, Your Honor.

THE COURT: Okay.

MR. BARNELLO: Thank you.

THE COURT: Thank you.

MS. PALMER: Good afternoon, Your Honor.

THE COURT: Good afternoon, Ms. Palmer.

MS. PALMER: First, I want to say that the defendant is correct. Ismael changes nothing about the law, but what Ismael did do is create a roadmap, as requested by Justices Gorsuch and Thomas, to tell our district courts how to handle evidence under Rule 56. Just because there are prior opinions that viewed it differently or that called it a convincing mosaic or that rejected cases does not mean that that's how we have to continue going forward.

Judge Tjoflat -- as defense counsel was talking about Smith versus Lockheed, Judge Tjoflat authored Smith versus Lockheed. He also authored Ismael. And I could imagine Judge Tjoflat sitting in the court, what, some 20 years after Smith versus Lockheed, pulling his hair out and saying, I have been trying to tell you how to reconcile Rule 56 in employment

cases, and you're still not listening. So let me give you a map. That's what we have here, Your Honor.

Unfortunately, I have some experience with convincing mosaic. I argued Berry. We'll pretend that that didn't happen. But I would say looking even at that case, Judge Abudu, in that one, issued a dissent that discussed the issue with looking at pretext, if you're not applying McDonnell Douglas and still looking at pretext and how you then get to the same result when you shouldn't because the evidence can be viewed differently. So I believe that the Court is trying to right the wrong.

I think Judge Newsom, in his concurrence with Tynes, outlines why he would rely on the convincing mosaic over McDonnell Douglas. And I do wonder if we, maybe one day, will get him to discuss that it's not even a convincing mosaic. It's just some evidence. If you look at the plain language of Rule 56, that's the answer. Is there evidence --

THE COURT: Help me think about this. If -- so let's say all we had in here was like the cell phone incident and Lackner, sort of, just being disagreeable in a few instances and then Pasley noting that Lackner's White and that he's Black. Like, is that enough?

MS. PALMER: If that was all we had, Your Honor, I would not be standing in front of you.

THE COURT: And then, I -- where I'm trying to go is

**like --**

**MS. PALMER: How much is enough.**

**THE COURT: -- a little more and a little more and a little more until I can find the tipping point.**

**MS. PALMER: Yes, sir.**

**THE COURT: And then, let's say we get to the tipping point where there might be enough but then Mercedes comes back with evidence like they have with regard to the specialist, and only the specialist was, sort of, qualified for the specialist team lead job. And if we didn't know that and we had this evidence, you might think, well, this White employee got promoted, the Black employee did not, maybe race was afoot because of the cell phone incident, the union documentation, et cetera. But then you learn that, well, actually he has the special training that makes him uniquely qualified. Like, at that point, would that be enough for the defendant to win as to that sort of claim at summary judgement? Or do we still have to take that to a jury? Help me think about that.**

**MS. PALMER: Right. So this is actually an issue that we have been, kind of, batting around the Plaintiffs' Bar is, you know, the way that we look at it, of course, we have always been arguing there should be no summary judgement in employment cases because you're dealing with intent. But, we do recognize that when we have those rare instances where they say, oh, I have been discriminated against because of my race.**

Okay. What evidence do you have?

Well, I'm White, and they're Black.

That's not enough. We will give you that.

But when you start compiling it all together, it maybe paints a picture. And the issue then becomes, if it paints a picture that any reasonable person could infer that it is because of race, then it has to go to a jury.

Does a jury look at it and say Mr. Stone was more qualified because he was a specialist? Possibly. But they might also say, what I would plan to argue, is that it wasn't even about the specialist position. It was about creating a position for the only other White candidate. So it depends on, kind of, how you look at it and how you paint the evidence. We have not ever argued Mr. Pasley was entitled to the promotion to the specialist position. That wasn't even a job he applied for. That job did not exist when he went on medical leave. Mercedes didn't follow their standard promotion process to create that position. So we believe that it could paint a picture that they created it to ensure that they continued to get the racial leadership. And then --

THE COURT: Help me think about that. Like, they create that position that he's not qualified for and a White employee fills it. Like, where is the evidence of race discrimination at all in that, first? And then secondly, where is the -- where is the harm to Pasley?

MS. PALMER: Okay. So standing alone there wouldn't be evidence of race discrimination. What we learned afterwards and through discovery is that Mr. Stone is no longer in that position, because that position was, again, recategorized. And we would argue that it is because they didn't follow the process, and by not following the process, they bypassed more senior African-American men who didn't have a chance to apply, because they didn't know there was a job.

So we would put all of that together, but the harm to Mr. Pasley comes more in not particularly that position but in putting it all together as a whole. And looking back at my complaint, I probably should have alleged a retaliatory hostile work environment, but I didn't. So we will go with that, but, you know, we are not saying he should have had that position. We are saying that can be further evidence that the initial position that he was qualified for was determined in a racial manner.

THE COURT: Okay. And help me think about the, like, whether or not he was qualified. Because in -- one reason he didn't get, sort of, the peer review at the beginning was because he had been rated by Coffin as not ready -- right -- continue at current level. Like, how do I test that? Or, like, what evidence do you have to say, like, actually, no, he was qualified. We know it because X, Y, Z. I mean, help me with that because if he wasn't qualified --

MS. PALMER: Right.

THE COURT: -- if the only issue here was the specialist position -- and there's no allegation that he was qualified for that at all -- we probably don't have a case; right?

MS. PALMER: Exactly.

THE COURT: So how do we know he was qualified for the position that he did want that ultimately McRee got?

MS. PALMER: Yes. McRee received it. The answer there is simple. It's an inference that goes to the jury. Do I win the day on it? I don't know. I don't know if I do, but we have raised the question.

So we can look at things like Mr. Pasley's testimony is that when the previous promotion that Mr. -- I can't remember -- Mr. Oswalt received on the other shift came up, he was rated as ready at that time. He then testifies he did not receive another evaluation. Mr. Coffin never sat down with him to give him another evaluation. Mr. Coffin testifies different. That's not an issue for this Court. This becomes a genuine issue of fact for the jury to determine. I put forth to you that he wouldn't have put his name on the list for promotion if he thought he wasn't eligible for promotion, so that tells me that he's maybe more credible there. But we're not asking for credibility determinations at this point. This is Rule 56. That goes to a jury.

So if he was eligible for the Oswalt promotion and nothing changed and then he becomes ineligible for the second promotion, the question becomes why. And if the difference that we can point to is race --

THE COURT: All right. Well, what's your best evidence of that?

MS. PALMER: Of that it is race?

THE COURT: Because he wasn't the only person who was down rated by Coffin. There was another employee down rated who was White.

MS. PALMER: Right.

THE COURT: So why do we think -- I mean, it's not -- so it's not the case that only Black employees were down rated. So, I mean, it can't just be enough that there was a Black employee who was down rated and therefore it must have been because he was Black. I mean, so what is the best evidence that down rating was for a racial reason as opposed to any other reason?

MS. PALMER: So in addition to being down rated, he testified that -- and I believe we have some affidavit testimony as well -- that the prior group leader had taken Mr. McRee under his wing and was letting him act as the, sort of, the team lead and training him up that way. And then additionally, we have that there are no other, like, there is no racial diversity in team lead and up in the CMM department.

So I know the defendant argued that there is racial diversity. There is now. Was it a subsequent remedial measure? The group leader is now Black, but that didn't happen until after we started this litigation. So that combined, I believe, does raise an eyebrow, which is, I think, all we have to do. We don't have to prove anything.

THE COURT: But is that -- I mean, so, sort of -- well, I guess it's not disparate impact alone but, I mean -- yeah.

MS. PALMER: It gives us a lot of heartburn. I get it. We're so used to thinking a plaintiff has to prove certain things at summary judgement in an employment case because that's what we're used to. But when we take a step back and we look at these new cases that have come out clarifying the actual burden, that there isn't one, it's truly just a burden of production, and look at it in the similar view you would look at a, say, car wreck case with diversity. Is there a question that this did or didn't happen? And you asked earlier about, well, what if they come forward with evidence? So if they come forward with evidence and it becomes a who do you believe, that goes to the jury.

THE COURT: Right. But to go to your -- like to negligence, say I allege -- Plaintiff alleges, like, I purchased these -- like, I purchased this item, and I later used it, and it fell apart and I got hurt. Okay. State of the

claim, you get passed summary judgment -- or passed motion to dismiss but then evidence comes forward unrebutted, like, oh, when I sold it to them, I told them this was used, that it was likely to fall apart, that this is a great museum piece but isn't something you would want to use for building a house. And they said, I know, and then they took it, and they used the antique as the cornerstone of their home and the home falls down. I mean, summary judgement, I think I could grant that at that point on the negligence claim. So --

MS. PALMER: I would argue different, Judge. Maybe on some sort of intentional tort, fraud or something like that, but if it is true negligence, you're only looking at like what evidence do they have that they told them that? Is it their testimony? If that's all they have is their testimony that they told the purchaser, and then you have the purchaser saying they didn't tell me.

THE COURT: Right. Well, that's a credibility issue.

MS. PALMER: Right.

THE COURT: But I'm saying if there's unrebutted evidence from the defendant saying I told them all of this.

MS. PALMER: Then absolutely. Yeah, absolutely. Summary judgement granted.

THE COURT: Right. And, I mean, we've got at least some unrebutted evidence, like, the lack of racial complaints at this facility and for Mr. Lackner and some of the testimony

from your own client during the deposition. So, like, I think that it -- perhaps it makes the mosaic a little less convincing; right?

MS. PALMER: I don't think there's a lack of racial complaints at the facility, Your Honor. I think that if you look at the evidence as a whole, we do have the statements about the -- the union push and why they were pushing for a union. I think there's a question as to just generally the racial environment at Mercedes. But, again, you know, maybe it didn't flesh out in summary judgement.

There was another issue that you mentioned -- oh, the qualifications. So we look at Mr. Oswalt who got the promotion to the other shift. The record is bare as to whether he was senior or not. We do know that he was the only person on his shift that put in for the job. He's a White male. But was he more senior? I don't know. I can't stand here and argue that he was. But if he was more senior and on that shift and got the job, then that further supports our premise that seniority should have been a factor, and if seniority should have been a factor and it was turned away from, that can also support the racial allegations.

THE COURT: Okay. Something that Mercedes brought up a lot earlier, like, the fact that -- Pasley or Pasley?

MS. PALMER: Pasley.

THE COURT: Pasley.

MS. PALMER: I say it wrong every time.

THE COURT: Okay. Ms. Pasley withdrew his name from consideration for promotion, I mean, why does that not end his failure to promote claim?

MS. PALMER: I think our cases are distinguished from the cases that the defendant cited, and I cited to that in our brief. Mostly because of the request for accommodation. I do read that email as a request.

THE COURT: That's for the ADA thing, but as a race, like on the race claim --

MS. PALMER: Right. You still have to look at it though if -- it is one of those, like, three-legged stools, right, like you can't look at one without the other. If you knock one leg out, does the other one fall? He requested an accommodation to be able to do his job. He was denied it. So because of that, because of his mental health, because of his disability, they made him withdraw his name. Mr. Lackner told him -- the conversation was not as cordial as it was presented here. The conversation was: Can I go back to my shift?

Denied.

That's it. And so he says in his email, as you have seen: I can't handle these mind games. It is affecting my PTSD. And so for his mental health and disability, he had to withdraw. The cases that Defendant cites to discuss that sometimes you do look at why they withdrew. One of the cases I believe there

were actually two claims, and one of them was a promotion that they did look at even though they withdrew their name -- and I may be conflating that with something -- a different argument. But it is not as cut and dry as he withdrew his name, that's it. They knew he was interested in the job. He had been interested in the job. He had applied previously to similar jobs. The only reason he withdrew his name is because they forced him, and that becomes a question for the jury.

THE COURT: And you would say there's evidence they forced him to withdraw because he was Black?

MS. PALMER: No. So there's evidence that they -- I hate to concede that point, but I will fall on my sword. There's evidence they forced him to withdraw because of his disability.

THE COURT: Okay.

MS. PALMER: But because they forced him to withdraw, it creates this issue with the promotion. And maybe it is that we don't have a failure to promote case with race. Maybe we only have a retaliation case with race. I don't know. I hope we have both. But if you were to ask me to choose one, I would choose the disability. I do think it is the stronger case. But I -- I don't think the race information is not there, but I could see how we get to more of a racial retaliation issue and not a racial failure to promote.

Now, the other stuff, though -- and again -- so maybe this

is the answer if you view it all together, we have got him being yelled out about the cell phone. We have got him being yelled at about the union papers. We have got him being spoken to curtly with things like denied. We have got him being moved to the other shift.

THE COURT: But as for adverse employment -- is that -- is that sufficient to establish the race discrimination claim or just the -- if you put it all together, it is retaliation?

MS. PALMER: It could be both. It could be both. So if he's the only person being spoken to this way -- and then, really, one of the key pieces of evidence here is when Mr. Lackner moved Mr. Pasley to B shift, he swapped him for some unknown reason with the only Black employee on B shift.

THE COURT: How many people are on B shift?

MS. PALMER: I don't want to misspeak, but I think, operator wise, maybe eightish.

THE COURT: Okay.

MS. PALMER: Ninish. And the A shift was, from what I recall -- and I do believe it is in the record, and I am happy to find it and supplement --

THE COURT: I understand it is about 50/50.

MS. PALMER: Right. The A shift was about 50/50, and on B shift, it was only Mr. Acoff, and for some reason, they moved Mr. Acoff to A shift and Mr. Pasley to B shift. His

argument to a jury would be that that was to isolate him, make him the only Black operator, and -- and I think that's further support of the retaliation but also could be race.

THE COURT: Okay. Let's see. So -- I am really trying to figure out the -- well, the adverse employment actions, like when it comes to the Count 1 race discrimination -- so perhaps failure to promote but maybe not, and then marking him not ready for the next level on evaluations, I am seeing that here. Transferring him to the other shift, that's -- where he was the only Black employee. Do you mean transferring him to B was the problem or transferring him to B and taking off the one other Black employee who had been on the B shift?

MS. PALMER: It is they swapped them.

THE COURT: Okay. So they swapped him.

MS. PALMER: So they transferred him to B and transferred Mr. Acoff to A.

THE COURT: And then, let's say that's the one thing that went on -- I am not saying that's how it would go, but, like, if you have got declaratory injunctive relief -- well, it wouldn't be the damages there for being swapped -- one Black employees for another on B shift.

MS. PALMER: Right. So I think that's where Muldrow comes in. Generally, that might not been enough, but under Muldrow, all you have to show is some harm. And Mr. Pasley

**will testify, and did testify, to the harm that he suffered being taken away from his structure, being taken away from his coworkers that he was used to, and being put over here isolated by himself.**

**THE COURT: Okay. But you are saying that the move -- the problem wasn't that he was moved to B, the problem was that when he was moved to B that particular employee was swapped out?**

**MS. PALMER: It is both.**

**THE COURT: Okay.**

**MS. PALMER: So the move in and of itself was an issue. That's not something that Mercedes generally does, and it's definitely not something that Mercedes would have done to the most senior employee. They didn't even look at moving anyone else. They only moved Mr. Pasley. So the move itself can be adverse, and then we add to that the race of the person he was swapped with. That's what supports our race claim. So the move is the adverse action. What supports the race claim is the race of the person he was swapped with.**

**THE COURT: Okay.**

**MS. PALMER: And what are the damages there? Emotional distress, and that's to a jury to prove some harm or for him to prove some harm.**

**THE COURT: Okay. And something that was in the -- in your responses, ECF page 35, said that Mercedes-Benz argued the**

incorrect legal standard for retaliation cases and ignores the evidence, attempting to hold Pasley to a higher bar than required by our courts.

First, MBUSI alleges Pasley cannot prove he engaged in protected activity prior to his EEOC charge. Perhaps MBUSI is correct with regard to race.

Can I take that as a concession that, like, Pasley has not introduced evidence that he engaged in protected activity prior to his prior activity with regard to race before the EEOC charge?

MS. PALMER: Correct, with regard to race. We believe there is record evidence regarding the disability claims that goes beyond his email. He testified that when he spoke to the two HR employees he detailed his disability verbally with them. So that evidence would stand as regards to his disability, but the first mention of race, we'll concede, would have been the EEOC charge.

THE COURT: Okay. What's the best evidence that his PTSD substantially limits major life activities? All right. What are the major life activities that are substantially limited?

MS. PALMER: So I don't want to misspeak, and I know I put it somewhere in the brief. But it is in his medical records, which are part of the record. And I am happy to supplement with the page numbers of that. But he filled out

**his FMLA paperwork and his short-term disability paperwork. And those read together show that he definitely had a problem with emotional disregulation. He had a problem concentrating. He was needing to go through a medication trial. That's why he needed time off. The ability to -- I think I said concentration already. So concentration, interacting with others, communicating, all of those things are substantial activities -- well, I'm sorry -- substantially limit -- because he was substantially limited in those activities, he has shown all that's required under the amended ADA to get past this hurdle.**

**Like, I recognize that, no, it is not a statutory disability. It is not listed like cancer and some of the other ones. But he put in the evidence, and Mercedes is well aware of the effect that his PTSD had on him, especially given his need to take 12 weeks off of work for it or eight weeks, whatever it ended up being.**

**THE COURT: Okay. On the, sort of, request for accommodation point, when it comes to the ADA, like, he needs to show that Lackner knew; correct?**

**MS. PALMER: No.**

**THE COURT: No?**

**MS. PALMER: No. He need only show that the defendant was aware that he gave them enough information to put them on notice. He testified that he did that, that he spoke to HR**

about it. HR, instead of doing anything about it, tells Mr. Lackner to decide what to do about it. So Mr. Lackner says, I will move you back if you withdraw your name. So he sends this email at which time they all become aware -- Mr. Lackner included -- and no one from Mercedes, in receipt of this email, reaches out and says, okay, this is a disability. This is a request for accommodation. What do we do from here?

Instead, I believe his testimony was that Ms. McAbee -- no, whoever the HR employee was -- reached out to him -- it's in -- I'm sorry -- it is in the record evidence. I don't think he testified to it, but it is in the -- in his deposition documents -- that the HR individual reached out to him to discuss with him sending an email like that to everyone. And that's it. They -- at that point, the entirety of his management structure became aware of his disability and his request for an accommodation which can be read multiple ways. He doesn't have to request a specific, magic word, accommodation.

THE COURT: Right. But if he says, I would like to get back to team A and he gets put back on team A, why is that not enough?

MS. PALMER: If he will remove his name from the promotion list. They conditioned his accommodation on his removal.

THE COURT: Right. Did he anywhere ask that he be

moved back to team A and continue to be considered for the team lead position?

MS. PALMER: He testified that he was not given the opportunity, that when he tried to discuss it with Mr. Lackner, he was denied the opportunity to discuss it. So then, he went to HR. And I think the record is a little fuzzy as to exactly what was discussed at HR. I know that they -- he says he discussed with them his disability. He discussed with them the issues he was having with Lackner, and he discussed with them the promotion process. So I think that, together, can be read to say, yes, he requested to be considered for promotion despite Mr. Lackner. But then, Mercedes turns it over to Mr. Lackner and says: What do you want to do?

Well, we need it in writing that he wants to withdraw.

So they conditioned any move on his withdrawal.

THE COURT: And the exhaustion point. I mean, we're just -- we're not relying on your amended EEOC complaint; right?

MS. PALMER: I don't think so, Your Honor. The amendment was nothing more than just clarifying the points.

THE COURT: Okay.

MS. PALMER: I actually, unfortunately, have a similar case up on appeal right now where we're looking at what is considered as far as the EEOC questionnaire. But in this case I don't think we even have to get to that question. The case

**law fully supports that the scope of a complaint is limited only by the reasonable investigation that could have occurred at the EEOC. We don't even have to assume what that is because we know. We have -- I am not looking at the EEOC questionnaire. I'm looking at the EEOC's interview notes. Those interview notes, taken by the investigator, support that they were aware of the disability allegations. They talked about his --**

**THE COURT: But does the case law allow us to look at the notes, or do we look at the charge of discrimination?**

**MS. PALMER: The case law allows us to look at the notes. It is what is reasonably expected to arise from the investigation. So we now know, because we have the EEOC notes, what the investigation was. That's all we are limited by is what would -- what would have been uncovered in a reasonable investigation.**

**And then, as far as the retaliation that occurred after the charge, that would be covered under the Gupta case, the Fifth Circuit 1981 -- of course, I can't find it now that I need it -- Gupta versus East Texas State University, 654 F.2d 411, Fifth Circuit, 1981. In that case, the Fifth Circuit, which as been adopted by the Eleventh, says that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge of discrimination because of the ancillary jurisdiction.**

So we are not dealing with a statute of limitations issue here. This is something that can be subject to equitable tolling and things like that. And so it's reasonable to assume that the continued retaliation that occurred after he filed his charge arose from the charge and is all encompassed in the same thing up to and including what's happening to him today.

THE COURT: I am just looking through my notes.

MS. PALMER: Do you want me to address any of the motion to strike or --

THE COURT: Yeah. So if we have taken a lot of that off of the table, do you have anything specifically you want to address as to --

MS. PALMER: I'm pretty confident in the briefs, Your Honor, except to say that, you know, none of the information put forth is there to prove the truth of the matter asserted. It is -- you know, Your Honor's well aware of what you can and can't consider. Just because it's hearsay now doesn't mean it may be hearsay then, and we're not conceding that any of it is necessarily even hearsay.

Some of it goes to Mr. Pasley's state of mind. Some of it may go to whether he was reasonable in believing there was a race discrimination claim which, you know, could arise later on in the retaliation issues. You know, he has to have a reasonable belief in order for there to be a retaliation claim. So a lot of that information is just background information

that shows, sort of, the environment and -- that Mr. Pasley was working with and what he was aware of as he himself is determining whether there's race or disability discrimination.

If you have any specific questions about any of the statements, I am happy to address them. But it was kind of just a general objection to all of it. So --

THE COURT: We will look at it very closely before --

MS. PALMER: Okay. And if you have anything -- you know, if you want any supplemental briefing, I'm happy to do that. Was there anything specific in the record? I didn't make any notes of you requesting me to find a particular piece of the record, but I'm happy to do that if there's anything that you need.

THE COURT: I think -- I mean, you know, I am going to be looking closely at the standard for, like, significantly limiting major life events or the disability standard and, sort of, the best evidence of that. Because, I mean, I think there's a lot of -- I mean, in the background section of your brief, you've got all of the citations but then sometimes there are some bullet points that are later in the argument section, and it is not as clear where some of that evidence is. And so I'll be looking to see if those, sort of, correspond to something in the background where you are pointing to --

MS. PALMER: Okay. And I'm happy to amend that. We tend to run out of pages when we put the citations in both

sections. This point and counter-point kills me. But I'm happy to submit to Mr. Lucas and to the Court just outlining each of those bullet points without argument in the record if that would assist.

THE COURT: Okay. And then, okay, is there any -- do you have any evidence in the record that Lackner was aware of Pasley's EEOC charge when Lackner evaluated Pasley as not ready or told him to remove the union pamphlets from his desk?

MS. PALMER: Yes. So the biggest piece of evidence there is that when Mr. Lackner met with Mr. Pasley after he filed his EEOC charge, he had another employee sit in, a former HR employee, and he told Mr. Pasley that was for legal purposes. It's not generally something you do. It wasn't something he had done. And, you know, that is, I believe, proof that he knew.

Additionally, though it didn't get fleshed out in the record, everybody knew. Everybody knows. It's -- it's not a secret. So -- well, and I guess arguably it did get a little fleshed out in the record because during the deposition period, Mr. Pasley experienced some specific retaliation. So, yeah. I don't think -- I don't think there's a question that Mr. Lackner knew. I think that's kind of a disingenuous argument given that there's no evidence that he didn't know.

THE COURT: Okay. And then, let's see. I mean, he wasn't disciplined for cell phone use; right? So why would

**that be an intangible employment action?**

**MS. PALMER: Right. So he wasn't disciplined. He testified -- of course, the versions are very different, but he testified that he was screamed at and that it made him emotional and that he had to leave the room to, kind of, regulate himself again, and that he's watching all of the White employees around him not be screamed at for the same thing. Everybody is on their phone. Everybody has got music going on their radios. He's the only one that was treated that way. And in combination with that, they rotate around these plates, and whenever he was on the one closest to the office, he testified that Mr. Lackner would shut the door, slam the door because he didn't want to hear his voice.**

**So it all goes, kind of, into this culmination of, like, why was he believing that it was race discrimination? Why was he feeling targeted by Mr. Lackner? Again, he wasn't disciplined for it. Did he suffer financial harm from it? No. But that's not the standard. It doesn't have to be financial harm. It just has to be some harm, and his testimony supports the emotional -- emotional distress.**

**THE COURT: Well, there has to be adverse employment action, though; right? So there might be evidence that some other adverse employment action was on account of race, but that standard alone wouldn't state a claim, would it? I mean, unless you could show -- maybe for retaliation because I know**

the standard is a little lower there. But --

MS. PALMER: I think that's a hard question to answer. That, standing alone, if the only evidence that Mr. Pasley had was that he had been screamed at one time about his cell phone and it caused him emotional harm, I would not bring that claim. I'm not saying it doesn't exist. But I can see --

THE COURT: But it sounds more like the beginning of a hostile work environment claim.

MS. PALMER: It does. It does.

THE COURT: That you don't have in this case.

MS. PALMER: It does. And I do see the error of my ways in that I should have pled a retaliatory hostile work environment. I could make a motion to amend to conform to the evidence, but summary judgement is not the proper place to do that.

So, yes, I will fall on my sword and concede that if that were his only evidence, that would not be enough.

THE COURT: All right. Well, thank you very much.

MS. PALMER: Thank you.

THE COURT: Two minutes?

MR. BARNELLO: That works, Your Honor.

THE COURT: Great.

MR. BARNELLO: All right. I will try to -- I am raised by a northerner and a southerner, so I will try to go with the fast northern talk with the two minutes, Your Honor.

But just a couple of points, Your Honor, from what Ms. Palmer said there. First, what the standard, Ismael states in itself that it still remains the burden of the plaintiff to point to evidence of Rule 56 record establishing affirmative case -- their affirmative case that there is a connection between an adverse employment action and a legal discrimination. I mean, I recall Judge Proctor, just last week, has issued two cases -- I don't know their names off the top of my head -- granting summary judgement after Ismael. It's the exact same kind of analysis that he would use before -- I'm a former clerk -- and his -- the -- and in those cases, there was no convincing mosaic. We can also supplement with further cases showing which cases there is and isn't a convincing mosaic, if that would help Your Honor.

Second, the investigation -- EEOC's investigation is limited by the scope of the charge. This is shown by the Supreme Court in the EEOC versus Shell Oil Company. It's a 1984. And here, I mean, the EEOC maybe investigated after the amended charge, but, again, there's just -- you can't -- the case law is very clear that you can't use the interview or an intake questionnaire that's unsigned and besides an intake interview is going even further.

And again, Mr. Stone, like you mentioned, Your Honor, he was marked not ready. The whole process started over. That's a moot point. He was evaluated. Mr. Pasley -- Pasley took

**himself out of consideration. The cases, again, make that point. The one case that Ms. Palmer was -- mentioned -- I believe it was the first case we mentioned. It's Jones v. -- let's see -- yeah -- well, I can't recall the case. Oh, here it is. It's Young versus International Paper. He had multiple -- the plaintiff there was bringing multiple failure to promote claims, and the Court took out the analysis claim by claim. And the claim in which he withdrew, the plaintiff withdrew, that was the end of that. There was other claims that -- other promotions that the Court looked into.**

**And once again, Your Honor, if you have any questions, I will be happy to answer them.**

**THE COURT: Great. I think that's it for now. I think I have got some reading to do. This has been really helpful, and I appreciate the great work from both sides. So thank you-all.**

**MS. PALMER: Your Honor, did you want me to supplement with the bullet point record cites?**

**THE COURT: Yeah, that would be helpful.**

**MS. PALMER: Okay. I will send it to you guys as well before I send it in, but it won't be any argument. It will literally just have those bullet points with the record citation.**

**THE COURT: That would be great. Thank you.**

**MR. BARNELLO: And, Your Honor, we can submit cases**

**for that argument as well to the convincing mosaic if that would be helpful.**

**THE COURT: Sure. I will take it. I think it would be helpful. Thank you-all.**

**MS. PALMER: Thank you.**

**MR. BARNELLO: Thank you.**

**(Proceedings concluded at 2:12 p.m.)**

**C E R T I F I C A T E**

**I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.**

**Dated: 6/10/2026**

**Kelli M. Griffin, RPR, CRR**

**CERTIFICATE OF SERVICE**

I hereby certify that on November ___, 2026, I electronically filed the foregoing Appellant's Appendix with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Joseph Barnello, Jr.
Michael L. Lucas
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
jbarnello@burr.com
mlucas@burr.com

I further certify that paper copies of this Appendix will be sent to the Clerk as directed by 11th Cir. R. 30-1.

/s/ Leslie A. Palmer
Leslie A. Palmer
*Counsel for Plaintiff-Appellant*